# McCONNELL, UNITED STATES SENATOR, et al. v. FEDERAL ELECTION COMMISSION et al.

No. 02–1674. Argued September 8, 2003—Decided December 10, 2003*

---

*Together with No. 02–1675, *National Rifle Association et al.* v. *Federal Election Commission et al.,* No. 02–1676, *Federal Election Commission et al.* v. *McConnell, United States Senator, et al.,* No. 02–1702, *McCain, United States Senator, et al.* v. *McConnell, United States Senator, et al.,* No. 02–1727, *Republican National Committee et al.* v. *Federal Election Commission et al.,* No. 02–1733, *National Right to Life Committee, Inc., et al.* v. *Federal Election Commission et al.,* No. 02–1734, *American Civil Liberties Union* v. *Federal Election Commission et al.,* No. 02–1740, *Adams et al.* v. *Federal Election Commission et al.,* No. 02–1747, *Paul, United States Congressman, et al.* v. *Federal Election Commission et al.,* No. 02–1753, *California Democratic Party et al.* v. *Federal Election Commission et al.,* No. 02–1755, *American Federation of Labor and Congress of Industrial Organizations et al.* v. *Federal Election Commission et al.,* and No. 02–1756, *Chamber of Commerce of the United States et al.* v. *Federal Election Commission et al.,* also on appeal from the same court.

96

98

100

102

104

106

108

STEVENS and O'CONNOR, JJ., delivered the opinion of the Court with respect to BCRA Titles I and II, in which SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., delivered the opinion of the Court with respect to BCRA Titles III and IV, in which O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined, in which STEVENS, GINSBURG, and BREYER, JJ., joined except with respect to BCRA §305, and in which THOMAS, J., joined with respect to BCRA §§304, 305, 307, 316, 319, and 403(b), *post*, p. 224. BREYER, J., delivered the opinion of the Court with respect to BCRA Title V, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined, *post*, p. 233. SCALIA, J., filed an opinion concurring with respect to BCRA Titles III and IV, dissenting with respect to BCRA Titles I and V, and concurring in the judgment in part and dissenting in

part with respect to BCRA Title II, *post*, p. 247. THOMAS, J., filed an opinion concurring with respect to BCRA Titles III and IV, except for BCRA §§ 311 and 318, concurring in the result with respect to BCRA § 318, concurring in the judgment in part and dissenting in part with respect to BCRA Title II, and dissenting with respect to BCRA Titles I, V, and § 311, in which opinion SCALIA, J., joined as to Parts I, II–A, and II–B, *post*, p. 264. KENNEDY, J., filed an opinion concurring in the judgment in part and dissenting in part with respect to BCRA Titles I and II, in which REHNQUIST, C. J., joined, in which SCALIA, J., joined except to the extent the opinion upholds new FECA § 323(e) and BCRA § 202, and in which THOMAS, J., joined with respect to BCRA § 213, *post*, p. 286. REHNQUIST, C. J., filed an opinion dissenting with respect to BCRA Titles I and V, in which SCALIA and KENNEDY, JJ., joined, *post*, p. 350. STEVENS, J., filed an opinion dissenting with respect to BCRA § 305, in which GINSBURG and BREYER, JJ., joined, *post*, p. 363.

*Kenneth W. Starr* and *Floyd Abrams* argued the cause for plaintiffs below, Senator Mitch McConnell et al., appellants in No. 02–1674 and cross-appellees in Nos. 02–1676 and 02–1702. With them on the briefs were *Edward W. Warren, Susan Buckley, Brian Markley, Kathleen M. Sullivan, Valle Simms Dutcher, L. Lynn Hogue, Jan Witold Baran, Lee E. Goodman, G. Hunter Bates, Jack N. Goodman,* and *Jerianne Timmerman.*

*Bobby R. Burchfield* argued the cause for the political party plaintiffs below. With him on the briefs for the Republican National Committee et al., appellants in No. 02–1727, the California Democratic Party et al., appellants in No. 02–1753, and the Libertarian National Committee, Inc., one of the appellants in No. 02–1733, were *Thomas O. Barnett, Robert K. Kelner, Richard W. Smith, Lance H. Olson, Deborah B. Caplan, Joseph E. Sandler, John Hardin Young, Charles H. Bell, Jr., Jan Witold Baran, Lee E. Goodman, Thomas J. Josefiak, Benjamin L. Ginsberg, Eric A. Kuwana, Michael A. Carvin, James Bopp, Jr., Richard E. Coleson,* and *Thomas J. Marzen.*

*Solicitor General Olson* and *Deputy Solicitor General Clement* argued the cause for federal defendants below, the Federal Election Commission et al. With them on the briefs

were *Assistant Attorney General Keisler, Malcolm L. Stewart, Gregory G. Garre, Douglas N. Letter, Dana J. Martin, Terry M. Henry, Lawrence H. Norton, Richard B. Bader,* and *David Kolker.*

*Seth P. Waxman* argued the cause for the intervenor-defendants below, Senator John McCain et al. With him on the briefs were *Randolph D. Moss, Edward C. DuMont, Paul R. Q. Wolfson, Roger M. Witten, Burt Neuborne, Frederick A. O. Schwarz, Jr., Charles G. Curtis, Jr., David J. Harth, Bradley S. Phillips, E. Joshua Rosenkranz, Alan B. Morrison, Scott L. Nelson, Eric J. Mogilnicki, Michael D. Leffel, Fred Wertheimer, Alexandra Edsall,* and *Trevor Potter.*

*Laurence E. Gold* argued the cause for plaintiffs below, the American Federation of Labor and Congress of Industrial Organizations et al., appellants in No. 02–1755 and appellees in Nos. 02–1676 and 02–1702. With him on the briefs were *Jonathan P. Hiatt, Michael B. Trister,* and *Larry P. Weinberg.*

*Jay Alan Sekulow* argued the cause for plaintiffs below, Emily Echols et al. With him on the brief were *James M. Henderson, Sr., Stuart J. Roth, Colby M. May, Joel H. Thornton, Walter M. Weber, James Bopp, Jr., Richard E. Coleson,* and *Thomas J. Marzen.*

Briefs in No. 02–1675 were filed for appellants National Rifle Association et al. by *Charles J. Cooper, David H. Thompson, Hamish P. M. Hume, Brian S. Koukoutchos,* and *Cleta Mitchell.*

Briefs in No. 02–1733 were filed for plaintiffs-appellants/cross-appellees National Right to Life Committee, Inc., et al. by *James Bopp, Jr., Richard E. Coleson,* and *Thomas J. Marzen.*

Briefs in No. 02–1734 were filed for appellant American Civil Liberties Union by *Mark J. Lopez, Steven R. Shapiro,* and *Joel M. Gora.*

Briefs in No. 02–1740 were filed for appellants Victoria Jackson Gray Adams et al. by *John C. Bonifaz, Bonita P. Tenneriello, Lisa J. Danetz, Brenda Wright,* and *David A. Wilson.*

Briefs in No. 02–1747 were filed for appellants Congressman Ron Paul et al. by *William J. Olson, John S. Miles, Herbert W. Titus,* and *Gary G. Kreep.*

Briefs in No. 02–1756 were filed for appellants Chamber of Commerce of the United States et al. by *Jan Witold Baran, Lee E. Goodman, Stephen A. Bokat,* and *Jan Amundson.*†

---

†A brief of *amici curiae* urging reversal was filed for the Commonwealth of Virginia et al. by *Jerry Kilgore,* Attorney General of Virginia, and *Craig Engle,* and by the Attorneys General for their respective States as follows: *Lawrence Wasden* of Idaho, *Steve Carter* of Indiana, *Phill Kline* of Kansas, *Jon Bruning* of Nebraska, *Wayne Stenehjem* of North Dakota, *Jim Petro* of Ohio, *Henry McMaster* of South Carolina, *Larry Long* of South Dakota, and *Mark Shurtleff* of Utah.

Briefs of *amici curiae* urging affirmance were filed for the Center for Governmental Studies by *Richard L. Hasen;* and for Thomas D. Grant et al. by *Christopher J. Wright* and *Timothy J. Simeone.*

Briefs of *amici curiae* were filed for the State of Iowa et al. by *Thomas J. Miller,* Attorney General of Iowa, and *Thomas Andrews,* Assistant Attorney General, *William H. Sorrell,* Attorney General of Vermont, and *Bridget C. Asay,* Assistant Attorney General, and *Richard Blumenthal,* Attorney General of Connecticut, and by the Attorneys General for their respective jurisdictions as follows: *Terry Goddard* of Arizona, *Ken Salazar* of Colorado, *Albert B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Eliot Spitzer* of New York, *W. A. Drew Edmondson* of Oklahoma, *Anabelle Rodríguez* of Puerto Rico, *Patrick Lynch* of Rhode Island, *Christine O. Gregoire* of Washington, *Peggy Lautenschlager* of Wisconsin, and *Iver A. Stridiron* of the Virgin Islands; for the Allen Temple Baptist Church et al. by *Martin R. Glick;* for the American Civil Rights Union by *John C. Armor* and *Peter Ferrara;* for Bipartisan Former Members of the United States Congress by *Randy L. Dryer* and *J. Michael Bailey;* for the California Student Public Interest Research Group, Inc., et al. by *Bonita Tenneriello, John C. Bonifaz, Brenda Wright, Lisa J. Danetz,* and *David A. Wilson;* for the Cato Insti-

JUSTICE STEVENS and JUSTICE O'CONNOR delivered the opinion of the Court with respect to BCRA Titles I and II.*

The Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81, contains a series of amendments to the Federal Election Campaign Act of 1971 (FECA or Act), 86 Stat. 11, as amended, 2 U. S. C. § 431 et seq. (2000 ed. and Supp. II), the Communications Act of 1934, 48 Stat. 1088, as amended, 47 U. S. C. § 315 (2000 ed. and Supp. II), and other portions of the United States Code, 18 U. S. C. § 607 (Supp. II), 36 U. S. C. §§ 510–511 (Supp. II), that are challenged in these cases.[1]  In this opinion we discuss Titles I and II of BCRA. The opinion of the Court delivered by THE CHIEF JUSTICE, post, p. 224, discusses Titles III and IV, and the opinion of the Court delivered by JUSTICE BREYER, post, p. 233, discusses Title V.

---

tute et al. by *Erik S. Jaffe;* for the Center for Responsive Politics by *Lawrence M. Noble* and *Paul Sanford;* for the Committee for Economic Development et al. by *Steven Alan Reiss, R. Bruce Rich,* and *Jonathan Bloom;* for Common Cause et al. by *Donald J. Simon, Daniel B. Kohrman,* and *Michael Schuster;* for Former Leaders of the American Civil Liberties Union by *Norman Dorsen* and *Eric M. Lieberman;* for the Interfaith Alliance Foundation et al. by *Evan A. Davis;* for the League of Women Voters by *Daniel R. Ortiz;* for Delaware State Representative Michael Castle et al. by *Richard Briffault, Charles Tiefer,* and *Jonathan W. Cuneo;* for the Honorable J. Dennis Hastert by *J. Randolph Evans* and *Stefan C. Passantino;* for Dr. David Moshman by *Kevin H. Theriot;* for Norman J. Ornstein et al. by *Teresa W. Roseborough* and *Judith A. O'Brien;* for Rodney A. Smith by *Clark Bensen;* and for the Honorable Fred Thompson by *David C. Frederick.*

*JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join this opinion in its entirety.

[1] The parties to the litigation are described in the findings of the District Court.  251 F. Supp. 2d 176, 221–226 (DC 2003) *(per curiam).*  For the sake of clarity, we refer to the parties who challenged the law in the District Court as the "plaintiffs," referring to specific plaintiffs by name where necessary.  We refer to the parties who intervened in defense of the law as the "intervenor-defendants."

## I

More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contributions by corporations in order to prevent " 'the great aggregations of wealth, from using their corporate funds, directly or indirectly,' " to elect legislators who would " 'vote for their protection and the advancement of their interests as against those of the public.' " *United States* v. *Automobile Workers*, 352 U. S. 567, 571 (1957) (quoting E. Root, Addresses on Government and Citizenship 143 (R. Bacon & J. Scott eds. 1916)). In Root's opinion, such legislation would " 'strik[e] at a constantly growing evil which has done more to shake the confidence of the plain people of small means of this country in our political institutions than any other practice which has ever obtained since the foundation of our Government.' " 352 U. S., at 571. The Congress of the United States has repeatedly enacted legislation endorsing Root's judgment.

BCRA is the most recent federal enactment designed "to purge national politics of what was conceived to be the pernicious influence of 'big money' campaign contributions." *Id.*, at 572. As Justice Frankfurter explained in his opinion for the Court in *Automobile Workers*, the first such enactment responded to President Theodore Roosevelt's call for legislation forbidding all contributions by corporations " 'to any political committee or for any political purpose.' " *Ibid.* (quoting 40 Cong. Rec. 96 (1905)). In his annual message to Congress in December 1905, President Roosevelt stated that " 'directors should not be permitted to use stockholders' money' " for political purposes, and he recommended that " 'a prohibition' " on corporate political contributions " 'would be, as far as it went, an effective method of stopping the evils aimed at in corrupt practices acts.' " 352 U. S., at 572. The resulting 1907 statute completely banned corporate contributions of "money . . . in connection with" any federal election. Tillman Act, ch. 420, 34 Stat. 864. Congress soon amended

the statute to require the public disclosure of certain contributions and expenditures and to place "maximum limits on the amounts that congressional candidates could spend in seeking nomination and election." *Automobile Workers, supra,* at 575–576.

In 1925 Congress extended the prohibition of "contributions" "to include 'anything of value,' and made acceptance of a corporate contribution as well as the giving of such a contribution a crime." *Federal Election Comm'n* v. *National Right to Work Comm.,* 459 U. S. 197, 209 (1982) (citing Federal Corrupt Practices Act, 1925, §§ 301, 313, 43 Stat. 1070, 1074). During the debates preceding that amendment, a leading Senator characterized "'the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions'" as "'one of the great political evils of the time.'" *Automobile Workers, supra,* at 576 (quoting 65 Cong. Rec. 9507–9508 (1924)). We upheld the amended statute against a constitutional challenge, observing that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress." *Burroughs* v. *United States,* 290 U. S. 534, 547 (1934).

Congress' historical concern with the "political potentialities of wealth" and their "untoward consequences for the democratic process," *Automobile Workers, supra,* at 577–578, has long reached beyond corporate money. During and shortly after World War II, Congress reacted to the "enormous financial outlays" made by some unions in connection with national elections. 352 U. S., at 579. Congress first restricted union contributions in the Hatch Act, 18 U. S. C. § 610,[2] and it later prohibited "union contributions in connec-

---

[2] The Hatch Act also limited both the amount political committees could expend and the amount they could receive in contributions. Act of July

tion with federal elections . . . altogether." *National Right to Work, supra,* at 209 (citing War Labor Disputes Act (Smith-Connally Anti-Strike Act), ch. 144, § 9, 57 Stat. 167). Congress subsequently extended that prohibition to cover unions' election-related expenditures as well as contributions, and it broadened the coverage of federal campaigns to include both primary and general elections. Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 136. See *Automobile Workers, supra,* at 578–584. During the consideration of those measures, legislators repeatedly voiced their concerns regarding the pernicious influence of large campaign contributions. See 93 Cong. Rec. 3428, 3522 (1947); H. R. Rep. No. 245, 80th Cong., 1st Sess. (1947); S. Rep. No. 1, 80th Cong., 1st Sess., pt. 2 (1947); H. R. Rep. No. 2093, 78th Cong., 2d Sess. (1945). As we noted in a unanimous opinion recalling this history, Congress' "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,' to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *National Right to Work, supra,* at 209 (citations omitted).

In early 1972 Congress continued its steady improvement of the national election laws by enacting FECA, 86 Stat. 3. As first enacted, that statute required disclosure of all contri-

---

19, 1940, ch. 640, 54 Stat. 767. Senator Bankhead, in offering the amendment from the Senate floor, said:

"'We all know that money is the chief source of corruption. We all know that large contributions to political campaigns not only put the political party under obligation to the large contributors, who demand pay in the way of legislation, but we also know that large sums of money are used for the purpose of conducting expensive campaigns through the newspapers and over the radio; in the publication of all sorts of literature, true and untrue; and for the purpose of paying the expenses of campaigners sent out into the country to spread propaganda, both true and untrue.'" *United States* v. *Automobile Workers,* 352 U. S. 567, 577–578 (1957) (quoting 86 Cong. Rec. 2720 (1940)).

butions exceeding $100 and of expenditures by candidates and political committees that spent more than $1,000 per year. *Id.*, at 11–19. It also prohibited contributions made in the name of another person, *id.*, at 19, and by Government contractors, *id.*, at 10. The law ratified the earlier prohibition on the use of corporate and union general treasury funds for political contributions and expenditures, but it expressly permitted corporations and unions to establish and administer separate segregated funds (commonly known as political action committees, or PACs) for election-related contributions and expenditures. *Id.*, at 12–13.[3] See *Pipefitters* v. *United States*, 407 U. S. 385, 409–410 (1972).

As the 1972 Presidential elections made clear, however, FECA's passage did not deter unseemly fundraising and campaign practices. Evidence of those practices persuaded Congress to enact the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263. Reviewing a constitutional challenge to the amendments, the Court of Appeals for the District of Columbia Circuit described them as "by far the most comprehensive . . . reform legislation [ever] passed by Congress concerning the election of the President, Vice-President and members of Congress." *Buckley* v. *Valeo*, 519 F. 2d 821, 831 (1975) (en banc) *(per curiam)*.

The 1974 amendments closed the loophole that had allowed candidates to use an unlimited number of political committees for fundraising purposes and thereby to circumvent the limits on individual committees' receipts and disbursements. They also limited individual political contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by any contributor; imposed ceilings on spending by candidates and political parties for national con-

---

[3] As a general rule, FECA permits corporations and unions to solicit contributions to their PACs from their shareholders or members, but not from outsiders. 2 U. S. C. §§ 441b(b)(4)(A), (C); see *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 198–199, and n. 1 (1982).

ventions; required reporting and public disclosure of contributions and expenditures exceeding certain limits; and established the Federal Election Commission (FEC) to administer and enforce the legislation. *Id.*, at 831–834.

The Court of Appeals upheld the 1974 amendments almost in their entirety.[4] It concluded that the clear and compelling interest in preserving the integrity of the electoral process provided a sufficient basis for sustaining the substantive provisions of the Act. *Id.*, at 841. The court's opinion relied heavily on findings that large contributions facilitated access to public officials[5] and described methods of evading the con-

---

[4] The court held that one disclosure provision was unconstitutionally vague and overbroad. *Buckley* v. *Valeo*, 519 F. 2d 821, 832 (CADC 1975) (en banc) *(per curiam)* (invalidating 2 U. S. C. § 437a (1970 ed., Supp. V)). No appeal was taken from that holding. *Buckley* v. *Valeo*, 424 U. S. 1, 10, n. 7 (1976) *(per curiam)*.

[5] The Court of Appeals found:

"Large contributions are intended to, and do, gain access to the elected official after the campaign for consideration of the contributor's particular concerns. Senator Mathias not only describes this but also the corollary, that the feeling that big contributors gain special treatment produces a reaction that the average American has no significant role in the political process." *Buckley*, 519 F. 2d, at 838 (footnotes omitted).

The court also noted:

"Congress found and the District Court confirmed that such contributions were often made for the purpose of furthering business or private interests by facilitating access to government officials or influencing governmental decisions, and that, conversely, elected officials have tended to afford special treatment to large contributors. *See* S. Rep. No. 93–689, 93d Cong., 2d Sess. 4–5; Findings I, ¶¶ 108, 110, 118, 170." *Id.*, at 838, n. 32.

Citing further evidence of corruption, the court explained:

"The disclosures of illegal corporate contributions in 1972 included the testimony of executives that they were motivated by the perception that this was necessary as a 'calling card, something that would get us in the door and make our point of view heard,' *Hearings before the Senate Select Comm. on Presidential Campaign Activities*, 93d Cong., 1st Sess. 5442 (1973) (Ashland Oil Co.—Orin Atkins, Chairman) or 'in response to pressure for fear of a competitive disadvantage that might result,' *id.* at 5495, 5514 (American Airlines—George Spater, former chairman); *see* Findings I, ¶ 105. The record before Congress was replete with specific examples

tribution limits that had enabled contributors of massive sums to avoid disclosure. *Id.*, at 837–841.[6]

The Court of Appeals upheld the provisions establishing contribution and expenditure limitations on the theory that they should be viewed as regulations of conduct rather than speech. *Id.*, at 840–841 (citing *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968)). This Court, however, concluded that each set of limitations raised serious—though different—concerns under the First Amendment. *Buckley* v. *Valeo,* 424 U. S. 1, 14–23 (1976) *(per curiam).* We treated the limitations on candidate and individual expenditures as direct restraints on speech, but we observed that the contribution limitations, in contrast, imposed only "a marginal restriction upon the contributor's ability to engage in free communication." *Id.*, at 20–21. Considering the "deeply disturbing examples" of corruption related to candidate contributions discussed in the Court of Appeals' opinion, we determined that limiting contributions served an interest in protecting "the integrity of our system of representative democracy." *Id.*, at 26–27. In the end, the Act's primary purpose—"to limit the actuality and appearance of corruption resulting from large individual financial contributions"—pro-

---

of improper attempts to obtain governmental favor in return for large campaign contributions. *See* Findings I, ¶¶ 159–64." *Id.*, at 839, n. 37.

[6] The court cited the intricate scheme of the American Milk Producers, Inc., as an example of the lengths to which contributors went to avoid their duty to disclose:

"Since the milk producers, on legal advice, worked on a $2500 limit per committee, they evolved a procedure, after consultation in November 1970 with Nixon fund raisers, to break down [their $2 million donation] into numerous smaller contributions to hundreds of committees in various states which could then hold the money for the President's reelection campaign, so as to permit the producers to meet independent reporting requirements without disclosure." *Id.*, at 839, n. 36.

The milk producers contributed large sums to the Nixon campaign "in order to gain a meeting with White House officials on price supports." *Ibid.*

vided "a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.*, at 26.

We prefaced our analysis of the $1,000 limitation on expenditures by observing that it broadly encompassed every expenditure "'relative to a clearly identified candidate.'" *Id.*, at 39 (quoting 18 U. S. C. § 608(e)(1) (1970 ed., Supp. IV)). To avoid vagueness concerns we construed that phrase to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U. S., at 42–44. We concluded, however, that as so narrowed, the provision would not provide effective protection against the dangers of *quid pro quo* arrangements, because persons and groups could eschew expenditures that expressly advocated the election or defeat of a clearly identified candidate while remaining "free to spend as much as they want to promote the candidate and his views." *Id.*, at 45. We also rejected the argument that the expenditure limits were necessary to prevent attempts to circumvent the Act's contribution limits, because FECA already treated expenditures controlled by or coordinated with the candidate as contributions, and we were not persuaded that independent expenditures posed the same risk of real or apparent corruption as coordinated expenditures. *Id.*, at 46–47. We therefore held that Congress' interest in preventing real or apparent corruption was inadequate to justify the heavy burdens on the freedoms of expression and association that the expenditure limits imposed.

We upheld all of the disclosure and reporting requirements in the Act that were challenged on appeal to this Court after finding that they vindicated three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act. *Id.*, at 66–68. In order to avoid an overbreadth problem, however, we placed the same narrowing construction on the

term "expenditure" in the disclosure context that we had adopted in the context of the expenditure limitations. Thus, we construed the reporting requirement for persons making expenditures of more than $100 in a year "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80 (footnote omitted).

Our opinion in *Buckley* addressed issues that primarily related to contributions and expenditures by individuals, since none of the parties challenged the prohibition on contributions by corporations and labor unions. We noted, however, that the statute authorized the use of corporate and union resources to form and administer segregated funds that could be used for political purposes. *Id.*, at 28–29, n. 31; see also n. 3, *supra.*

Three important developments in the years after our decision in *Buckley* persuaded Congress that further legislation was necessary to regulate the role that corporations, unions, and wealthy contributors play in the electoral process. As a preface to our discussion of the specific provisions of BCRA, we comment briefly on the increased importance of "soft money," the proliferation of "issue ads," and the disturbing findings of a Senate investigation into campaign practices related to the 1996 federal elections.

## Soft Money

Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U. S. C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions.

As a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "nonfederal money"—also known as "soft money"—to political parties for activities intended to influence state or local elections.

Shortly after *Buckley* was decided, questions arose concerning the treatment of contributions intended to influence both federal and state elections. Although a literal reading of FECA's definition of "contribution" would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities—including get-out-the-vote drives and generic party advertising—in part with soft money.[7] In 1995 the FEC concluded that the parties could also use soft money to defray the costs of "legislative advocacy media advertisements," even if the ads mentioned the name of a federal candidate, so long as

---

[7] In 1977 the FEC promulgated a rule allowing parties to allocate their administrative expenses "on a reasonable basis" between accounts containing funds raised in compliance with FECA and accounts containing nonfederal funds, including corporate and union donations. 11 CFR § 102.6(a)(2). In advisory opinions issued in 1978 and 1979, the FEC allowed parties similarly to allocate the costs of voter registration and get-out-the-vote drives between federal and nonfederal accounts. FEC Advisory Op. 1978–10; FEC Advisory Op. 1979–17. See 251 F. Supp. 2d, at 195–197 *(per curiam)*.

In 1990 the FEC clarified the phrase "on a reasonable basis" by promulgating fixed allocation rates. 11 CFR § 106.5 (1991). The regulations required the Republican National Committee (RNC) and Democratic National Committee (DNC) to pay for at least 60% of mixed-purpose activities (65% in Presidential election years) with funds from their federal accounts. § 106.5(b)(2). By contrast, the regulations required state and local committees to allocate similar expenditures based on the ratio of federal to nonfederal offices on the State's ballot, § 106.5(d)(1), which in practice meant that they could expend a substantially greater proportion of soft money than national parties to fund mixed-purpose activities affecting both federal and state elections. See 251 F. Supp. 2d, at 198–199 *(per curiam)*.

they did not expressly advocate the candidate's election or defeat. FEC Advisory Op. 1995–25.

As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially. Of the two major parties' total spending, soft money accounted for 5% ($21.6 million) in 1984, 11% ($45 million) in 1988, 16% ($80 million) in 1992, 30% ($272 million) in 1996, and 42% ($498 million) in 2000.[8] The national parties transferred large amounts of their soft money to the state parties, which were allowed to use a larger percentage of soft money to finance mixed-purpose activities under FEC rules.[9] In the year 2000, for example, the national parties diverted $280 million—more than half of their soft money—to state parties.

Many contributions of soft money were dramatically larger than the contributions of hard money permitted by FECA. For example, in 1996 the top five corporate soft-money donors gave, in total, more than $9 million in nonfederal funds to the two national party committees.[10] In the most recent election cycle the political parties raised almost $300 million—60% of their total soft-money fundraising—from just 800 donors, each of which contributed a minimum of $120,000.[11] Moreover, the largest corporate donors often made substantial contributions to both parties.[12] Such practices corroborate evidence indicating that many corporate contributions were motivated by a desire for access to candi-

---

[8] 1 Defs. Exhs., Tab 1, Tbl. 2 (report of Thomas E. Mann, Chair & Sr. Fellow, Brookings Institution (hereinafter Mann Expert Report)); 251 F. Supp. 2d, at 197–201 *(per curiam)*.

[9] Mann Expert Report 26; 251 F. Supp. 2d, at 441 (Kollar-Kotelly, J.).

[10] *Id.*, at 494 (Kollar-Kotelly, J.).

[11] Mann Expert Report 24.

[12] In the 2000 election cycle, 35 of the 50 largest soft-money donors gave to both parties; 28 of the 50 gave more than $100,000 to both parties. Mann Expert Report Tbl. 6; see also 251 F. Supp. 2d, at 509 (Kollar-Kotelly, J.); *id.*, at 785, n. 77 (Leon, J.).

dates and a fear of being placed at a disadvantage in the legislative process relative to other contributors, rather than by ideological support for the candidates and parties.[13]

Not only were such soft-money contributions often designed to gain access to federal candidates, but they were in many cases solicited by the candidates themselves. Candidates often directed potential donors to party committees and tax-exempt organizations that could legally accept soft money. For example, a federal legislator running for reelection solicited soft money from a supporter by advising him that even though he had already " 'contributed the legal maximum' " to the campaign committee, he could still make an additional contribution to a joint program supporting federal, state, and local candidates of his party.[14] Such solicitations were not uncommon.[15]

---

[13] A former chief executive officer of a large corporation explained:

"Business and labor leaders believe, based on their experience, that disappointed Members, and their party colleagues, may shun or disfavor them because they have not contributed. Equally, these leaders fear that if they refuse to contribute (enough), competing interests who do contribute generously will have an advantage in gaining access to and influencing key Congressional leaders on matters of importance to the company or union." App. 283, ¶ 9 (declaration of Gerald Greenwald, United Airlines (hereinafter Greenwald Decl.)).

*Amici Curiae* Committee for Economic Development and various business leaders attest that corporate soft-money contributions are "coerced and, at bottom, wholly commercial" in nature, and that "[b]usiness leaders increasingly wish to be freed from the grip of a system in which they fear the adverse consequences of refusing to fill the coffers of the major parties." Brief for Committee for Economic Development et al. as *Amici Curiae* 28.

[14] See 251 F. Supp. 2d, at 480 (Kollar-Kotelly, J.); *id.*, at 842 (Leon, J.).

[15] See *id.*, at 479–480 (Kollar-Kotelly, J.); *id.*, at 842–843 (Leon, J.). One former party official explained to the District Court:

" 'Once you've helped a federal candidate by contributing hard money to his or her campaign, you are sometimes asked to do more for the candidate by making donations of hard and/or soft money to the national party committees, the relevant state party (assuming it can accept corporate contri-

The solicitation, transfer, and use of soft money thus enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections.

## Issue Advertising

In *Buckley* we construed FECA's disclosure and reporting requirements, as well as its expenditure limitations, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U. S., at 80 (footnote omitted). As a result of that strict reading of the statute, the use or omission of "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" marked a bright statutory line separating "express advocacy" from "issue advocacy." See *id.*, at 44, n. 52. Express advocacy was subject to FECA's limitations and could be financed only using hard money. The political parties, in other words, could not use soft money to sponsor ads that used any magic words, and corporations and unions could not fund such ads out of their general treasuries. So-called issue ads, on the other hand, not only could be financed with soft money, but could be aired without disclosing the identity of, or any other information about, their sponsors.

While the distinction between "issue" and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words.[16] Little difference

---

butions), or an outside group that is planning on doing an independent expenditure or issue advertisement to help the candidate's campaign.'" *Id.*, at 479 (Kollar-Kotelly, J.).

[16] *Id.*, at 532–537 (Kollar-Kotelly, J.); *id.*, at 875–879 (Leon, J.). As the former chair of one major advocacy organization's PAC put it: "'It is foolish to believe there is any practical difference between issue advocacy and advocacy of a political candidate. What separates issue advocacy and political advocacy is a line in the sand drawn on a windy day.'" *Id.*, at 536–537 (Kollar-Kotelly, J.) (quoting Tanya K. Metaksa, Opening Remarks

existed, for example, between an ad that urged viewers to "vote against Jane Doe" and one that condemned Jane Doe's record on a particular issue before exhorting viewers to "call Jane Doe and tell her what you think."[17]   Indeed, campaign professionals testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words.[18]   Moreover, the conclusion that such ads were specifically intended to affect election results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election.[19]   Corporations and unions spent hundreds of millions of dollars of their general funds to pay for these ads,[20] and those expenditures, like

at the American Assn. of Political Consultants Fifth General Session on "Issue Advocacy," Jan. 17, 1997, p. 2); 251 F. Supp. 2d, at 878–879 (Leon, J.) (same).

[17] *Id.*, at 304 (Henderson, J., concurring in judgment in part and dissenting in part); *id.*, at 534 (Kollar-Kotelly, J.); *id.*, at 875–879 (Leon, J.).

[18] It is undisputed that very few ads—whether run by candidates, parties, or interest groups—used words of express advocacy.  *Id.*, at 303 (Henderson, J.); *id.*, at 529 (Kollar-Kotelly, J.); *id.*, at 874 (Leon, J.).  In the 1998 election cycle, just 4% of candidate advertisements used magic words; in 2000, that number was a mere 5%.  App. 1334 (report of Jonathan S. Krasno, Yale University, & Frank J. Sorauf, University of Minnesota, pp. 53–54 (hereinafter Krasno & Sorauf Expert Report); see 1 Defs. Exhs., Tab 2, pp. 53–54).

[19] 251 F. Supp. 2d, at 564, and n. 96 (Kollar-Kotelly, J.) (citing report of Kenneth M. Goldstein, University of Wisconsin-Madison, App. A, Tbl. 16; see 3–R Defs. Exhs., Tab 7); Tr. of Oral Arg. 202–203; see also 251 F. Supp. 2d, at 305 (Henderson, J.).

[20] The spending on electioneering communications climbed dramatically during the last decade.  In the 1996 election cycle, $135 to $150 million was spent on multiple broadcasts of about 100 ads.  In the next cycle (1997–1998), 77 organizations aired 423 ads at a total cost between $270 and $340 million.  By the 2000 election, 130 groups spent over an estimated $500 million on more than 1,100 different ads.  Two out of every three dollars spent on issue ads in the 2000 cycle were attributable to the two major parties and six major interest groups.  *Id.*, at 303–304 (Henderson, J.) (citing Annenberg Public Policy Center, Issue Advertising in the 1999–2000 Election Cycle 1–15 (2001) (hereinafter Annenberg Report); see

soft-money donations to the political parties, were unregulated under FECA. Indeed, the ads were attractive to organizations and candidates precisely because they were beyond FECA's reach, enabling candidates and their parties to work closely with friendly interest groups to sponsor so-called issue ads when the candidates themselves were running out of money.[21]

Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers.[22] And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals—brothers who together spent $25 million on ads supporting their favored candidate.[23]

While the public may not have been fully informed about the sponsorship of so-called issue ads, the record indi-

---

38 Defs. Exhs., Tab 22); 251 F. Supp. 2d, at 527 (Kollar-Kotelly, J.) (same); *id.*, at 879 (Leon, J.) (same).

[21] *Id.*, at 540 (Kollar-Kotelly, J.) (citing internal AFL–CIO Memorandum from Brian Weeks to Mike Klein, Electronic Buy for Illinois Senator (Oct. 9, 1996), AFL–CIO 005244); 251 F. Supp. 2d, at 886 (Leon, J.) (same).

[22] The association was known as the Pharmaceutical Research and Manufacturers of America (PhRMA). *Id.*, at 232 *(per curiam).*

[23] *Id.*, at 232–233. Other examples of mysterious groups included "Voters for Campaign Truth," "Aretino Industries," "Montanans for Common Sense Mining Laws," "American Seniors, Inc.," "American Family Voices," App. 1355 (Krasno & Sorauf Expert Report 71–77), and the "Coalition to Make our Voices Heard," 251 F. Supp. 2d, at 538 (Kollar-Kotelly, J.). Some of the actors behind these groups frankly acknowledged that "'in some places it's much more effective to run an ad by the "Coalition to Make Our Voices-Heard" than it is to say paid for by "the men and women of the AFL–CIO."'" *Ibid.* (Kollar-Kotelly, J.) (quoting report of David B. Magleby, Brigham Young University 18–19 (hereinafter Magleby Expert Report), App. 1484–1485).

cates that candidates and officeholders often were. A former Senator confirmed that candidates and officials knew who their friends were and "'sometimes suggest[ed] that corporations or individuals make donations to interest groups that run "issue ads."'"[24] As with soft-money contributions, political parties and candidates used the availability of so-called issue ads to circumvent FECA's limitations, asking donors who contributed their permitted quota of hard money to give money to nonprofit corporations to spend on "issue" advocacy.[25]

### Senate Committee Investigation

In 1998 the Senate Committee on Governmental Affairs issued a six-volume report summarizing the results of an extensive investigation into the campaign practices in the 1996 federal elections. The report gave particular attention to the effect of soft money on the American political system, including elected officials' practice of granting special access in return for political contributions.

The committee's principal findings relating to Democratic Party fundraising were set forth in the majority's report, while the minority report primarily described Republican practices. The two reports reached consensus, however, on certain central propositions. They agreed that the "soft money loophole" had led to a "meltdown" of the campaign finance system that had been intended "to keep corporate, union and large individual contributions from influencing the electoral process."[26] One Senator stated that "the hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually de-

---

[24] 251 F. Supp. 2d, at 518–519 (Kollar-Kotelly, J.).

[25] *Id.*, at 478–479 (Kollar-Kotelly, J.) (citing declaration of Robert Hickmott, Senior V. P., Smith-Free Group ¶ 8 (hereinafter Hickmott Decl.); see 6–R Defs. Exhs., Tab 19, ¶ 8).

[26] S. Rep. No. 105–167, vol. 4, p. 4611 (1998) (hereinafter 1998 Senate Report); 5 *id.*, at 7515.

stroyed our campaign finance laws, leaving us with little more than a pile of legal rubble."[27]

The report was critical of both parties' methods of raising soft money, as well as their use of those funds. It concluded that both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions. The committee majority described the White House coffees that rewarded major donors with access to President Clinton,[28] and the courtesies extended to an international businessman named Roger Tamraz, who candidly acknowledged that his donations of about $300,000 to the DNC and to state parties were motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus.[29] The minority described the promotional materials used by the RNC's two principal donor programs, "Team 100" and the "Republican Eagles," which promised "special access to high-ranking Republican elected officials, including governors, senators, and representatives."[30] One fundraising letter recited that the chairman of the RNC had personally escorted a donor on

---

[27] 3 *id.*, at 4535 (additional views of Sen. Collins).

[28] 1 *id.*, at 41–42, 195–200. The report included a memorandum written by the DNC finance chairman suggesting the use of White House coffees and "overnights" to give major donors "quality time" with the President, and noted that the guests accounted for $26.4 million in contributions. *Id.*, at 194, 196.

[29] 2 *id.*, at 2913–2914, 2921. Despite concerns about Tamraz's background and a possible conflict with United States foreign policy interests, he was invited to six events attended by the President. *Id.*, at 2920–2921. Similarly, the minority noted that in exchange for Michael Kojima's contribution of $500,000 to the 1992 President's Dinner, he and his wife had been placed at the head table with President and Mrs. Bush. Moreover, Kojima received several additional meetings with the President, other administration officials, and United States embassy officials. 4 *id.*, at 5418, 5422, 5428.

[30] The former requires an initial contribution of $100,000, and $25,000 for each of the next three years; the latter requires annual contributions of $15,000. 5 *id.*, at 7968.

appointments that "'turned out to be very significant in the legislation affecting public utility holding companies'" and made the donor "'a hero in his industry.'"[31]

In 1996 both parties began to use large amounts of soft money to pay for issue advertising designed to influence federal elections. The committee found such ads highly problematic for two reasons. Since they accomplished the same purposes as express advocacy (which could lawfully be funded only with hard money), the ads enabled unions, corporations, and wealthy contributors to circumvent protections that FECA was intended to provide. Moreover, though ostensibly independent of the candidates, the ads were often actually coordinated with, and controlled by, the campaigns.[32] The ads thus provided a means for evading FECA's candidate contribution limits.

The report also emphasized the role of state and local parties. While the FEC's allocation regime permitted national parties to use soft money to pay for up to 40% of the costs of both generic voter activities and issue advertising, they allowed state and local parties to use larger percentages of soft money for those purposes.[33] For that reason, national parties often made substantial transfers of soft money to "state and local political parties for 'generic voter activities' that in fact ultimately benefit[ed] federal candidates because the funds for all practical purposes remain[ed] under the control of the national committees." The report concluded that "[t]he use of such soft money thus allow[ed] more corporate, union treasury, and large contributions from wealthy individuals into the system."[34]

The report discussed potential reforms, including a ban on soft money at the national and state party levels and restric-

---

[31] *Id.*, at 7971.
[32] 1 *id.*, at 49; 3 *id.*, at 3997–4006.
[33] *Id.*, at 4466.
[34] *Ibid.*

tions on sham issue advocacy by nonparty groups.[35]  The majority expressed the view that a ban on the raising of soft money by national party committees would effectively address the use of union and corporate general treasury funds in the federal political process only if it required that candidate-specific ads be funded with hard money.[36]  The minority similarly recommended the elimination of soft-money contributions to political parties from individuals, corporations, and unions, as well as "reforms addressing candidate advertisements masquerading as issue ads."[37]

## II

In BCRA, Congress enacted many of the committee's proposed reforms.  BCRA's central provisions are designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections. Title I regulates the use of soft money by political parties, officeholders, and candidates.  Title II primarily prohibits corporations and labor unions from using general treasury funds for communications that are intended to, or have the effect of, influencing the outcome of federal elections.

Section 403 of BCRA provides special rules for actions challenging the constitutionality of any of the Act's provisions.  2 U. S. C. § 437h note (Supp. II).  Eleven such actions were filed promptly after the statute went into effect in March 2002.  As required by § 403, those actions were filed in the District Court for the District of Columbia and heard by a three-judge court.  Section 403 directed the District Court to advance the cases on the docket and to expedite their disposition "to the greatest possible extent."  The court received a voluminous record compiled by the parties and ultimately delivered a decision embodied in a two-judge *per curiam* opinion and three separate, lengthy opinions,

---

[35] *Id.*, at 4468–4470, 4480–4481, 4491–4494.

[36] *Id.*, at 4492.

[37] 6 *id.*, at 9394.

each of which contained extensive commentary on the facts and a careful analysis of the legal issues. 251 F. Supp. 2d 176 (2003). The three judges reached unanimity on certain issues but differed on many. Their judgment, entered on May 1, 2003, held some parts of BCRA unconstitutional and upheld others. 251 F. Supp. 2d 948.

As authorized by § 403, all of the losing parties filed direct appeals to this Court within 10 days. 2 U. S. C. § 437h note. On June 5, 2003, we noted probable jurisdiction and ordered the parties to comply with an expedited briefing schedule and present their oral arguments at a special hearing on September 8, 2003. 539 U. S. 911. To simplify the presentation, we directed the parties challenging provisions of BCRA to proceed first on all issues, whether or not they prevailed on any issue in the District Court. *Ibid.* Mindful of § 403's instruction that we expedite our disposition of these appeals to the greatest extent possible, we also consider each of the issues in order. Accordingly, we first turn our attention to Title I of BCRA.

### III

Title I is Congress' effort to plug the soft-money loophole. The cornerstone of Title I is new FECA § 323(a), which prohibits national party committees and their agents from soliciting, receiving, directing, or spending any soft money. 2 U. S. C. § 441i(a) (Supp. II).[38] In short, § 323(a) takes national parties out of the soft-money business.

The remaining provisions of new FECA § 323 largely reinforce the restrictions in § 323(a). New FECA § 323(b) prevents the wholesale shift of soft-money influence from

---

[38] The national party committees of the two major political parties are: the RNC; the DNC; the National Republican Senatorial Committee (NRSC); the National Republican Congressional Committee (NRCC); the Democratic Senatorial Campaign Committee (DSCC); and the Democratic Congressional Campaign Committee (DCCC). 251 F. Supp. 2d, at 468 (Kollar-Kotelly, J.).

national to state party committees by prohibiting state and local party committees from using such funds for activities that affect federal elections. 2 U. S. C. § 441i(b). These "Federal election activit[ies]," defined in new FECA § 301(20)(A), are almost identical to the mixed-purpose activities that have long been regulated under the FEC's pre-BCRA allocation regime. 2 U. S. C. § 431(20)(A). New FECA § 323(d) reinforces these soft-money restrictions by prohibiting political parties from soliciting and donating funds to tax-exempt organizations that engage in electioneering activities. 2 U. S. C. § 441i(d). New FECA § 323(e) restricts federal candidates and officeholders from receiving, spending, or soliciting soft money in connection with federal elections and limits their ability to do so in connection with state and local elections. 2 U. S. C. § 441i(e). Finally, new FECA § 323(f) prevents circumvention of the restrictions on national, state, and local party committees by prohibiting state and local candidates from raising and spending soft money to fund advertisements and other public communications that promote or attack federal candidates. 2 U. S. C. § 441i(f).

Plaintiffs mount a facial First Amendment challenge to new FECA § 323, as well as challenges based on the Elections Clause, U. S. Const., Art. I, § 4, principles of federalism, and the equal protection component of the Due Process Clause. We address these challenges in turn.

## A

In *Buckley* and subsequent cases, we have subjected restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions. See, *e. g., Federal Election Comm'n* v. *Beaumont,* 539 U. S. 146, 161 (2003); see also *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 387–388 (2000); *Buckley,* 424 U. S., at 19. In these cases we have recognized that contribution limits, unlike limits on expenditures, "entai[l] only a marginal restriction upon the

contributor's ability to engage in free communication." *Id.*, at 20; see also, *e. g., Beaumont, supra,* at 161; *Shrink Missouri, supra,* at 386–388. In *Buckley* we said:

> "A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of the contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U. S., at 21 (footnote omitted).

Because the communicative value of large contributions inheres mainly in their ability to facilitate the speech of their recipients, we have said that contribution limits impose serious burdens on free speech only if they are so low as to "preven[t] candidates and political committees from amassing the resources necessary for effective advocacy." *Ibid.*

We have recognized that contribution limits may bear "more heavily on the associational right than on freedom to speak," *Shrink Missouri, supra,* at 388, since contributions serve "to affiliate a person with a candidate" and "enabl[e] like-minded persons to pool their resources," *Buckley,* 424 U. S., at 22. Unlike expenditure limits, however, which

"preclud[e] most associations from effectively amplifying the voice of their adherents," contribution limits both "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates," and allow associations "to aggregate large sums of money to promote effective advocacy." *Ibid.* The "overall effect" of dollar limits on contributions is "merely to require candidates and political committees to raise funds from a greater number of persons." *Id.*, at 21–22. Thus, a contribution limit involving even "'significant interference'" with associational rights is nevertheless valid if it satisfies the "lesser demand" of being "'closely drawn'" to match a "'sufficiently important interest.'" *Beaumont, supra,* at 162 (quoting *Shrink Missouri, supra,* at 387–388).[39]

Our treatment of contribution restrictions reflects more than the limited burdens they impose on First Amendment freedoms. It also reflects the importance of the interests that underlie contribution limits—interests in preventing "both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption." *National Right to Work,* 459 U. S., at 208; see also *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, 440–441 (2001) *(Colorado II).* We have said that these interests directly implicate "'the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning

---

[39] JUSTICE KENNEDY accuses us of engaging in a sleight of hand by conflating "unseemly corporate speech" with the speech of political parties and candidates, and then adverting to the "corporate speech rationale as if it were the linchpin of the case." *Post,* at 290–291 (opinion concurring in judgment in part and dissenting in part). This is incorrect. The principles set forth here and relied upon in assessing Title I are the same principles articulated in *Buckley* and its progeny that regulations of contributions to candidates, parties, and political committees are subject to less rigorous scrutiny than direct restraints on speech—including "unseemly corporate speech."

of that process.'" *National Right to Work, supra,* at 208 (quoting *Automobile Workers,* 352 U. S., at 570). Because the electoral process is the very "means through which a free society democratically translates political speech into concrete governmental action," *Shrink Missouri,* 528 U. S., at 401 (BREYER, J., concurring), contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate. For that reason, when reviewing Congress' decision to enact contribution limits, "there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny.'" *Id.,* at 400 (BREYER, J., concurring). The less rigorous standard of review we have applied to contribution limits (*Buckley*'s "closely drawn" scrutiny) shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise. It also provides Congress with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process.

Our application of this less rigorous degree of scrutiny has given rise to significant criticism in the past from our dissenting colleagues. See, *e. g., Shrink Missouri,* 528 U. S., at 405–410 (KENNEDY, J., dissenting); *id.,* at 410–420 (THOMAS, J., dissenting); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 635–644 (1996) *(Colorado I)* (THOMAS, J., dissenting). We have rejected such criticism in previous cases for the reasons identified above. We are also mindful of the fact that in its lengthy deliberations leading to the enactment of BCRA, Congress properly relied on the recognition of its authority contained in *Buckley* and its progeny. Considerations of *stare decisis,* buttressed by the respect that the Legislative and Judicial Branches owe to one another, provide additional powerful reasons for adhering to the analysis of contribution limits that the Court has consistently followed since *Buckley*

was decided. See *Hilton* v. *South Carolina Public Railways Comm'n,* 502 U. S. 197, 202 (1991).[40]

Like the contribution limits we upheld in *Buckley,* § 323's restrictions have only a marginal impact on the ability of contributors, candidates, officeholders, and parties to engage in effective political speech. *Beaumont,* 539 U. S., at 161. Complex as its provisions may be, § 323, in the main, does little more than regulate the ability of wealthy individuals, corporations, and unions to contribute large sums of money to influence federal elections, federal candidates, and federal officeholders.

Plaintiffs contend that we must apply strict scrutiny to § 323 because many of its provisions restrict not only contributions but also the spending and solicitation of funds raised outside of FECA's contribution limits. But for purposes of determining the level of scrutiny, it is irrelevant that Congress chose in § 323 to regulate contributions on the demand rather than the supply side. See, *e. g., National Right to Work, supra,* at 206–211 (upholding a provision restricting PACs' ability to solicit funds). The relevant inquiry is whether the mechanism adopted to implement the contribu-

---

[40] Since our decision in *Buckley,* we have consistently applied less rigorous scrutiny to contribution restrictions aimed at the prevention of corruption and the appearance of corruption. See, *e. g.,* 424 U. S., at 23–36 (applying less rigorous scrutiny to FECA's $1,000 limit on individual contributions to a candidate and FECA's $5,000 limit on PAC contributions to a candidate); *id.,* at 38 (applying less rigorous scrutiny to FECA's $25,000 aggregate yearly limit on contributions to candidates, political party committees, and political committees); *California Medical Assn.* v. *Federal Election Comm'n,* 453 U. S. 182, 195–196 (1981) (plurality opinion) (applying less rigorous scrutiny to FECA's $5,000 limit on contributions to multicandidate political committees); *National Right to Work,* 459 U. S., at 208–211 (applying less rigorous scrutiny to antisolicitation provision buttressing an otherwise valid contribution limit); *Colorado II,* 533 U. S. 431, 456 (2001) (applying less rigorous scrutiny to expenditures coordinated with a candidate); *Federal Election Comm'n* v. *Beaumont,* 539 U. S. 146, 161–162 (2003) (applying less rigorous scrutiny to provisions intended to prevent circumvention of otherwise valid contribution limits).

tion limit, or to prevent circumvention of that limit, burdens speech in a way that a direct restriction on the contribution itself would not. That is not the case here.

For example, while § 323(a) prohibits national parties from receiving or spending nonfederal money, and § 323(b) prohibits state party committees from spending nonfederal money on federal election activities, neither provision in any way limits the total amount of money parties can spend. 2 U. S. C. §§ 441i(a), (b) (Supp. II). Rather, they simply limit the source and individual amount of donations. That they do so by prohibiting the spending of soft money does not render them expenditure limitations.[41]

Similarly, the solicitation provisions of §§ 323(a) and 323(e), which restrict the ability of national party committees, federal candidates, and federal officeholders to solicit nonfederal funds, leave open ample opportunities for soliciting federal funds on behalf of entities subject to FECA's source and amount restrictions. Even § 323(d), which on its face enacts a blanket ban on party solicitations of funds to certain tax-exempt organizations, nevertheless allows parties to solicit funds to the organizations' federal PACs. 2 U. S. C. § 441i(d). As for those organizations that cannot or do not administer PACs, parties remain free to donate federal funds directly to such organizations, and may solicit funds expressly for that purpose. See *infra*, at 180–181 (construing *§ 323(d)'s restriction on donations by parties to apply only to* donations from a party committee's nonfederal or soft-money account). And as with § 323(a), § 323(d) places no limits on other means of endorsing tax-exempt organizations or any restrictions on solicitations by party officers acting in their individual capacities. 2 U. S. C. §§ 441i(a), (d).

Section 323 thus shows "due regard for the reality that solicitation is characteristically intertwined with informative

---

[41] Indeed, Congress structured § 323(b) in such a way as to free individual, corporate, and union donations to state committees for *nonfederal* elections from federal source and amount restrictions.

and perhaps persuasive speech seeking support for particular causes or for particular views." *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 632 (1980). The fact that party committees and federal candidates and officeholders must now ask only for limited dollar amounts or request that a corporation or union contribute money through its PAC in no way alters or impairs the political message "intertwined" with the solicitation. Cf. *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988) (treating solicitation restriction that required fundraisers to disclose particular information as a content-based regulation subject to strict scrutiny because it "necessarily alter[ed] the content of the speech"). And rather than chill such solicitations, as was the case in *Schaumburg*, the restriction here tends to increase the dissemination of information by forcing parties, candidates, and officeholders to solicit from a wider array of potential donors. As with direct limits on contributions, therefore, § 323's spending and solicitation restrictions have only a marginal impact on political speech.[42]

---

[42] JUSTICE KENNEDY's contention that less rigorous scrutiny applies only to regulations burdening political association, rather than political speech, misreads *Buckley*. In *Buckley*, we recognized that contribution limits burden both protected speech and association, though they generally have more significant impacts on the latter. 424 U. S., at 20–22. We nevertheless applied less rigorous scrutiny to FECA's contribution limits because neither burden was sufficiently weighty to overcome Congress' countervailing interest in protecting the integrity of the political process. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 388 (2000) ("While we did not [in *Buckley*] attempt to parse [the] distinctions between the speech and association standards of scrutiny for contribution limits, we did make it clear that those restrictions bore more heavily on the associational right than on [the] freedom to speak. We consequently proceeded on the understanding that a contribution limitation surviving a claim of associational abridgment would survive a speech challenge as well, and we held the standard satisfied by the contribution limits under review" (citation omitted)). It is thus simply untrue in the campaign finance context that all "burdens on speech necessitate strict scrutiny review." *Post*, at 312.

Finally, plaintiffs contend that the type of associational burdens that § 323 imposes are fundamentally different from the burdens that accompanied *Buckley*'s contribution limits, and merit the type of strict scrutiny we have applied to attempts to regulate the internal processes of political parties. *E. g., California Democratic Party* v. *Jones,* 530 U. S. 567, 573–574 (2000). In making this argument, plaintiffs greatly exaggerate the effect of § 323, contending that it precludes *any* collaboration among national, state, and local committees of the same party in fundraising and electioneering activities. We do not read the provisions in that way. See *infra,* at 161. Section 323 merely subjects a greater percentage of contributions to parties and candidates to FECA's source and amount limitations. *Buckley* has already acknowledged that such limitations "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." 424 U. S., at 22. The modest impact that § 323 has on the ability of committees within a party to associate with each other does not independently occasion strict scrutiny. None of this is to suggest that the alleged associational burdens imposed on parties by § 323 have no place in the First Amendment analysis; it is only that we account for them in the application, rather than the choice, of the appropriate level of scrutiny.[43]

With these principles in mind, we apply the less rigorous scrutiny applicable to contribution limits to evaluate the constitutionality of new FECA § 323. Because the five

---

[43] JUSTICE KENNEDY is no doubt correct that the associational burdens imposed by a particular piece of campaign-finance regulation may at times be so severe as to warrant strict scrutiny. *Post,* at 311. In light of our interpretation of § 323(a), however, see *infra,* at 161, § 323 does not present such a case. As JUSTICE KENNEDY himself acknowledges, even *"significant* interference" with "protected rights of association" are subject to less rigorous scrutiny. *Beaumont,* 539 U. S., at 162; see *post,* at 311. There is thus nothing inconsistent in our decision to account for the particular associational burdens imposed by § 323(a) when applying the appropriate level of scrutiny.

challenged provisions of § 323 implicate different First Amendment concerns, we discuss them separately. We are mindful, however, that Congress enacted § 323 as an integrated whole to vindicate the Government's important interest in preventing corruption and the appearance of corruption.

### *New FECA § 323(a)'s Restrictions on National Party Committees*

The core of Title I is new FECA § 323(a), which provides that "national committee[s] of a political party . . . may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act." 2 U. S. C. § 441i(a)(1) (Supp. II). The prohibition extends to "any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee." § 441i(a)(2).

The main goal of § 323(a) is modest. In large part, it simply effects a return to the scheme that was approved in *Buckley* and that was subverted by the creation of the FEC's allocation regime, which permitted the political parties to fund federal electioneering efforts with a combination of hard and soft money. See *supra*, at 123–125, and n. 7. Under that allocation regime, national parties were able to use vast amounts of soft money in their efforts to elect federal candidates. Consequently, as long as they directed the money to the political parties, donors could contribute large amounts of soft money for use in activities designed to influence federal elections.[44] New § 323(a) is designed to put a stop to that practice.

---

[44] The fact that the post-1990 explosion in soft-money spending on federal electioneering was accompanied by a series of efforts in Congress to clamp down on such uses of soft money (culminating, of course, in BCRA)

## 1. Governmental Interests Underlying New FECA § 323(a)

The Government defends § 323(a)'s ban on national parties' involvement with soft money as necessary to prevent the actual and apparent corruption of federal candidates and officeholders. Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits. We have not limited that interest to the elimination of cash-for-votes exchanges. In *Buckley*, we expressly rejected the argument that antibribery laws provided a less restrictive alternative to FECA's contribution limits, noting that such laws "deal[t] with only the most blatant and specific attempts of those with money to influence governmental action." 424 U. S., at 28. Thus, "[i]n speaking of 'improper influence' and 'opportunities for abuse' in addition to '*quid pro quo* arrangements,' we [have] recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Shrink Missouri*, 528 U. S., at 389; see also *Colorado II*, 533 U. S., at 441 (acknowledging that corruption extends beyond explicit cash-for-votes agreements to "undue influence on an officeholder's judgment").

Of "almost equal" importance has been the Government's interest in combating the appearance or perception of corruption engendered by large campaign contributions.

underscores the fact that the FEC regulations permitted more than Congress, in enacting FECA, had ever intended. See J. Cantor, Congressional Research Service Report for Congress: Campaign Finance Legislation in the 101st Congress (1990) (9 bills seeking to limit the influence of soft money introduced); J. Cantor, CRS Report for Congress: Campaign Finance Legislation in the 102d Congress (1991) (10 such bills introduced); J. Cantor, CRS Report for Congress: Campaign Finance Legislation in the 103d Congress (1993) (16 bills); J. Cantor, CRS Report for Congress: Campaign Finance Legislation in the 104th Congress (1996) (18 bills); see also 251 F. Supp. 2d, at 201–206 *(per curiam)* (discussing legislative efforts to curb soft money in 105th and subsequent Congresses).

*Buckley, supra,* at 27; see also *Shrink Missouri, supra,* at 390; *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 496–497 (1985). Take away Congress' authority to regulate the appearance of undue influence and "the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Shrink Missouri,* 528 U. S., at 390; see also *id.,* at 401 (BREYER, J., concurring). And because the First Amendment does not require Congress to ignore the fact that "candidates, donors, and parties test the limits of the current law," *Colorado II,* 533 U. S., at 457, these interests have been sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits, *id.,* at 456 ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption").

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Missouri, supra,* at 391. The idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible. For nearly 30 years, FECA has placed strict dollar limits and source restrictions on contributions that individuals and other entities can give to national, state, and local party committees for the purpose of influencing a federal election. The premise behind these restrictions has been, and continues to be, that contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation. See *Buckley, supra,* at 38 (upholding FECA's $25,000 limit on aggregate yearly contributions to a candidate, political committee, and political party committee as a "quite modest restraint . . . to prevent evasion of the $1,000 contribution limitation" by, among

other things, "huge contributions to the candidate's political party"). This is particularly true of contributions to national parties, with which federal candidates and officeholders enjoy a special relationship and unity of interest. This close affiliation has placed national parties in a unique position, "whether they like it or not," to serve as "agents for spending on behalf of those who seek to produce obligated officeholders." *Colorado II, supra,* at 452; see also *Shrink Missouri, supra,* at 406 (KENNEDY, J., dissenting) ("[Respondent] asks us to evaluate his speech claim in the context of a system which favors candidates and officeholders whose campaigns are supported by *soft money, usually funneled through political parties*" (emphasis added)). As discussed below, rather than resist that role, the national parties have actively embraced it.

The question for present purposes is whether large *soft-money* contributions to national party committees have a corrupting influence or give rise to the appearance of corruption. Both common sense and the ample record in these cases confirm Congress' belief that they do. As set forth above, *supra,* at 123–125, and n. 7, the FEC's allocation regime has invited widespread circumvention of FECA's limits on contributions to parties for the purpose of influencing federal elections. Under this system, corporate, union, and wealthy individual donors have been free to contribute substantial sums of soft money to the national parties, which the parties can spend for the specific purpose of influencing a particular candidate's federal election. It is not only plausible, but likely, that candidates would feel grateful for such donations and that donors would seek to exploit that gratitude.[45]

---

[45] JUSTICE KENNEDY contends that the plurality's observation in *Colorado I* that large soft-money donations to a political party pose little threat of corruption "establish[es] that" such contributions are not corrupting. *Post,* at 301 (citing *Colorado I,* 518 U. S. 604, 616, 617–618 (1996)). The cited dictum has no bearing on the present cases. *Colorado I* addressed an entirely different question—namely, whether Congress could permissi-

The evidence in the record shows that candidates and donors alike have in fact exploited the soft-money loophole, the former to increase their prospects of election and the latter to create debt on the part of officeholders, with the national parties serving as willing intermediaries. Thus, despite FECA's hard-money limits on direct contributions to candidates, federal officeholders have commonly asked donors to make soft-money donations to national and state committees " 'solely in order to assist federal campaigns,' " including the officeholder's own. 251 F. Supp. 2d, at 472 (Kollar-Kotelly, J.) (quoting declaration of Wade Randlett, CEO, Dashboard Technology ¶¶ 6–9 (hereinafter Randlett Decl.), App. 713–714); see also 251 F. Supp. 2d, at 471–473, 478–479 (Kollar-Kotelly, J.); id., at 842–843 (Leon, J.). Parties kept tallies of the amounts of soft money raised by each officeholder, and "the amount of money a Member of Congress raise[d] for the national political party committees often affect[ed] the amount the committees g[a]ve to assist the Member's campaign." Id., at 474–475 (Kollar-Kotelly, J.). Donors often asked that their contributions be credited to particular candidates, and the parties obliged, irrespective of whether the funds were hard or soft. Id., at 477–478 (Kollar-Kotelly, J.); id., at 824, 847 (Leon, J.). National party committees often teamed with individual candidates' campaign committees to create joint fundraising committees, which enabled the candidates to take advantage of the party's higher contribution limits while still allowing donors to give to their preferred candidate. Id., at 478 (Kollar-Kotelly, J.); id., at 847–848 (Leon, J.); see also App. 1286 (Krasno & Sorauf Expert Report (characterizing the joint fundraising committee as one

bly limit a party's independent expenditures—and did so on an entirely different set of facts. It also had before it an evidentiary record frozen in 1990—well before the soft-money explosion of the 1990's. See *Federal Election Comm'n* v. *Colorado Republican Fed. Campaign Comm.*, 839 F. Supp. 1448, 1451 (Colo. 1993).

"in which Senate candidates in effect rais[e] soft money for use in their own races")). Even when not participating directly in the fundraising, federal officeholders were well aware of the identities of the donors: National party committees would distribute lists of potential or actual donors, or donors themselves would report their generosity to officeholders. 251 F. Supp. 2d, at 487–488 (Kollar-Kotelly, J.) ("[F]or a Member not to know the identities of these donors, he or she must actively avoid such knowledge as it is provided by the national political parties and the donors themselves"); *id.*, at 853–855 (Leon, J.).

For their part, lobbyists, CEOs, and wealthy individuals alike all have candidly admitted donating substantial sums of soft money to national committees not on ideological grounds, but for the express purpose of securing influence over federal officials. For example, a former lobbyist and partner at a lobbying firm in Washington, D. C., stated in his declaration:

> " 'You are doing a favor for somebody by making a large [soft money] donation and they appreciate it. Ordinarily, people feel inclined to reciprocate favors. Do a bigger favor for someone—that is, write a larger check—and they feel even more compelled to reciprocate. In my experience, overt words are rarely exchanged about contributions, but people do have understandings.' " *Id.*, at 493 (Kollar-Kotelly, J.) (quoting declaration of Robert Rozen, partner, Ernst & Young ¶ 14; see 8–R Defs. Exhs., Tab 33).[46]

---

[46] Other business leaders agreed. For example, the chairman of the board and CEO of a major toy company explained:

" 'Many in the corporate world view large soft money donations as a cost of doing business . . . . I remain convinced that in some of the more publicized cases, federal officeholders actually appear to have sold themselves and the party cheaply. They could have gotten even more money, because of the potential importance of their decisions to the affected busi-

Particularly telling is the fact that, in 1996 and 2000, more than half of the top 50 soft-money donors gave substantial sums to *both* major national parties, leaving room for no other conclusion but that these donors were seeking influence, or avoiding retaliation, rather than promoting any particular ideology. See, *e. g.*, 251 F. Supp. 2d, at 508–510 (Kollar-Kotelly, J.) (citing Mann Expert Report Tbls. 5–6); 251 F. Supp. 2d, at 509 (" 'Giving soft money to both parties, the Republicans and the Democrats, makes no sense at all unless the donor feels that he or she is buying access' " (quoting declaration of former Sen. Dale Bumpers ¶ 15, App. 175)).[47]

---

ness.' " 251 F. Supp. 2d, at 491 (Kollar-Kotelly, J.) (quoting declaration of Alan G. Hassenfeld, CEO, Hasbro, Inc., ¶ 16; see 6–R Defs. Exhs., Tab 17). Similarly, the chairman emeritus of a major airline opined:

" 'Though a soft money check might be made out to a political party, labor and business leaders know that those checks open the doors to the offices of individual and important Members of Congress and the Administration . . ... Labor and business leaders believe—based on experience and with good reason—that such access gives them an opportunity to shape and affect governmental decisions and that their ability to do so derives from the fact that they have given large sums of money to the parties.' " 251 F. Supp. 2d, at 498 (Kollar-Kotelly, J.) (quoting Greenwald Decl. ¶ 12, App. 283–284); 251 F. Supp. 2d, at 858–859 (Leon, J.) (same).

[47] Even more troubling is evidence in the record showing that national parties have actively exploited the belief that contributions purchase influence or protection to pressure donors into making contributions. As one CEO explained:

" '[I]f you're giving a lot of soft money to one side, the other side knows. For many economically-oriented donors, there is a risk in giving to only one side, because the other side may read through FEC reports and have staff or a friendly lobbyist call and indicate that someone with interests before a certain committee has had their contributions to the other side noticed. They'll get a message that basically asks: "Are you sure you want to be giving only to one side? Don't you want to have friends on both sides of the aisle?" If your interests are subject to anger from the other side of the aisle, you need to fear that you may suffer a penalty if you don't give. . . . [D]uring the 1990's, it became more and more acceptable to call someone, saying you saw he gave to this person, so he should also

The evidence from the federal officeholders' perspective is similar. For example, one former Senator described the influence purchased by nonfederal donations as follows:

> " 'Too often, Members' first thought is not what is right or what they believe, but how it will affect fundraising. Who, after all, can seriously contend that a $100,000 donation does not alter the way one thinks about—and quite possibly votes on—an issue? . . . When you don't pay the piper that finances your campaigns, you will never get any more money from that piper. Since money is the mother's milk of politics, you never want to be in that situation.' " 251 F. Supp. 2d, at 481 (Kollar-Kotelly, J.) (quoting declaration of former Sen. Alan Simpson ¶ 10 (hereinafter Simpson Decl.), App. 811); 251 F. Supp. 2d, at 851 (Leon, J.) (same).

See also *id.,* at 489 (Kollar-Kotelly, J.) (" 'The majority of those who contribute to political parties do so for business reasons, to gain access to influential Members of Congress and to get to know new Members' " (quoting Hickmott Decl., Exh. A, ¶ 46)). By bringing soft-money donors and federal candidates and officeholders together, "[p]arties are thus necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors." *Colorado II,* 533 U. S., at 451–452.

Plaintiffs argue that without concrete evidence of an instance in which a federal officeholder has actually switched a vote (or, presumably, evidence of a specific instance where the public believes a vote was switched), Congress has not shown that there exists real or apparent corruption. But

---

give to you or the person's opponent.' " *Id.,* at 510 (Kollar-Kotelly, J.) (quoting Randlett Decl. ¶ 12, App. 715); 251 F. Supp. 2d, at 868 (Leon, J.) (same).

the record is to the contrary. The evidence connects soft money to manipulations of the legislative calendar, leading to Congress' failure to enact, among other things, generic drug legislation, tort reform, and tobacco legislation. See, *e. g.*, 251 F. Supp. 2d, at 482 (Kollar-Kotelly, J.); *id.*, at 852 (Leon, J.); App. 390–394 (declaration of Sen. John McCain ¶¶ 5, 8–11 (hereinafter McCain Decl.)); App. 811 (Simpson Decl. ¶ 10) ("Donations from the tobacco industry to Republicans scuttled tobacco legislation, just as contributions from the trial lawyers to Democrats stopped tort reform"); App. 805 (declaration of former Sen. Paul Simon ¶¶ 13–14). To claim that such actions do not change legislative outcomes surely misunderstands the legislative process.

More importantly, plaintiffs conceive of corruption too narrowly. Our cases have firmly established that Congress' legitimate interest extends beyond preventing simple cash-for-votes corruption to curbing "undue influence on an officeholder's judgment, and the appearance of such influence." *Colorado II, supra*, at 441. Many of the "deeply disturbing examples" of corruption cited by this Court in *Buckley*, 424 U. S., at 27, to justify FECA's contribution limits were not episodes of vote buying, but evidence that various corporate interests had given substantial donations to gain access to high-level government officials. See *Buckley*, 519 F. 2d, at 839–840, n. 36; nn. 5–6, *supra*. Even if that access did not secure actual influence, it certainly gave the "appearance of such influence." *Colorado II, supra*, at 441; see also 519 F. 2d, at 838.

The record in the present cases is replete with similar examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations. See 251 F. Supp. 2d, at 492–506 (Kollar-Kotelly, J.). As one former Senator put it:

> "'Special interests who give large amounts of soft money to political parties do in fact achieve their objectives. They do get special access. Sitting Senators

and House Members have limited amounts of time, but they make time available in their schedules to meet with representatives of business and unions and wealthy individuals who gave large sums to their parties. These are not idle chit-chats about the philosophy of democracy. . . . Senators are pressed by their benefactors to introduce legislation, to amend legislation, to block legislation, and to vote on legislation in a certain way.'" *Id.*, at 496 (Kollar-Kotelly, J.) (quoting declaration of former Sen. Warren Rudman ¶ 7 (hereinafter Rudman Decl.), App. 742); 251 F. Supp. 2d, at 858 (Leon, J.) (same).

So pervasive is this practice that the six national party committees actually furnish their own menus of opportunities for access to would-be soft-money donors, with increased prices reflecting an increased level of access. For example, the DCCC offers a range of donor options, starting with the $10,000-per-year Business Forum program, and going up to the $100,000-per-year National Finance Board program. The latter entitles the donor to bimonthly conference calls with the Democratic House leadership and chair of the DCCC, complimentary invitations to all DCCC fundraising events, two private dinners with the Democratic House leadership and ranking Members, and two retreats with the Democratic House leader and DCCC chair in Telluride, Colorado, and Hyannisport, Massachusetts. *Id.*, at 504–505 (Kollar-Kotelly, J.); see also *id.*, at 506 (describing records indicating that DNC offered meetings with President in return for large donations); *id.*, at 502–503 (describing RNC's various donor programs); *id.*, at 503–504 (same for NRSC); *id.*, at 500–503 (same for DSCC); *id.*, at 504 (same for NRCC). Similarly, "the RNC's donor programs offer greater access to federal office holders as the donations grow larger, with the highest level and most personal access offered to the largest soft money donors." *Id.*, at 500–503 (finding, further, that the RNC holds out the prospect of access to officeholders to attract soft-money donations and encourages

officeholders to meet with large soft-money donors); accord, *id.*, at 860–861 (Leon, J.).

Despite this evidence and the close ties that candidates and officeholders have with their parties, JUSTICE KENNEDY would limit Congress' regulatory interest *only* to the prevention of the actual or apparent *quid pro quo* corruption "inherent in" contributions made directly to, contributions made at the express behest of, and expenditures made in coordination with, a federal officeholder or candidate. *Post,* at 292, 298. Regulation of any other donation or expenditure—regardless of its size, the recipient's relationship to the candidate or officeholder, its potential impact on a candidate's election, its value to the candidate, or its unabashed and explicit intent to purchase influence—would, according to JUSTICE KENNEDY, simply be out of bounds. This crabbed view of corruption, and particularly of the appearance of corruption, ignores precedent, common sense, and the realities of political fundraising exposed by the record in this litigation.[48]

_____

[48] In addition to finding no support in our recent cases, see, *e. g., Colorado II,* 533 U. S., at 441 (defining corruption more broadly than *quid pro quo* arrangements); *Shrink Missouri,* 528 U. S., at 389 (same), JUSTICE KENNEDY's contention that *Buckley* limits Congress to regulating contributions to a candidate ignores *Buckley* itself. There, we upheld FECA's $25,000 limit on aggregate yearly contributions to candidates, *political committees,* and *party committees* out of recognition that FECA's $1,000 limit on candidate contributions would be meaningless if individuals could instead make "huge contributions to the candidate's political party." 424 U. S., at 38. Likewise, in *California Medical Assn.* v. *Federal Election Comm'n,* 453 U. S. 182 (1981), we upheld FECA's $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of "contribution," the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as pass-throughs (*e. g.,* a strict limit

JUSTICE KENNEDY's interpretation of the First Amendment would render Congress powerless to address more subtle but equally dispiriting forms of corruption. Just as troubling to a functioning democracy as classic *quid pro quo* corruption is the danger that officeholders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder. Even if it occurs only occasionally, the potential for such undue influence is manifest. And unlike straight cash-for-votes transactions, such corruption is neither easily detected nor practical to criminalize. The best means of prevention is to identify and to remove the temptation. The evidence set forth above, which is but a sampling of the reams of disquieting evidence contained in the record, convincingly demonstrates that soft-money contributions to political parties carry with them just such temptation.

JUSTICE KENNEDY likewise takes too narrow a view of the appearance of corruption. He asserts that only those transactions with "inherent corruption potential," which he again limits to contributions directly to candidates, justify the inference "that regulating the conduct will stem the appearance of real corruption." *Post*, at 297–298.[49] In our view, however, Congress is not required to ignore historical evidence regarding a particular practice or to view conduct in isolation from its context. To be sure, mere political favoritism or opportunity for influence alone is insufficient to justify regulation. *Ibid.* As the record demonstrates, it is the manner in which parties have *sold* access to federal

---

on donations that could be used to fund candidate contributions) would have provided insufficient justification for such overbroad legislation.

[49] At another point, describing our "flawed reasoning," JUSTICE KENNEDY seems to suggest that Congress' interest in regulating the appearance of corruption extends only to those contributions that actually "create . . . corrupt donor favoritism among . . . officeholders." *Post*, at 299–300. This latter formulation would render Congress' interest in stemming the appearance of corruption indistinguishable from its interest in preventing actual corruption.

candidates and officeholders that has given rise to the appearance of undue influence. Implicit (and, as the record shows, sometimes explicit) in the sale of access is the suggestion that money buys influence. It is no surprise then that purchasers of such access unabashedly admit that they are seeking to purchase just such influence. It was not unwarranted for Congress to conclude that the selling of access gives rise to the appearance of corruption.

In sum, there is substantial evidence to support Congress' determination that large soft-money contributions to national political parties give rise to corruption and the appearance of corruption.

### 2. *New FECA § 323(a)'s Restriction on Spending and Receiving Soft Money*

Plaintiffs and THE CHIEF JUSTICE contend that § 323(a) is impermissibly overbroad because it subjects *all* funds raised and spent by national parties to FECA's hard-money source and amount limits, including, for example, funds spent on purely state and local elections in which no federal office is at stake.[50] *Post*, at 353–354 (REHNQUIST, C. J., dissenting). Such activities, THE CHIEF JUSTICE asserts, pose "little or no potential to corrupt . . . federal candidates and officeholders." *Post*, at 353 (dissenting opinion). This observation is beside the point. Section 323(a), like the remainder of § 323, regulates *contributions*, not activities. As the record demonstrates, it is the close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship, that have

---

[50] In support of this claim, the political party plaintiffs assert that, in 2001, the RNC spent $15.6 million of nonfederal funds (30% of the nonfederal amount raised that year) on purely state and local election activity, including contributions to state and local candidates, transfers to state parties, and direct spending. See Tr. of Oral Arg. 102–103 (statement of counsel Bobby R. Burchfield); 251 F. Supp. 2d, at 336–337 (Henderson, J.); *id.*, at 464–465 (Kollar-Kotelly, J.); *id.*, at 830 (Leon, J.).

made all large soft-money contributions to national parties suspect.

As one expert noted, "'[t]here is no meaningful separation between the national party committees and the public officials who control them.'" 251 F. Supp. 2d, at 468–469 (Kollar-Kotelly, J.) (quoting Mann Expert Report 29). The national committees of the two major parties are both run by, and largely composed of, federal officeholders and candidates. Indeed, of the six national committees of the two major parties, four are composed entirely of federal officeholders. *Ibid.* The nexus between national parties and federal officeholders prompted one of Title I's framers to conclude:

> "Because the national parties operate at the national level, and are inextricably intertwined with federal officeholders and candidates, who raise the money for the national party committees, there is a close connection between the funding of the national parties and the corrupting dangers of soft money on the federal political process. The only effective way to address this [soft-money] problem of corruption is to ban entirely all raising and spending of soft money by the national parties." 148 Cong. Rec. H409 (Feb. 13, 2002) (statement of Rep. Shays).

Given this close connection and alignment of interests, large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, regardless of how those funds are ultimately used.

This close affiliation has also placed national parties in a position to sell access to federal officeholders in exchange for soft-money contributions that the party can then use for its own purposes. Access to federal officeholders is the most valuable favor the national party committees are able to give in exchange for large donations. The fact that officeholders comply by donating their valuable time indicates either that

officeholders place substantial value on the soft-money contribution themselves, without regard to their end use, or that national committees are able to exert considerable control over federal officeholders. See, *e. g.*, App. 1196–1198 (Expert Report of Donald P. Green, Yale University) (hereinafter Green Expert Report) ("Once elected to legislative office, public officials enter an environment in which political parties-in-government control the resources crucial to subsequent electoral success and legislative power. Political parties organize the legislative caucuses that make committee assignments"); App. 1298 (Krasno & Sorauf Expert Report) (indicating that officeholders' reelection prospects are significantly influenced by attitudes of party leadership). Either way, large soft-money donations to national party committees are likely to buy donors preferential access to federal officeholders no matter the ends to which their contributions are eventually put. As discussed above, Congress had sufficient grounds to regulate the appearance of undue influence associated with this practice. The Government's strong interests in preventing corruption, and in particular the appearance of corruption, are thus sufficient to justify subjecting all donations to national parties to the source, amount, and disclosure limitations of FECA.[51]

---

[51] The close relationship of federal officeholders and candidates to their parties answers not only THE CHIEF JUSTICE's concerns about § 323(a), but also his fear that our analysis of § 323's remaining provisions bespeaks no limiting principle. *Post*, at 355–356 (dissenting opinion). As set forth in our discussion of those provisions, the record demonstrates close ties between federal officeholders and the state and local committees of their parties. That close relationship makes state and local parties effective conduits for donors desiring to corrupt federal candidates and officeholders. Thus, in upholding §§ 323(b), (d), and (f), we rely not only on the fact that they regulate contributions used to fund activities influencing federal elections, but also that they regulate contributions to, or at the behest of, entities uniquely positioned to serve as conduits for corruption. We agree with THE CHIEF JUSTICE that Congress could not regulate financial contributions to political talk show hosts or newspaper editors on the sole

### 3. *New FECA § 323(a)'s Restriction on Soliciting or Directing Soft Money*

Plaintiffs also contend that § 323(a)'s prohibition on national parties' soliciting or directing soft-money contributions is substantially overbroad. The reach of the solicitation prohibition, however, is limited. It bars only solicitations of soft money by national party committees and by party officers in their official capacities. The committees remain free to solicit hard money on their own behalf, as well as to solicit hard money on behalf of state committees and state and local candidates.[52] They also can contribute hard money to state committees and to candidates. In accordance with FEC regulations, furthermore, officers of national parties are free to solicit soft money in their individual capacities, or, if they are also officials of state parties, in that capacity. See 67 Fed. Reg. 49083 (2002).

This limited restriction on solicitation follows sensibly from the prohibition on national committees' receiving soft money. The same observations that led us to approve the latter compel us to reach the same conclusion regarding the former. A national committee is likely to respond favorably to a donation made at its request regardless of whether the

---

basis that their activities conferred a *benefit* on the candidate. *Post*, at 355 (dissenting opinion).

[52] Plaintiffs claim that the option of soliciting hard money for state and local candidates is an illusory one, since several States prohibit state and local candidates from establishing multiple campaign accounts, which would preclude them from establishing separate accounts for federal funds. See Cal. Fair Pol. Practs. Comm'n Advisory Op. A–91–448 (Dec. 16, 1991), 1991 WL 772902; Colo. Const., Art. XXVIII, § 2(3); Iowa Code § 56.5A (2003); and Ohio Rev. Code Ann. § 3517.10(J) (Anderson Supp. 2002). Plaintiffs maintain that § 323(a) combines with these state laws to make it impossible for state and local candidates to receive hard-money donations. But the challenge we are considering is a facial one, and on its face § 323(a) permits solicitations. The fact that a handful of States might interfere with the mechanism Congress has chosen for such solicitations is an argument that may be addressed in an as-applied challenge.

recipient is the committee itself or another entity. This principle accords with common sense and appears elsewhere in federal laws. *E. g.*, 18 U. S. C. § 201(b)(2) (prohibition on public officials "demand[ing] [or] seek[ing] . . . anything of value personally *or for any other person or entity* . . ." (emphasis added)); 5 CFR § 2635.203(f)(2) (2003) (restriction on gifts to federal employees encompasses gifts "[g]iven to any other person, including any charitable organization, on the basis of designation, recommendation, or other specification by the employee").

Plaintiffs argue that BCRA itself demonstrates the overbreadth of § 323(a)'s solicitation ban. They point in particular to § 323(e), which allows federal candidates and officeholders to solicit limited amounts of soft money from individual donors under certain circumstances. Compare 2 U. S. C. § 441i(a) with § 441i(e) (Supp. II). The differences between §§ 323(a) and 323(e), however, are without constitutional significance. We have recognized that "the 'differing structures and purposes' of different entities 'may require different forms of regulation in order to protect the integrity of the electoral process,'" *National Right to Work*, 459 U. S., at 210, and we respect Congress' decision to proceed in incremental steps in the area of campaign finance regulation, see *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 258, n. 11 (1986) *(MCFL); Buckley*, 424 U. S., at 105. The differences between the two provisions reflect Congress' reasonable judgments about the function played by national committees and the interactions between committees and officeholders, subjects about which Members of Congress have vastly superior knowledge.

### 4. *New FECA § 323(a)'s Application to Minor Parties*

The McConnell and political party plaintiffs contend that § 323(a) is substantially overbroad and must be stricken on its face because it impermissibly infringes the speech and

associational rights of minor parties such as the Libertarian National Committee, which, owing to their slim prospects for electoral·success and the fact that they receive few large soft-money contributions from corporate sources, pose no threat of corruption comparable to that posed by the RNC and DNC. In *Buckley*, we rejected a similar argument concerning limits on contributions to minor-party candidates, noting that "any attempt to exclude minor parties and independents en masse from the Act's contribution limitations overlooks the fact that minor-party candidates may win elective office or have a substantial impact on the outcome of an election." 424 U. S., at 34–35. We have thus recognized that the relevance of the interest in avoiding actual or apparent corruption is not a function of the number of legislators a given party manages to elect. It applies as much to a minor party that manages to elect only one of its members to federal office as it does to a major party whose members make up a majority of Congress. It is therefore reasonable to require that all parties and all candidates follow the same set of rules designed to protect the integrity of the electoral process.

We add that nothing in § 323(a) prevents individuals from pooling resources to start a new national party. *Post*, at 289 (KENNEDY, J., concurring in judgment in part and dissenting in part). Only when an organization has gained official status, *which carries with it significant benefits for its members,* will the proscriptions of § 323(a) apply. Even then, a nascent or struggling minor party can bring an as-applied challenge if § 323(a) prevents it from "amassing the resources necessary for effective advocacy." *Buckley, supra*, at 21.

### 5. *New FECA § 323(a)'s Associational Burdens*

Finally, plaintiffs assert that § 323(a) is unconstitutional because it impermissibly interferes with the ability of national committees to associate with state and local committees. By way of example, plaintiffs point to the Republican

Victory Plans, whereby the RNC acts in concert with the state and local committees of a given State to plan and implement joint, full-ticket fundraising and electioneering programs. See App. 693, 694–697 (declaration of John Peschong, RNC Western Reg. Political Dir. (describing the Republican Victory Plans)). The political parties assert that § 323(a) outlaws *any* participation in Victory Plans by RNC officers, including merely sitting down at a table and engaging in collective decisionmaking about how soft money will be solicited, received, and spent. Such associational burdens, they argue, are too great for the First Amendment to bear.

We are not persuaded by this argument because it hinges on an unnaturally broad reading of the terms "spend," "receive," "direct," and "solicit." 2 U. S. C. § 441i(a) (Supp. II). Nothing on the face of § 323(a) prohibits national party officers, whether acting in their official or individual capacities, from sitting down with state and local party committees or candidates to plan and advise how to raise and spend soft money. As long as the national party officer does not personally spend, receive, direct, or solicit soft money, § 323(a) permits a wide range of joint planning and electioneering activity. Intervenor-defendants, the principal drafters and proponents of the legislation, concede as much. Brief for Intervenor-Defendants Sen. John McCain et al. in No. 02–1674 et al., p. 22 ("BCRA leaves parties and candidates free to coordinate campaign plans and activities, political messages, and fundraising goals with one another"). The FEC's current definitions of § 323(a)'s terms are consistent with that view. See, *e. g.*, 11 CFR § 300.2(m) (2002) (defining "solicit" as "to *ask* . . . another person" (emphasis added)); § 300.2(n) (defining "direct" as "to *ask* a person who has expressed an intent to make a contribution . . . to make that contribution . . . including through a conduit or intermediary" (emphasis added)); § 300.2(c) (laying out the factors

that determine whether an entity will be considered to be controlled by a national committee).

Given the straightforward meaning of this provision, JUS-TICE KENNEDY is incorrect that "[a] national party's mere involvement in the strategic planning of fundraising for a state ballot initiative" or its assistance in developing a state party's Levin-money fundraising efforts risks a finding that the officers are in "'indirect control'" of the state party and subject to criminal penalties. *Post*, at 289. Moreover, § 323(a) leaves national party committee officers entirely free to participate, in their official capacities, with state and local parties and candidates in soliciting and spending hard money; party officials may also solicit soft money in their unofficial capacities.

Accordingly, we reject the plaintiffs' First Amendment challenge to new FECA § 323(a).

### New FECA § 323(b)'s Restrictions on State and Local Party Committees

In constructing a coherent scheme of campaign finance regulation, Congress recognized that, given the close ties between federal candidates and state party committees, BCRA's restrictions on national committee activity would rapidly become ineffective if state and local committees remained available as a conduit for soft-money donations.[53] Section 323(b) is designed to foreclose wholesale evasion of § 323(a)'s anticorruption measures by sharply curbing state committees' ability to use large soft-money contributions to influence federal elections. The core of § 323(b) is a straightforward contribution regulation: It prevents donors from

---

[53] Even opponents of campaign finance reform acknowledged that "a prohibition of soft money donations to national party committees alone would be wholly ineffective." The Constitution and Campaign Reform: Hearings on S. 522 before the Senate Committee on Rules and Administration, 106th Cong., 2d Sess., 301 (2000) (statement of Bobby R. Burchfield, Partner, Covington & Burling).

contributing nonfederal funds to state and local party committees to help finance "Federal election activity." 2 U. S. C. § 441i(b)(1) (Supp. II). The term "Federal election activity" encompasses four distinct categories of electioneering: (1) voter registration activity during the 120 days preceding a regularly scheduled federal election; (2) voter identification, get-out-the-vote (GOTV), and generic campaign activity[54] that is "conducted in connection with an election in which a candidate for Federal office appears on the ballot"; (3) any "public communication"[55] that "refers to a clearly identified candidate for Federal office" and "promotes," "supports," "attacks," or "opposes" a candidate for that office; and (4) the services provided by a state committee employee who dedicates more than 25% of his or her time to "activities in connection with a Federal election." §§ 431(20)(A)(i)–(iv). The Act explicitly excludes several categories of activity from this definition: public communications that refer solely to nonfederal candidates;[56] contributions to nonfederal candidates;[57] state and local political conventions; and the cost of grassroots campaign materials like bumper stickers that refer only to state candidates. § 431(20)(B). All activities that fall within the statutory definition must be funded with hard money. § 441i(b)(1).

Section 323(b)(2), the so-called Levin Amendment, carves out an exception to this general rule. A refinement on the pre-BCRA regime that permitted parties to pay for certain activities with a mix of federal and nonfederal funds, the

[54] Generic campaign activity promotes a political party rather than a specific candidate. 2 U. S. C. § 431(21) (Supp. II).

[55] A public communication is "a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising." § 431(22).

[56] So long as the communication does not constitute voter registration, voter identification, GOTV, or generic campaign activity. § 431(20)(B)(i).

[57] Unless the contribution is earmarked for federal election activity. § 431(20)(B)(ii).

Levin Amendment allows state and local party committees to pay for certain types of federal election activity with an allocated ratio of hard money and "Levin funds"—that is, funds raised within an annual limit of $10,000 per person. 2 U. S. C. § 441i(b)(2). Except for the $10,000 cap and certain related restrictions to prevent circumvention of that limit, § 323(b)(2) leaves regulation of such contributions to the States.[58]

The scope of the Levin Amendment is limited in two ways. First, state and local parties can use Levin money to fund only activities that fall within categories (1) and (2) of the statute's definition of federal election activity—namely, voter registration activity, voter identification drives, GOTV drives, and generic campaign activities. 2 U. S. C. § 441i(b)(2)(A). And not all of these activities qualify: Levin funds cannot be used to pay for any activities that refer to "a clearly identified candidate for Federal office"; they likewise cannot be used to fund broadcast communications unless they refer "solely to a clearly identified candidate for State or local office." §§ 441i(b)(2)(B)(i)–(ii).

Second, both the Levin funds and the allocated portion of hard money used to pay for such activities must be raised entirely by the state or local committee that spends them. § 441i(b)(2)(B)(iv). This means that a state party committee cannot use Levin funds transferred from other party committees to cover the Levin funds portion of a Levin Amendment expenditure. It also means that a state party committee cannot use hard money transferred from other party committees to cover the hard-money portion of a Levin Amendment expenditure. Furthermore, national committees, federal candidates, and federal officeholders generally may not solicit Levin funds on behalf of state committees, and state committees may not team up to raise Levin funds.

---

[58] The statute gives the FEC responsibility for setting the allocation ratio. § 441i(b)(2)(A); see also 11 CFR § 300.33(b) (2003) (defining allocation ratios).

§ 441i(b)(2)(C). They can, however, jointly raise the hard money used to make Levin expenditures.

### 1. *Governmental Interests Underlying New FECA 323(b)*

We begin by noting that, in addressing the problem of soft-money contributions to state committees, Congress both drew a conclusion and made a prediction. Its conclusion, based on the evidence before it, was that the corrupting influence of soft money does not insinuate itself into the political process solely through national party committees. Rather, state committees function as an alternative avenue for precisely the same corrupting forces.[59] Indeed, both candidates and parties already ask donors who have reached the limit on their direct contributions to donate to state committees.[60] There is at least as much evidence as there was in

---

[59] One former Senator noted:

" 'The fact is that much of what state and local parties do helps to elect federal candidates. The national parties know it; the candidates know it; the state and local parties know it. If state and local parties can use soft money for activities that affect federal elections, then the problem will not be solved at all. The same enormous incentives to raise the money will exist; the same large contributions by corporations, unions, and wealthy individuals will be made; the federal candidates who benefit from state party use of these funds will know exactly whom their benefactors are; the same degree of beholdenness and obligation will arise; the same distortions on the legislative process will occur; and the same public cynicism will erode the foundations of our democracy—except it will all be worse in the public's mind because a perceived reform was undercut once again by a loophole that allows big money into the system.' " 251 F. Supp. 2d, at 467 (Kollar-Kotelly, J.) (quoting Rudman Decl. ¶ 19, App. 746).

[60] *E.g.*, 251 F. Supp. 2d, at 479 (Kollar-Kotelly, J.) (" 'It is . . . not uncommon for the RNC to put interested donors in touch with various state parties. This often occurs when a donor has reached his or her federal dollar limits to the RNC, but wishes to make additional contributions to the state party' " (quoting declaration of Thomas Josefiak, RNC Chief Counsel ¶ 68, App. 308)); see also *Colorado II*, 533 U. S., at 458 (quoting Congressman Wayne Allard's Aug. 27, 1996, fundraising letter informing the recipient that " 'you are at the limit of what you can directly contribute

*Buckley* that such donations have been made with the intent—and in at least some cases the effect—of gaining influence over federal officeholders.[61]  Section 323(b) thus promotes an important governmental interest by confronting the corrupting influence that soft-money donations to political parties already have.

Congress also made a prediction.  Having been taught the hard lesson of circumvention by the entire history of campaign finance regulation, Congress knew that soft-money donors would react to § 323(a) by scrambling to find another way to purchase influence.  It was "neither novel nor implausible," *Shrink Missouri*, 528 U. S., at 391, for Congress to conclude that political parties would react to § 323(a) by directing soft-money contributors to the state committees, and that federal candidates would be just as indebted to these contributors as they had been to those who had formerly contributed to the national parties.  We "must accord substantial deference to the predictive judgments of Congress," *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 665 (1994) (plurality opinion), particularly when, as here, those predictions are so firmly rooted in relevant history and common sense.  Preventing corrupting activity from shift-

---

to my campaign,'" but "'you can further help my campaign by assisting the Colorado Republican Party'"); 251 F. Supp. 2d, at 454 (Kollar-Kotelly, J.) ("'Both political parties have found spending soft money with its accompanying hard money match through their state parties to work smoothly, for the most part, and state officials readily acknowledge they are simply "pass throughs" to the vendors providing the broadcast ads or direct mail'" (quoting Magleby Expert Report 37, App. 1510–1511)).

[61] The 1998 Senate Report found that, in exchange for a substantial donation to *state* Democratic committees and candidates, the DNC arranged meetings for the donor with the President and other federal officials.  1 1998 Senate Report 43–44; 2 *id.*, at 2907–2931; 5 *id.*, at 7519.  That same Report also detailed how Native American tribes that operated casinos made sizable soft-money contributions to state Democratic committees in apparent exchange for access and influence.  1 *id.*, at 44–46; 2 *id.*, at 3167–3194; see also McCain Decl., Exh. I (Weisskopf, The Busy Back-Door Men, Time, Mar. 31, 1997, p. 40).

ing wholesale to state committees and thereby eviscerating FECA clearly qualifies as an important governmental interest.

## 2. *New FECA § 323(b)'s Tailoring*

Plaintiffs argue that even if some legitimate interest might be served by § 323(b), the provision's restrictions are unjustifiably burdensome and therefore cannot be considered "closely drawn" to match the Government's objectives. They advance three main contentions in support of this proposition. First, they argue that the provision is substantially overbroad because it federalizes activities that pose no conceivable risk of corrupting or appearing to corrupt federal officeholders. Second, they argue that the Levin Amendment imposes an unconstitutional burden on the associational rights of political parties. Finally, they argue that the provision prevents them from amassing the resources they need to engage in effective advocacy. We address these points in turn.

### a. *§ 323(b)'s Application to Federal Election Activity*

Plaintiffs assert that § 323(b) represents a new brand of pervasive federal regulation of state-focused electioneering activities that cannot possibly corrupt or appear to corrupt federal officeholders and thus goes well beyond Congress' concerns about the corruption of the federal electoral process. We disagree.

It is true that § 323(b) captures some activities that affect state campaigns for nonfederal offices. But these are the same sorts of activities that already were covered by the FEC's pre-BCRA allocation rules, and thus had to be funded in part by hard money, because they affect federal as well as state elections. See 11 CFR § 106.5 (2002). As a practical matter, BCRA merely codifies the principles of the FEC's allocation regime while at the same time justifiably adjusting the formulas applicable to these activities in order to restore

the efficacy of FECA's longtime statutory restriction—approved by the Court and eroded by the FEC's allocation regime—on contributions to state and local party committees for the purpose of influencing federal elections. See 2 U. S. C. §§ 431(8)(A), 441a(a)(1)(C); see also *Buckley*, 424 U. S., at 38 (upholding FECA's $25,000 limit on aggregate contributions to candidates and political committees); cf. *California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182 (1981) (upholding FECA's $5,000 limit on contributions to multicandidate political committees).

Like the rest of Title I, § 323(b) is premised on Congress' judgment that if a large donation is capable of putting a federal candidate in the debt of the contributor, it poses a threat of corruption or the appearance of corruption. As we explain below, § 323(b) is narrowly focused on regulating contributions that pose the greatest risk of this kind of corruption: those contributions to state and local parties that can be used to benefit federal candidates directly. Further, these regulations all are reasonably tailored, with various temporal and substantive limitations designed to focus the regulations on the important anticorruption interests to be served. We conclude that § 323(b) is a closely drawn means of countering both corruption and the appearance of corruption.

The first two categories of "Federal election activity," voter registration efforts, § 301(20)(A)(i), and voter identification, GOTV, and generic campaign activities conducted in connection with a federal election, § 301(20)(A)(ii), clearly capture activity that benefits federal candidates. Common sense dictates, and it was "undisputed" below, that a party's efforts to register voters sympathetic to that party directly assist the party's candidates for federal office. 251 F. Supp. 2d, at 460 (Kollar-Kotelly, J.). It is equally clear that federal candidates reap substantial rewards from any efforts that increase the number of like-minded registered voters who

actually go to the polls.[62]  See, *e. g., id.,* at 459 (" '[The evidence] shows quite clearly that a campaign that mobilizes residents of a highly Republican precinct will produce a harvest of votes for Republican candidates for both state and federal offices.  A campaign need not mention federal candidates to have a direct effect on voting for such a candidate. . . . [G]eneric campaign activity has a direct effect on federal elections' " (quoting Green Expert Report 14)). Representatives of the four major congressional campaign committees confirmed that they " 'transfe[r] federal and nonfederal funds to state and/or local party committees for' " both voter registration and GOTV activities, and that " '[t]hese efforts have a significant effect on the election of federal candidates.' "  251 F. Supp. 2d, at 459, 461 (citations omitted).

The record also makes quite clear that federal officeholders are grateful for contributions to state and local parties that can be converted into GOTV-type efforts.  See *id.,* at 459 (quoting a letter thanking a California Democratic Party donor and noting that CDP's voter registration and GOTV efforts would help " 'increase the number of Californian Democrats in the United States Congress' " and " 'deliver California's 54 electoral votes' " to the Democratic Presidential candidate).

Because voter registration, voter identification, GOTV, and generic campaign activity all confer substantial benefits on federal candidates, the funding of such activities creates a significant risk of actual and apparent corruption.  Section 323(b) is a reasonable response to that risk.  Its contribution limitations are focused on the subset of voter registration activity that is most likely to affect the election prospects of federal candidates: activity that occurs within 120 days before a federal election.  And if the voter registration drive

---

[62] Since voter identification is a necessary precondition of any GOTV program, the findings regarding GOTV funding obviously apply with equal force to the funding of voter identification efforts.

does not specifically mention a federal candidate, state committees can take advantage of the Levin Amendment's higher contribution limits and relaxed source restrictions. 2 U. S. C. §§ 441i(b)(2)(B)(i)–(ii) (Supp. II). Similarly, the contribution limits applicable to § 301(20)(A)(ii) activities target only those voter identification, GOTV, and generic campaign efforts that occur "in connection with an election in which a candidate for a Federal office appears on the ballot." 2 U. S. C. § 431(20)(A)(ii). Appropriately, in implementing this subsection, the FEC has categorically excluded all activity that takes place during the runup to elections when no federal office is at stake.[63] Furthermore, state committees can take advantage of the Levin Amendment's higher contribution limits to fund any § 301(A)(20)(i) and § 301(A)(20)(ii) activities that do not specifically mention a federal candidate. 2 U. S. C. §§ 441i(b)(2)(B)(i)–(ii). The prohibition on the use of soft money in connection with these activities is therefore closely drawn to meet the sufficiently important governmental interests of avoiding corruption and its appearance.

"Public communications" that promote or attack a candidate for federal office—the third category of "Federal election activity," § 301(20)(A)(iii)—also undoubtedly have a dramatic effect on federal elections. Such ads were a prime motivating force behind BCRA's passage. See 3 1998 Senate Report 4535 (additional views of Sen. Collins) ("[T]he

---

[63] With respect to GOTV, voter identification, and other generic campaign activity, the FEC has interpreted § 323(b) to apply only to those activities conducted after the earliest filing deadline for access to the federal election ballot or, in States that do not conduct primaries, after January 1 of even-numbered years. 11 CFR § 100.24(a)(1) (2002). Any activities conducted outside of those periods are completely exempt from regulation under § 323(b). Of course, this facial challenge does not present the question of the FEC regulations' constitutionality. But the fact that the statute provides this basis for the FEC reasonably to narrow § 301(20)(A)(ii) further calls into question plaintiffs' claims of facial overbreadth. See Broadrick v. Oklahoma, 413 U. S. 601, 613 (1973).

hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble"). As explained below, any public communication that promotes or attacks a clearly identified federal candidate directly affects the election in which he is participating. The record on this score could scarcely be more abundant. Given the overwhelming tendency of public communications, as carefully defined in § 301(20)(A)(iii), to benefit directly federal candidates, we hold that application of § 323(b)'s contribution caps to such communications is also closely drawn to the anticorruption interest it is intended to address.[64]

As for the final category of "Federal election activity," § 301(20)(A)(iv), we find that Congress' interest in preventing circumvention of § 323(b)'s other restrictions justifies the requirement that state and local parties spend federal funds to pay the salary of any employee spending more than 25% of his or her compensated time on activities in connection with

---

[64] We likewise reject the argument that § 301(20)(A)(iii) is unconstitutionally vague. The words "promote," "oppose," "attack," and "support" clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision. These words "provide explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972). This is particularly the case here, since actions taken by political parties are presumed to be in connection with election campaigns. See *Buckley*, 424 U. S., at 79 (noting that a general requirement that political committees disclose their expenditures raised no vagueness problems because the term "political committee" "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate" and thus a political committee's expenditures "are, by definition, campaign related"). Furthermore, should plaintiffs feel that they need further guidance, they are able to seek advisory opinions for clarification, see 2 U. S. C. § 437f(a)(1), and thereby "remove any doubt there may be as to the meaning of the law," *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 580 (1973).

a federal election. In the absence of this provision, a party might use soft money to pay for the equivalent of a full-time employee engaged in federal electioneering, by the simple expedient of dividing the federal workload among multiple employees. Plaintiffs have suggested no reason for us to strike down this provision. Accordingly, we give "deference to [the] congressional determination of the need for [this] prophylactic rule." *National Conservative Political Action Comm.*, 470 U. S., at 500.

### b. *Associational Burdens Imposed by the Levin Amendment*

Plaintiffs also contend that § 323(b) is unconstitutional because the Levin Amendment unjustifiably burdens association among party committees by forbidding transfers of Levin funds among state parties, transfers of hard money to fund the allocable federal portion of Levin expenditures, and joint fundraising of Levin funds by state parties. We recognize, as we have in the past, the importance of preserving the associational freedom of parties. See, *e. g., California Democratic Party* v. *Jones*, 530 U. S. 567 (2000); *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214 (1989). But not every minor restriction on parties' otherwise unrestrained ability to associate is of constitutional dimension. See *Colorado II*, 533 U. S., at 450, n. 11.

As an initial matter, we note that state and local parties can avoid these associational burdens altogether by forgoing the Levin Amendment option and electing to pay for federal election activities entirely with hard money. But in any event, the restrictions on the use, transfer, and raising of Levin funds are justifiable anticircumvention measures. Without the ban on transfers of Levin funds among state committees, donors could readily circumvent the $10,000 limit on contributions to a committee's Levin account by making multiple $10,000 donations to various committees that could then transfer the donations to the committee of

choice.[65] The same anticircumvention goal undergirds the ban on joint solicitation of Levin funds. Without this restriction, state and local committees could organize "all hands" fundraisers at which individual, corporate, or union donors could make large soft-money donations to be divided between the committees. In that case, the purpose, if not the letter, of § 323(b)(2)'s $10,000 limit would be thwarted: Donors could make large, visible contributions at fundraisers, which would provide ready means for corrupting federal officeholders. Given the delicate and interconnected regulatory scheme at issue here, any associational burdens imposed by the Levin Amendment restrictions are far outweighed by the need to prevent circumvention of the entire scheme.

Section 323(b)(2)(B)(iv)'s apparent prohibition on the transfer of hard money by a national, state, or local committee to help fund the allocable hard-money portion of a separate state or local committee's Levin expenditures presents a closer question. 2 U. S. C. § 441i(b)(2)(B)(iv) (Supp. II). The Government defends the restriction as necessary to prevent the donor committee, particularly a national committee, from leveraging the transfer of federal money to wrest control over the spending of the recipient committee's Levin funds. This purported interest is weak, particularly given the fact that § 323(a) already polices attempts by national parties to engage in such behavior. See 2 U. S. C. § 441i(a)(2) (extending § 323(a)'s restrictions to entities *controlled* by national party committees). However, the associational burdens posed by the hard-money transfer restriction are so insubstantial as to be *de minimis.* Party committees, including national party committees, remain free to transfer

---

[65] Any doubts that donors would engage in such a seemingly complex scheme are put to rest by the record evidence in *Buckley* itself. See n. 6, *supra* (setting forth the Court of Appeals' findings regarding the efforts of milk producers to obtain a meeting with White House officials).

unlimited hard money so long as it is not used to fund Levin expenditures. State and local party committees can thus dedicate all "homegrown" hard money to their Levin activities while relying on outside transfers to defray the costs of other hard-money expenditures. Given the strong anticircumvention interest vindicated by § 323(b)(2)(B)(iv)'s restriction on the transfer of Levin funds, we will not strike down the entire provision based upon such an attenuated claim of associational infringement.

### c. New FECA § 323(b)'s Impact on Parties' Ability to Engage in Effective Advocacy

Finally, plaintiffs contend that § 323(b) is unconstitutional because its restrictions on soft-money contributions to state and local party committees will prevent them from engaging in effective advocacy. As Judge Kollar-Kotelly noted, the political parties' evidence regarding the impact of BCRA on their revenues is "speculative and not based on any analysis." 251 F. Supp. 2d, at 524. If the history of campaign finance regulation discussed above proves anything, it is that political parties are extraordinarily flexible in adapting to new restrictions on their fundraising abilities. Moreover, the mere fact that § 323(b) may reduce the relative amount of money available to state and local parties to fund federal election activities is largely inconsequential. The question is not whether § 323(b) reduces the amount of funds available over previous election cycles, but whether it is "so radical in effect as to . . . drive the sound of [the recipient's] voice below the level of notice." Shrink Missouri, 528 U. S., at 397. If indeed state or local parties can make such a showing, as-applied challenges remain available.

We accordingly conclude that § 323(b), on its face, is closely drawn to match the important governmental interests of preventing corruption and the appearance of corruption.

*New FECA § 323(d)'s Restrictions on Parties' Solicitations
for, and Donations to, Tax-Exempt Organizations*

Section 323(d) prohibits national, state, and local party committees, and their agents or subsidiaries, from "solicit-[ing] any funds for, or mak[ing] or direct[ing] any donations" to, any organization established under § 501(c) of the Internal Revenue Code[66] that makes expenditures in connection with an election for federal office, and any political organizations established under § 527 "other than a political committee, a State, district, or local committee of a political party, or the authorized campaign committee of a candidate for State or local office."[67]  2 U. S. C. § 441i(d) (Supp. II).  The District Court struck down the provision on its face.  We reverse and uphold § 323(d), narrowly construing the section's ban on donations to apply only to the donation of funds not raised in compliance with FECA.

### 1. *New FECA § 323(d)'s Regulation of Solicitations*

The Government defends § 323(d)'s ban on solicitations to tax-exempt organizations engaged in political activity as preventing circumvention of Title I's limits on contributions of soft money to national, state, and local party committees. That justification is entirely reasonable.  The history of Congress' efforts at campaign finance reform well demonstrates that "candidates, donors, and parties test the limits of the

---

[66] Section 501(c) organizations are groups generally exempted from taxation under the Internal Revenue Code.  26 U. S. C. § 501(a).  These include § 501(c)(3) charitable and educational organizations, as well as § 501(c)(4) social welfare groups.

[67] Section 527 "political organizations" are, unlike § 501(c) groups, organized for the express purpose of engaging in partisan political activity. They include any "party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures" for the purpose of "influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office."  26 U. S. C. § 527(e).

current law." *Colorado II,* 533 U. S., at 457. Absent the solicitation provision, national, state, and local party committees would have significant incentives to mobilize their formidable fundraising apparatuses, including the peddling of access to federal officeholders, into the service of like-minded tax-exempt organizations that conduct activities benefiting their candidates.[68] All of the corruption and appearance of corruption attendant on the operation of those fundraising apparatuses would follow. Donations made at the behest of party committees would almost certainly be regarded by party officials, donors, and federal officeholders alike as benefiting the party as well as its candidates. Yet, by soliciting the donations to third-party organizations, the parties would avoid FECA's source and amount limitations, as well as its disclosure restrictions. See 251 F. Supp. 2d, at 348 (Henderson, J.) (citing various declarations demonstrating that, prior to BCRA, most tax-exempt organizations did not disclose

---

[68] The record shows that many of the targeted tax-exempt organizations engage in sophisticated and effective electioneering activities for the purpose of influencing federal elections, including waging broadcast campaigns promoting or attacking particular candidates and conducting large-scale voter registration and GOTV drives. For instance, during the final weeks of the 2000 Presidential campaign, the NAACP's National Voter Fund registered more than 200,000 people, promoted a GOTV hotline, ran three newspaper print ads, and made several direct mailings. 251 F. Supp. 2d, at 348–349 (Henderson, J.). The NAACP reports that the program turned out one million additional African-American voters and increased turnout over 1996 among targeted groups by 22% in New York, 50% in Florida, and 140% in Missouri. *Ibid.* The effort, which cost $10 million, was funded primarily by a $7 million contribution from an anonymous donor. *Id.,* at 349 (citing cross-examination of Donald P. Green, Yale University 15–20, Exh. 3; see I Defs. Refiling Trs. on Pub. Record); 251 F. Supp. 2d, at 522 (Kollar-Kotelly, J.) (same); *id.,* at 851 (Leon, J.) (same); see also *id.,* at 349 (Henderson, J.) (stating that in 2000 the National Abortion and Reproductive Rights Action League (NARAL) spent $7.5 million and mobilized 2.1 million pro-choice voters (citing declaration of Mary Jane Gallagher, Exec. V. P., NARAL 8, App. 271–272, ¶ 24)); 251 F. Supp. 2d, at 522 (Kollar-Kotelly, J.) (same).

the source or amount of contributions); *id.*, at 521 (Kollar-Kotelly, J.) (same).

Experience under the current law demonstrates that Congress' concerns about circumvention are not merely hypothetical. Even without the added incentives created by Title I, national, state, and local parties already solicit unregulated soft-money donations to tax-exempt organizations for the purpose of supporting federal electioneering activity. See, *e. g.*, 3 1998 Senate Report 4013 ("In addition to direct contributions from the RNC to nonprofit groups, the senior leadership of the RNC helped to raise funds for many of the coalition's nonprofit organizations"); 4 *id.*, at 5983 (minority views) ("Tax-exempt 'issue advocacy' groups and other conduits were systematically used to circumvent the federal campaign finance laws"); 251 F. Supp. 2d, at 517 (Kollar-Kotelly, J.); *id.*, at 848 (Leon, J.). Parties and candidates have also begun to take advantage of so-called "politician 527s," which are little more than soft-money fronts for the promotion of particular federal officeholders and their interests. See *id.*, at 519 (Kollar-Kotelly, J.) (" 'Virtually every member of Congress in a formal leadership position has his or her own 527 group. . . . In all, Public Citizen found 63 current members of Congress who have their own 527s' " (quoting Public Citizen Congress Watch, Congressional Leaders' Soft Money Accounts Show Need for Campaign Finance Reform Bills, Feb. 26, 2002, p. 6)); 251 F. Supp. 2d, at 849–850 (Leon, J.). These 527s have been quite successful at raising substantial sums of soft money from corporate interests, as well as from the national parties themselves. See *id.*, at 519–520 (Kollar-Kotelly, J.) (finding that 27 industries had each donated over $100,000 in a single year to the top 25 politician 527 groups and that the DNC was the single largest contributor to politician 527 groups (citing Public Citizen Congress Watch, *supra*, at 10–11)); 251 F. Supp. 2d, at 850 (Leon, J.) (same). Given BCRA's tighter restrictions on

the raising and spending of soft money, the incentives for parties to exploit such organizations will only increase.

Section 323(d)'s solicitation restriction is closely drawn to prevent political parties from using tax-exempt organizations as soft-money surrogates. Though phrased as an absolute prohibition, the restriction does nothing more than subject contributions solicited by parties to FECA's regulatory regime, leaving open substantial opportunities for solicitation and other expressive activity in support of these organizations. First, and most obviously, § 323(d) restricts solicitations only to those § 501(c) groups "mak[ing] expenditures or disbursements in connection with an election for Federal office," 2 U. S. C. § 441i(d)(1) (Supp. II), and to § 527 organizations, which by definition engage in partisan political activity, § 441i(d)(2); 26 U. S. C. § 527(e). Second, parties remain free to solicit hard-money contributions to a § 501(c)'s federal PAC, as well as to § 527 organizations that already qualify as federal PACs.[69] Third, § 323(d) allows parties to endorse qualifying organizations in ways other than direct solicitations of unregulated donations. For example, with respect to § 501(c) organizations that are prohibited from administering PACs, parties can solicit hard-money donations to themselves for the express purpose of donating to these organizations. See *infra*, at 180–181. Finally, as with § 323(a), § 323(d) in no way restricts solicitations by party officers acting in their individual capacities. 2 U. S. C. § 441i(d) (extending restrictions to solicitations and donations

---

[69] Notably, the FEC has interpreted § 323(d)(2) to permit state, district, and local party committees to solicit donations to § 527 organizations that are state-registered PACs, that support only state or local candidates, and that do not make expenditures or disbursements in connection with federal elections. 11 CFR § 300.37(a)(3)(iv) (2003). The agency determined that this interpretation of "political committee"—at least with respect to state, district, and local committees—was consistent with BCRA's fundamental purpose of prohibiting soft money from being used in connection with federal elections. 67 Fed. Reg. 49106 (2002).

made by "an officer or agent acting *on behalf of* any such party committee" (emphasis added)).

In challenging § 323(d)'s ban on solicitations, plaintiffs renew the argument they made with respect to § 323(a)'s solicitation restrictions: that it cannot be squared with § 323(e), which allows federal candidates and officeholders to solicit limited donations of soft money to tax-exempt organizations that engage in federal election activities. Compare 2 U. S. C. § 441i(d) with § 441i(e)(4). But if § 323(d)'s restrictions on solicitations are otherwise valid, they are not rendered unconstitutional by the mere fact that Congress chose not to regulate the activities of another group as stringently as it might have. See *National Right to Work*, 459 U. S., at 210; see also *Katzenbach* v. *Morgan*, 384 U. S. 641, 656–657 (1966). In any event, the difference between the two provisions is fully explained by the fact that national party officers, unlike federal candidates and officeholders, are able to solicit soft money on behalf of nonprofit organizations in their individual capacities. Section 323(e), which is designed to accommodate the individual associational and speech interests of candidates and officeholders in lending personal support to nonprofit organizations, also places tight content, source, and amount restrictions on solicitations of soft money by federal candidates and officeholders. Given those limits, as well as the less rigorous standard of review, the greater allowances of § 323(e) do not render § 323(d)'s solicitation restriction facially invalid.

### 2. *New FECA § 323(d)'s Regulation of Donations*

Section 323(d) also prohibits national, state, and local party committees from making or directing "any donatio[n]" to qualifying § 501(c) or § 527 organizations. 2 U. S. C. § 441i(d) (Supp. II). The Government again defends the restriction as an anticircumvention measure. We agree insofar as it prohibits the donation of soft money. Absent such a restriction, state and local party committees could

accomplish directly what the antisolicitation restrictions prevent them from doing indirectly—namely, raising large sums of soft money to launder through tax-exempt organizations engaging in federal election activities. Because the party itself would be raising and collecting the funds, the potential for corruption would be that much greater. We will not disturb Congress' reasonable decision to close that loophole, particularly given a record demonstrating an already robust practice of parties making such donations. See 251 F. Supp. 2d, at 517–518 (Kollar-Kotelly); *id.*, at 848–849 (Leon, J.).

The prohibition does raise overbreadth concerns if read to restrict donations from a party's federal account—*i. e.*, funds that have already been raised in compliance with FECA's source, amount, and disclosure limitations. Parties have many valid reasons for giving to tax-exempt organizations, not the least of which is to associate themselves with certain causes and, in so doing, to demonstrate the values espoused by the party. A complete ban on donations prevents parties from making even the "general expression of support" that a contribution represents. *Buckley,* 424 U. S., at 21. At the same time, prohibiting parties from donating funds already raised in compliance with FECA does little to further Congress' goal of preventing corruption or the appearance of corruption of federal candidates and officeholders.

The Government asserts that the restriction is necessary to prevent parties from leveraging their hard money to gain control over a tax-exempt group's soft money. Even if we accepted that rationale, it would at most justify a dollar limit, not a flat ban. Moreover, any legitimate concerns over capture are diminished by the fact that the restrictions set forth in §§ 323(a) and (b) apply not only to party committees, but to entities under their control. See 2 U. S. C. § 441i(a)(2) (extending prohibitions on national party committees to "any entity that is directly or indirectly established, financed, maintained, *or controlled* by such a national committee" (em-

phasis added)); § 441i(b)(1) (same for state and local party committees).

These observations do not, however, require us to sustain plaintiffs' facial challenge to § 323(d)'s donation restriction. "When the validity of an act of the Congress is drawn in question, and . . . a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); see also *Boos* v. *Barry*, 485 U. S. 312, 331 (1988); *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982). Given our obligation to avoid constitutional problems, we narrowly construe § 323(d)'s ban to apply only to donations of funds not raised in compliance with FECA. This construction is consistent with the concerns animating Title I, whose purpose is to plug the soft-money loophole. Though there is little legislative history regarding BCRA generally, and almost nothing on § 323(d) specifically, the abuses identified in the 1998 Senate Report regarding campaign finance practices involve the use of nonprofit organizations as conduits for large *soft-money* donations. See, *e. g.*, 3 1998 Senate Report 4565 ("The evidence indicates that the soft-money loophole is fueling many of the campaign abuses investigated by the Committee. . . . Soft money also supplied the funds parties used to make contributions to tax-exempt groups, which in turn used the funds to pay for election-related activities"); *id.*, at 4568–4569 (describing as an "egregious exampl[e]" of misuse a $4.6 million donation of nonfederal funds by the RNC to Americans for Tax Reform, which the organization spent on "direct mail and phone bank operations to counter anti-Republican advertising"). We have found no evidence that Congress was concerned about, much less that it intended to prohibit, donations of money already fully regulated by FECA. Given Title I's exclusive focus on abuses related to soft money, we would expect that if Congress meant § 323(d)'s restriction to have this dramatic and

constitutionally questionable effect, it would say so explicitly. Because there is nothing that compels us to conclude that Congress intended "donations" to include transfers of federal money, and because of the constitutional infirmities such an interpretation would raise, we decline to read § 323(d) in that way. Thus, political parties remain free to make or direct donations of money to any tax-exempt organization that has otherwise been raised in compliance with FECA.

### New FECA § 323(e)'s Restrictions on Federal Candidates and Officeholders

New FECA § 323(e) regulates the raising and soliciting of soft money by federal candidates and officeholders. 2 U. S. C. § 441i(e) (Supp. II). It prohibits federal candidates and officeholders from "solicit[ing], receiv[ing], direct[ing], transfer[ing], or spend[ing]" any soft money in connection with federal elections. § 441i(e)(1)(A). It also limits the ability of federal candidates and officeholders to solicit, receive, direct, transfer, or spend soft money in connection with state and local elections. § 441i(e)(1)(B).[70]

Section 323(e)'s general prohibition on solicitations admits of a number of exceptions. For instance, federal candidates and officeholders are permitted to "attend, speak, or be a featured guest" at a state or local party fundraising event. 2 U. S. C. § 441i(e)(3). Section 323(e) specifically provides

---

[70] Section 323(e)(1)(B) tightly constrains the ability of federal candidates and officeholders to solicit or spend nonfederal money in connection with state or local elections. Contributions cannot exceed FECA's analogous hard-money contribution limits or come from prohibited sources. In effect, § 323(e)(1)(B) doubles the limits on what individuals can contribute to or at the behest of federal candidates and officeholders, while restricting the use of the additional funds to activities not related to federal elections. If the federal candidate or officeholder is also a candidate for state or local office, he or she may solicit, receive, and spend an unlimited amount of nonfederal money in connection with that election, subject only to state regulation and the requirement that such solicitation or expenditures refer only to the relevant state or local office. 2 U. S. C. § 441i(e)(2).

that federal candidates and officeholders may make solicitations of soft money to §501(c) organizations whose primary purpose is not to engage in "Federal election activit[ies]" as long as the solicitation does not specify how the funds will be spent, 2 U. S. C. §441i(e)(4)(A); to §501(c) organizations whose primary purpose *is* to engage in "Federal election activit[ies]" as long as the solicitations are limited to individuals and the amount solicited does not exceed $20,000 per year per individual, 2 U. S. C. §441i(e)(4)(B); and to §501(c) organizations for the express purpose of carrying out such activities, again so long as the amount solicited does not exceed $20,000 per year per individual, 2 U. S. C. §441i(e)(4)(B).

No party seriously questions the constitutionality of §323(e)'s general ban on donations of soft money made directly to federal candidates and officeholders, their agents, or entities established or controlled by them. Even on the narrowest reading of *Buckley*, a regulation restricting donations to a federal candidate, regardless of the ends to which those funds are ultimately put, qualifies as a contribution limit subject to less rigorous scrutiny. Such donations have only marginal speech and associational value, but at the same time pose a substantial threat of corruption. By severing the most direct link between the soft-money donor and the federal candidate, §323(e)'s ban on donations of soft money is closely drawn to prevent the corruption or the appearance of corruption of federal candidates and officeholders.

Section 323(e)'s restrictions on solicitations are justified as valid anticircumvention measures. Large soft-money donations at a candidate's or officeholder's behest give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder. Though the candidate may not ultimately control how the funds are spent, the value of the donation to the candidate or officeholder is evident from the fact of the solicitation itself. Without some restriction on solicitations, federal candidates and officeholders could easily avoid FECA's contribution limits by so-

liciting funds from large donors and restricted sources to like-minded organizations engaging in federal election activities. As the record demonstrates, even before the passage of BCRA, federal candidates and officeholders had already begun soliciting donations to state and local parties, as well as tax-exempt organizations, in order to help their own, as well as their party's, electoral cause. See *Colorado II*, 533 U. S., at 458 (quoting fundraising letter from a Congressman explaining to contributor that "'you are at the limit of what you can directly contribute to my campaign,' but 'you can further help my campaign by assisting the Colorado Republican Party'"); 251 F. Supp. 2d, at 479–480 (Kollar-Kotelly, J.) (surveying evidence of federal officeholders soliciting funds to state and local parties); *id.*, at 848 (Leon, J.) (same); *id.*, at 518 (Kollar-Kotelly, J.) (surveying evidence of federal officeholders soliciting funds for nonprofits for electioneering purposes); *id.*, at 849 (Leon, J.) (same). The incentives to do so, at least with respect to solicitations to tax-exempt organizations, will only increase with Title I's restrictions on the raising and spending of soft money by national, state, and local parties.

Section 323(e) addresses these concerns while accommodating the individual speech and associational rights of federal candidates and officeholders. Rather than place an outright ban on solicitations to tax-exempt organizations, § 323(e)(4) permits limited solicitations of soft money. 2 U. S. C. § 441i(e)(4). This allowance accommodates individuals who have long served as active members of nonprofit organizations in both their official and individual capacities. Similarly, §§ 323(e)(1)(B) and 323(e)(3) preserve the traditional fundraising role of federal officeholders by providing limited opportunities for federal candidates and officeholders to associate with their state and local colleagues through joint fundraising activities. 2 U. S. C. §§ 441i(e)(1)(B), 441i(e)(3). Given these many exceptions, as well as the substantial threat of corruption or its appearance posed by dona-

tions to or at the behest of federal candidates and officeholders, § 323(e) is clearly constitutional. We accordingly uphold § 323(e) against plaintiffs' First Amendment challenge.

### New FECA § 323(f)'s Restrictions on State Candidates and Officeholders

The final provision of Title I is new FECA § 323(f). 2 U. S. C. § 441i(f) (Supp. II). Section 323(f) generally prohibits candidates for state or local office, or state or local officeholders, from spending soft money to fund "public communications" as defined in § 301(20)(A)(iii)—i. e., a communication that "refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office." 2 U. S. C. § 441i(f)(1); § 431(20)(A)(iii). Exempted from this restriction are communications made in connection with an election for state or local office which refer only to the state or local candidate or officeholder making the expenditure or to any other candidate for the same state or local office. § 441i(f)(2).

Section 323(f) places no cap on the amount of money that state or local candidates can spend on any activity. Rather, like §§ 323(a) and 323(b), it limits only the source and amount of contributions that state and local candidates can draw on to fund expenditures that directly impact federal elections. And, by regulating only contributions used to fund "public communications," § 323(f) focuses narrowly on those soft-money donations with the greatest potential to corrupt or give rise to the appearance of corruption of federal candidates and officeholders.

Plaintiffs advance two principal arguments against § 323(f). We have already rejected the first argument, that the definition of "public communications" in new FECA § 301(20)(A)(iii) is unconstitutionally vague and overbroad. See n. 64, supra. We add only that, plaintiffs' and JUSTICE KENNEDY's contrary reading notwithstanding, post, at 316–

317, this provision does not prohibit a state or local candidate from advertising that he has received a federal officeholder's endorsement.[71]

The second argument, that soft-money contributions to state and local candidates for "public communications" do not corrupt or appear to corrupt federal candidates, ignores both the record in this litigation and Congress' strong interest in preventing circumvention of otherwise valid contribution limits. The proliferation of sham issue ads has driven the soft-money explosion. Parties have sought out every possible way to fund and produce these ads with soft money: They have labored to bring them under the FEC's allocation regime; they have raised and transferred soft money from national to state party committees to take advantage of favorable allocation ratios; and they have transferred and solicited funds to tax-exempt organizations for production of such ads. We will not upset Congress' eminently reasonable prediction that, with these other avenues no longer available, state and local candidates and officeholders will become the next conduits for the soft-money funding of sham issue advertising. We therefore uphold § 323(f) against plaintiffs' First Amendment challenge.[72]

---

[71] See 148 Cong. Rec. S2143 (Mar. 20, 2002) (statement of Sen. Feingold) (*Section 323(f) does not prohibit* "spending non-Federal money to run advertisements that mention that [state or local candidates] have been endorsed by a Federal candidate or say that they identify with a position of a named Federal candidate, so long as those advertisements do not support, attack, promote or oppose the Federal candidate").

[72] JUSTICE KENNEDY faults our "unwillingness" to confront that "Title I's entirety . . . look[s] very much like an incumbency protection plan," citing § 323(e), which provides officeholders and candidates with greater opportunities to solicit soft money than §§ 323(a) and (d) permit party officers. *Post*, at 306, 307. But, § 323(e) applies to both officeholders *and candidates* and allows only *minimally* greater opportunities for solicitation out of regard for the fact that candidates and officeholders, unlike party officers, can never step out of their official roles. *Supra*, at 183; 2 U. S. C. § 441i(e). Any concern that Congress might opportunistically

## B

Several plaintiffs contend that Title I exceeds Congress' Election Clause authority to "make or alter" rules governing federal elections, U. S. Const., Art. I, § 4, and, by impairing the authority of the States to regulate their own elections, violates constitutional principles of federalism. In examining congressional enactments for infirmity under the Tenth Amendment, this Court has focused its attention on laws that commandeer the States and state officials in carrying out federal regulatory schemes. See *Printz* v. *United States*, 521 U. S. 898 (1997); *New York* v. *United States*, 505 U. S. 144 (1992). By contrast, Title I of BCRA only regulates the conduct of private parties. It imposes no requirements whatsoever upon States or state officials, and, because it does not expressly pre-empt state legislation, it leaves the States free to enforce their own restrictions on the financing of state electoral campaigns. It is true that Title I, as amended, prohibits some fundraising tactics that would otherwise be permitted under the laws of various States, and that it may therefore have an indirect effect on the financing of state electoral campaigns. But these indirect effects do not render BCRA unconstitutional. It is not uncommon for federal law to prohibit private conduct that is legal in some States. See, *e. g.*, *United States* v. *Oakland Cannabis Buy-*

---

pass campaign-finance regulation for self-serving ends is taken into account by the applicable level of scrutiny. Congress must show concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption and that the chosen means of regulation are closely drawn to address that real or apparent corruption. It has done so here. At bottom, JUSTICE KENNEDY has long disagreed with the basic holding of *Buckley* and its progeny that less rigorous scrutiny—which shows a measure of deference to Congress in an area where it enjoys particular expertise—applies to assess limits on campaign contributions. *Colorado II*, 533 U. S., at 465 (THOMAS, J., dissenting) (joining JUSTICE THOMAS for the proposition that *"Buckley* should be overruled" (citation omitted)); *Shrink Missouri*, 528 U. S., at 405–410 (KENNEDY, J., dissenting).

*ers' Cooperative*, 532 U. S. 483 (2001). Indeed, such conflict is inevitable in areas of law that involve both state and federal concerns. It is not in and of itself a marker of constitutional infirmity. See *Ex parte Siebold*, 100 U. S. 371, 392 (1880).

Of course, in maintaining the federal system envisioned by the Founders, this Court has done more than just prevent Congress from commandeering the States. We have also policed the absolute boundaries of congressional power under Article I. See *United States* v. *Morrison*, 529 U. S. 598 (2000); *United States* v. *Lopez*, 514 U. S. 549 (1995). But plaintiffs offer no reason to believe that Congress has overstepped its Elections Clause power in enacting BCRA. Congress has a fully legitimate interest in maintaining the integrity of federal officeholders and preventing corruption of federal electoral processes through the means it has chosen. Indeed, our above analysis turns on our finding that those interests are sufficient to satisfy First Amendment scrutiny. Given that finding, we cannot conclude that those interests are insufficient to ground Congress' exercise of its Elections Clause power. See *Morrison, supra*, at 607 (respect owed to coordinate branches "demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds").

## C

Finally, plaintiffs argue that Title I violates the equal protection component of the Due Process Clause of the Fifth Amendment because it discriminates against political parties in favor of special interest groups such as the National Rifle Association, American Civil Liberties Union, and Sierra Club. As explained earlier, BCRA imposes numerous restrictions on the fundraising abilities of political parties, of which the soft-money ban is only the most prominent. Interest groups, however, remain free to raise soft money to fund voter registration, GOTV activities, mailings, and

broadcast advertising (other than electioneering communications). We conclude that this disparate treatment does not offend the Constitution.

As an initial matter, we note that BCRA actually favors political parties in many ways. Most obviously, party committees are entitled to receive individual contributions that substantially exceed FECA's limits on contributions to non-party political committees; individuals can give $25,000 to political party committees whereas they can give a maximum of $5,000 to nonparty political committees. In addition, party committees are entitled in effect to contribute to candidates by making coordinated expenditures, and those expenditures may greatly exceed the contribution limits that apply to other donors. See 2 U. S. C. § 441a(d) (Supp. II).

More importantly, however, Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation. See *National Right to Work*, 459 U. S., at 210. Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. As a result, it is hardly surprising that party affiliation is the primary way by which voters identify candidates, or that parties in turn have special access to and relationships with federal officeholders. Congress' efforts at campaign finance regulation may account for these salient differences. Taken seriously, plaintiffs' equal protection arguments would call into question not just Title I of BCRA, but much of the pre-existing structure of FECA as well. We therefore reject those arguments.

Accordingly, we affirm the judgment of the District Court insofar as it upheld §§ 323(e) and 323(f). We reverse the

judgment of the District Court insofar as it invalidated §§ 323(a), 323(b), and 323(d).

## IV

Title II of BCRA, entitled "Noncandidate Campaign Expenditures," is divided into two subtitles: "Electioneering Communications" and "Independent and Coordinated Expenditures." We consider each challenged section of these subtitles in turn.

### BCRA § 201's Definition of "Electioneering Communications"

The first section of Title II, § 201, comprehensively amends FECA § 304, which requires political committees to file detailed periodic financial reports with the FEC. The amendment coins a new term, "electioneering communications," to replace the narrowing construction of FECA's disclosure provisions adopted by this Court in *Buckley*. As discussed further below, that construction limited the coverage of FECA's disclosure requirement to communications expressly advocating the election or defeat of particular candidates. By contrast, the term "electioneering communication" is not so limited, but is defined to encompass any "broadcast, cable, or satellite communication" that

"(I) refers to a clearly identified candidate for Federal office;

"(II) is made within—

"(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

"(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

"(III) in the case of a communication which refers to a candidate for an office other than President or Vice

President, is targeted to the relevant electorate." 2 U. S. C. § 434(f)(3)(A)(i) (Supp. II).[73]

New FECA § 304(f)(3)(C) further provides that a communication is "'targeted to the relevant electorate'" if it "can be received by 50,000 or more persons" in the district or State the candidate seeks to represent. 2 U. S. C. § 434(f)(3)(C).

In addition to setting forth this definition, BCRA's amendments to FECA § 304 specify significant disclosure requirements for persons who fund electioneering communications. BCRA's use of this new term is not, however, limited to the disclosure context: A later section of the Act (BCRA § 203, which amends FECA § 316(b)(2)) restricts corporations' and labor unions' funding of electioneering communications. Plaintiffs challenge the constitutionality of the new term as it applies in both the disclosure and the expenditure contexts.

The major premise of plaintiffs'. challenge to BCRA's use of the term "electioneering communication" is that *Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech. Thus, plaintiffs maintain, Congress cannot constitutionally require disclosure of, or regulate expenditures for, "electioneering communications" without making an exception for those "communications" that do not meet *Buckley*'s definition of express advocacy.

That position misapprehends our prior decisions, for the express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law. In

_____

[73] BCRA also provides a "backup" definition of "electioneering communication," which would become effective if the primary definition were "held to be constitutionally insufficient by final judicial decision to support the regulation provided herein." 2 U. S. C. § 434(f)(3)(A)(ii). We uphold all applications of the primary definition and accordingly have no occasion to discuss the backup definition.

*Buckley* we began by examining then-18 U. S. C. § 608(e)(1) (1970 ed., Supp. IV), which restricted expenditures "'relative to a clearly identified candidate,'" and we found that the phrase "'relative to'" was impermissibly vague. 424 U. S., at 40–42. We concluded that the vagueness deficiencies could "be avoided only by reading § 608(e)(1) as limited to communications that include explicit words of advocacy of election or defeat of a candidate."[74] *Id.*, at 43. We provided examples of words of express advocacy, such as "'vote for,' 'elect,' 'support,' . . . 'defeat,' [and] 'reject,'" *id.*, at 44, n. 52, and those examples eventually gave rise to what is now known as the "magic words" requirement.

We then considered FECA's disclosure provisions, including 2 U. S. C. § 431(f) (1970 ed., Supp. IV), which defined "'expenditur[e]'" to include the use of money or other assets "'for the purpose of . . . influencing'" a federal election. *Buckley*, 424 U. S., at 77. Finding that the "ambiguity of this phrase" posed "constitutional problems," *ibid.*, we noted our "obligation to construe the statute, if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness," *id.*, at 77–78 (citations omitted). "To insure that the reach" of the disclosure requirement was "not impermissibly broad, we construe[d] 'expenditure' for purposes of that section in the same way we construed the terms of § 608(e)—to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80 (footnote omitted).

Thus, a plain reading of *Buckley* makes clear that the express advocacy limitation, in both the expenditure and the

---

[74] We then held that, so construed, the expenditure restriction did not advance a substantial government interest, because independent express advocacy did not pose a danger of real or apparent corruption, and the line between express advocacy and other electioneering activities was easily circumvented. Concluding that § 608(e)(1)'s heavy First Amendment burden was not justified, we invalidated the provision. *Buckley*, 424 U. S., at 45–48.

disclosure contexts, was the product of statutory interpretation rather than a constitutional command.[75] In narrowly reading the FECA provisions in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line. Nor did we suggest as much in *MCFL*, 479 U. S. 238 (1986), in which we addressed the scope of another FECA expenditure limitation and confirmed the understanding that *Buckley*'s express advocacy category was a product of statutory construction.[76]

In short, the concept of express advocacy and the concomitant class of magic words were born of an effort to avoid constitutional infirmities. See *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500 (1979) (citing *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804)). We have long "'rigidly adhered'" to the tenet "'never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" *United States* v. *Raines*, 362 U. S. 17, 21 (1960) (citation omitted), for "[t]he nature of judicial review constrains us to consider the case that is actually before us," *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 547 (1991) (Blackmun, J., concurring). Consistent with that principle, our decisions in *Buckley* and *MCFL* were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the

---

[75] Our adoption of a narrowing construction was consistent with our vagueness and overbreadth doctrines. See *Broadrick*, 413 U. S., at 613; *Grayned*, 408 U. S., at 108–114.

[76] The provision at issue in *MCFL*—2 U. S. C. § 441b (1982 ed.)—required corporations and unions to use separate segregated funds, rather than general treasury moneys, on expenditures made "'in connection with'" a federal election. 479 U. S., at 241. We noted that *Buckley* had limited the statutory term "'expenditure'" to words of express advocacy "in order to avoid problems of overbreadth." 479 U. S., at 248. We held that "a similar *construction*" must apply to the expenditure limitation before us in *MCFL* and that the reach of 2 U. S. C. § 441b was therefore constrained to express advocacy. 479 U. S., at 249 (emphasis added).

permissible scope of provisions regulating campaign-related speech.

Nor are we persuaded, independent of our precedents, that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy. That notion cannot be squared with our longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad. See *Buckley, supra*, at 45. Indeed, the unmistakable lesson from the record in this litigation, as all three judges on the District Court agreed, is that *Buckley*'s magic-words requirement is functionally meaningless. 251 F. Supp. 2d, at 303–304 (Henderson, J.); *id.*, at 534 (Kollar-Kotelly, J.); *id.*, at 875–879 (Leon, J.). Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted.[77] And although the resulting advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election.[78] *Buckley*'s

---

[77] As one major-party political consultant testified, "'it is rarely advisable to use such clumsy words as "vote for" or "vote against."'" 251 F. Supp. 2d, at 305 (Henderson, J.) (quoting declaration of Douglas L. Bailey, founder, Bailey, Deardourff & Assoc. 1–2, App. 24, ¶ 3). He explained: "'All advertising professionals understand that the most effective advertising leads the viewer to his or her own conclusion without forcing it down their throat.'" 251 F. Supp. 2d, at 305 (Henderson, J.). Other political professionals and academics confirm that the use of magic words has become an anachronism. See *id.*, at 531 (Kollar-Kotelly, J.) (citing declaration of Raymond D. Strother, Pres., Strother/Duffy/Strother ¶ 4, 9 Defs. Exhs., Tab 40); see Unsealed Pp. Vol., Tab 7; App. 1334–1335 (Krasno & Sorauf Expert Report); see also 251 F. Supp. 2d, at 305 (Henderson, J.); *id.*, at 532 (Kollar-Kotelly, J.); *id.*, at 875–876 (Leon, J.).

[78] One striking example is an ad that a group called "Citizens for Reform" sponsored during the 1996 Montana congressional race, in which Bill Yellowtail was a candidate. The ad stated:

"'Who is Bill Yellowtail? He preaches family values but took a swing at his wife. And Yellowtail's response? He only slapped her. But "her nose was not broken." He talks law and order . . . but is himself a con-

express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption, and Congress enacted BCRA to correct the flaws it found in the existing system.

Finally we observe that new FECA § 304(f)(3)'s definition of "electioneering communication" raises none of the vagueness concerns that drove our analysis in *Buckley.* The term "electioneering communication" applies only (1) to a broadcast (2) clearly identifying a candidate for federal office, (3) aired within a specific time period, and (4) targeted to an identified audience of at least 50,000 viewers or listeners. These components are both easily understood and objectively determinable. See *Grayned* v. *City of Rockford,* 408 U. S. 104, 108–114 (1972). Thus, the constitutional objection that persuaded the Court in *Buckley* to limit FECA's reach to express advocacy is simply inapposite here.

### BCRA § 201's Disclosure Requirements

Having rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy, we turn to plaintiffs' other concerns about the use of the term "electioneering communication" in amended FECA § 304's disclosure provisions. Under those provisions, whenever any person makes disbursements totaling more than $10,000 during any calendar year for the direct costs of producing and airing electioneering communications, he must file a statement with the FEC identifying the pertinent elections and all persons sharing the costs of the disbursements. 2 U. S. C. §§ 434(f)(2)(A), (B), and (D) (Supp. II). If the disbursements are made from a corporation's

---

victed felon. And though he talks about protecting children, Yellowtail failed to make his own child support payments—then voted against child support enforcement. Call Bill Yellowtail. Tell him to support family values.'" 5 1998 Senate Report 6305 (minority views).

The notion that this advertisement was designed purely to discuss the issue of family values strains credulity.

or labor union's segregated account,[79] or by a single individual who has collected contributions from others, the statement must identify all persons who contributed $1,000 or more to the account or the individual during the calendar year. §§ 434(f)(2)(E), (F). The statement must be filed within 24 hours of each "disclosure date"—a term defined to include the first date and all subsequent dates on which a person's aggregate undisclosed expenses for electioneering communications exceed $10,000 for that calendar year. §§ 434(f)(1), (2), and (4). Another subsection further provides that the execution of a contract to make a disbursement is itself treated as a disbursement for purposes of FECA's disclosure requirements. § 434(f)(5).

In addition to the failed argument that BCRA's amendments to FECA § 304 improperly extend to both express and issue advocacy, plaintiffs challenge amended FECA § 304's disclosure requirements as unnecessarily (1) requiring disclosure of the names of persons who contributed $1,000 or more to the individual or group that paid for a communication, and (2) mandating disclosure of executory contracts for communications that have not yet aired. The District Court rejected the former submission but accepted the latter, finding invalid new FECA § 304(f)(5), which governs executory contracts. Relying on BCRA's severability provision,[80] the court held that invalidation of the executory contracts subsection did

---

[79] As discussed below, *infra,* at 203–209, BCRA § 203 bars corporations and labor unions from funding electioneering communications with money from their general treasuries, instead requiring them to establish a "separate segregated fund" for such expenditures. 2 U. S. C. § 441b(b)(2).

[80] Section 401 of BCRA provides:

"If any provision of this Act or amendment made by this Act . . . , or the application of a provision or amendment to any person or circumstance, is held to be unconstitutional, the remainder of this Act and amendments made by this Act, and the application of the provisions and amendment to any person or circumstance, shall not be affected by the holding." 2 U. S. C. § 454 note.

not render the balance of BCRA's amendments to FECA § 304 unconstitutional. 251 F. Supp. 2d, at 242 *(per curiam)*.

We agree with the District Court that the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements—providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions—apply in full to BCRA.[81] Accordingly, *Buckley* amply supports application of FECA § 304's disclosure requirements to the entire range of "electioneering communications." As the authors of the District Court's *per curiam* opinion concluded after reviewing evidence concerning the use of purported "issue ads" to influence federal elections:

> "The factual record demonstrates that the abuse of the present law not only permits corporations and labor unions to fund broadcast advertisements designed to influence federal elections, but permits them to do so while concealing their identities from the public. BCRA's disclosure provisions require these organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections. Plaintiffs' disdain for BCRA's disclosure provisions is nothing short of surprising. Plaintiffs challenge BCRA's restrictions on electioneering communications on the premise that they should be permitted to spend corporate and labor union general treasury funds in the sixty

---

[81] The disclosure requirements that BCRA § 201 added to FECA § 304 are actually somewhat less intrusive than the comparable requirements that have long applied to persons making independent expenditures. For example, the previous version of § 304 required groups making independent expenditures to identify donors who contributed more than $200. 2 U. S. C. § 434(c)(2)(C). The comparable requirement in the amendments applies only to donors of $1,000 or more. §§ 434(f)(2)(E), (F) (Supp. II).

days before the federal elections on broadcast advertisements, which refer to federal candidates, because speech needs to be 'uninhibited, robust, and wide-open.' McConnell Br. at 44 (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964)). Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: 'The Coalition-Americans Working for Real Change' (funded by business organizations opposed to organized labor), 'Citizens for Better Medicare' (funded by the pharmaceutical industry), 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly). Findings ¶¶ 44, 51, 52. Given these tactics, Plaintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public. McConnell Br. at 44. Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." 251 F. Supp. 2d, at 237.

The District Court was also correct that *Buckley* forecloses a facial attack on the new provision in § 304 that requires disclosure of the names of persons contributing $1,000 or more to segregated funds or individuals that spend more than $10,000 in a calendar year on electioneering communications. Like our earlier decision in *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958),[82] *Buckley* recognized

---

[82] *NAACP* v. *Alabama* arose out of a judgment holding the NAACP in contempt for refusing to produce the names and addresses of its members and agents in Alabama. The NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostil-

that compelled disclosures may impose an unconstitutional burden on the freedom to associate in support of a particular cause. Nevertheless, *Buckley* rejected the contention that FECA's disclosure requirements could not constitutionally be applied to minor parties and independent candidates because the Government's interest in obtaining information from such parties was minimal and the danger of infringing their rights substantial. In *Buckley*, unlike *NAACP*, we found no evidence that any party had been exposed to economic reprisals or physical threats as a result of the compelled disclosures. 424 U. S., at 69–70. We acknowledged that such a case might arise in the future, however, and addressed the standard of proof that would then apply:

> "We recognize that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.*, at 74.

A few years later we used that standard to resolve a minor party's challenge to the constitutionality of the State of Ohio's disclosure requirements. We held that the First Amendment prohibits States from compelling disclosures that would subject identified persons to "threats, harassment, and reprisals," and that the District Court's findings

---

ity." 357 U. S., at 462. We thought it apparent that the compelled disclosure would "affect adversely" the NAACP and its members' ability "to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *Id.*, at 462–463. Under these circumstances, we concluded that Alabama's interest in determining whether the NAACP was doing business in the State was plainly insufficient to justify its production order. *Id.*, at 464–466.

had established a "reasonable probability" of such a result.[83] *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87, 100 (1982).

In this litigation the District Court applied *Buckley*'s evidentiary standard and found—consistent with our conclusion in *Buckley*, and in contrast to that in *Brown*—that the evidence did not establish the requisite "reasonable probability" of harm to any plaintiff group or its members. The District Court noted that some parties had expressed such concerns, but it found a "lack of specific evidence about the basis for these concerns." 251 F. Supp. 2d, at 247 *(per curiam)*. We agree, but we note that, like our refusal to recognize a blanket exception for minor parties in *Buckley*, our rejection of plaintiffs' facial challenge to the requirement to disclose individual donors does not foreclose possible future challenges to particular applications of that requirement.

We also are unpersuaded by plaintiffs' challenge to new FECA § 304(f)(5), which requires disclosure of executory contracts for electioneering communications:

---

[83] We stated:

"The District Court properly applied the *Buckley* test to the facts of this case. The District Court found 'substantial evidence of both governmental and private hostility toward and harassment of [Socialist Workers Party (SWP)] members and supporters.' Appellees introduced proof of specific incidents of private and government hostility toward the SWP and its members within the four years preceding the trial. These incidents, many of which occurred in Ohio and neighboring States, included threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office. There was also evidence that in the 12-month period before trial 22 SWP members, including 4 in Ohio, were fired because of their party membership. Although appellants contend that two of the Ohio firings were not politically motivated, the evidence amply supports the District Court's conclusion that 'private hostility and harassment toward SWP members make it difficult for them to maintain employment.' The District Court also found a past history of Government harassment of the SWP." *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87, 98–99 (1982) (paragraph break omitted).

"Contracts to disburse

"For purposes of this subsection, a person shall be treated as having made a disbursement if the person has executed a contract to make the disbursement." 2 U. S. C. § 434(f)(5) (Supp. II).

In our view, this provision serves an important purpose the District Court did not advance. BCRA's amendments to FECA § 304 mandate disclosure only if and when a person makes disbursements totaling more than $10,000 in any calendar year to pay for electioneering communications. Plaintiffs do not take issue with the use of a dollar amount, rather than the number or dates of the ads, to identify the time when a person paying for electioneering communications must make disclosures to the FEC. Nor do they question the need to make the contents of parties' disclosure statements available to curious voters in advance of elections. Given the relatively short timeframes in which electioneering communications are made, the interest in assuring that disclosures are made promptly and in time to provide relevant information to voters is unquestionably significant. Yet fixing the deadline for filing disclosure statements based on the date when aggregate disbursements exceed $10,000 would open a significant loophole if advertisers were not required to disclose executory contracts. In the absence of that requirement, political supporters could avoid preelection disclosures concerning ads slated to run during the final week of a campaign simply by making a preelection downpayment of less than $10,000, with the balance payable after the election. Indeed, if the advertiser waited to pay that balance until the next calendar year then, as long as the balance did not itself exceed $10,000, the advertiser might avoid the disclosure requirements completely.

The record contains little evidence identifying any harm that might flow from the enforcement of § 304(f)(5)'s "advance" disclosure requirement. The District Court speculated that disclosing information about contracts "that have

not been performed, and may never be performed, may lead to confusion and an unclear record upon which the public will evaluate the forces operating in the political marketplace." 251 F. Supp. 2d, at 241 *(per curiam)*. Without evidence relating to the frequency of nonperformance of executed contracts, such speculation cannot outweigh the public interest in ensuring full disclosure before an election actually takes place. It is no doubt true that § 304(f)(5) will sometimes require the filing of disclosure statements in advance of the actual broadcast of an advertisement.[84] But the same would be true in the absence of an advance disclosure requirement, if a television station insisted on advance payment for all of the ads covered by a contract. Thus, the possibility that amended § 304 may sometimes require disclosures prior to the airing of an ad is as much a function of the use of disbursements (rather than the date of an ad) to trigger the disclosure requirement as it is a function of § 304(f)(5)'s treatment of executory contracts.

As the District Court observed, amended FECA § 304's disclosure requirements are constitutional because they "'d[o] not prevent anyone from speaking.'" *Ibid.* (quoting Brief for FEC in Opposition in No. 02–582 et al. (DC), p. 112). Moreover, the required disclosures "'would not have to reveal the specific content of the advertisements, yet they would perform an important function in informing the public about various candidates' supporters *before* election day.'" 251 F. Supp. 2d, at 241 (quoting Brief for FEC in Opposition, *supra,* at 112) (emphasis in original). Accordingly, we affirm the judgment of the District Court insofar as it upheld the disclosure requirements in amended FECA § 304 and rejected the facial attack on the provisions relating to donors

---

[84] We cannot judge the likelihood that this will occur, as the record contains little if any description of the contractual provisions that commonly govern payments for electioneering communications. Nor does the record contain any evidence relating to JUSTICE KENNEDY's speculation, *post,* at 321, that advance disclosure may disadvantage an advertiser.

of $1,000 or more, and reverse that judgment insofar as it invalidated FECA § 304(f)(5).

### BCRA § 202's Treatment of "Coordinated Communications" as Contributions

Section 202 of BCRA amends FECA § 315(a)(7)(C) to provide that disbursements for "electioneering communication[s]" that are coordinated with a candidate or party will be treated as contributions to, and expenditures by, that candidate or party. 2 U. S. C. § 441a(a)(7)(C) (Supp. II).[85] The amendment clarifies the scope of the preceding subsection, § 315(a)(7)(B), which states more generally that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of" a candidate or party will constitute contributions. 2 U. S. C. §§ 441a(a)(7)(B)(i)–(ii) (2000 ed. and Supp. II). In *Buckley* we construed the statutory term "expenditure" to reach only spending for express advocacy. 424 U. S., at 40–44, and n. 52 (addressing 18 U. S. C. § 608(e)(1) (1970 ed., Supp. IV), which placed a $1,000 cap on expenditures "'relative to a clearly identified candidate'"). BCRA § 202 pre-empts a possible claim that § 315(a)(7)(B) is similarly limited, such that coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions. As we ex-

---

[85] New FECA § 315(a)(7)(C) reads as follows:

"[I]f—

"(i) any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of section 434(f)(3) of this title); and

"(ii) such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee;

"such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party . . . ." 2 U. S. C. § 441a(a)(7)(C).

plained above, see *supra*, at 190–193, *Buckley*'s narrow interpretation of the term "expenditure" was not a constitutional limitation on Congress' power to regulate federal elections. Accordingly, there is no reason why Congress may not treat coordinated disbursements for electioneering communications in the same way it treats all other coordinated expenditures. We affirm the judgment of the District Court insofar as it held that plaintiffs had advanced "no basis for finding Section 202 unconstitutional." 251 F. Supp. 2d, at 250.

### BCRA § 203's Prohibition of Corporate and Labor Disbursements for Electioneering Communications

Since our decision in *Buckley*, Congress' power to prohibit corporations and unions from using funds in their treasuries to finance advertisements expressly advocating the election or defeat of candidates in federal elections has been firmly embedded in our law. The ability to form and administer separate segregated funds authorized by FECA § 316, 2 U. S. C. § 441b (2000 ed. and Supp. II), has provided corporations and unions with a constitutionally sufficient opportunity to engage in express advocacy. That has been this Court's unanimous view,[86] and it is not challenged in this litigation.

---

[86] We have explained:

"The statutory purpose of § 441b . . . is to prohibit contributions or expenditures by corporations or labor organizations in connection with federal elections. 2 U. S. C. § 441b(a). The section, however, permits some participation of unions and corporations in the federal electoral process by allowing them to establish and pay the administrative expenses of 'separate segregated fund[s],' which may be 'utilized for political purposes.' 2 U. S. C. § 441b(b)(2)(C). The Act restricts the operations of such segregated funds, however, by making it unlawful for a corporation to solicit contributions to a fund established by it from persons other than its 'stockholders and their families and its executive or administrative personnel and their families.' 2 U. S. C. § 441b(b)(4)(A)." *National Right to Work*, 459 U. S., at 201–202.

Section 203 of BCRA amends FECA § 316(b)(2) to extend this rule, which previously applied only to express advocacy, to all "electioneering communications" covered by the definition of that term in amended FECA § 304(f)(3), discussed above. 2 U. S. C. § 441b(b)(2) (Supp. II).[87] Thus, under BCRA, corporations and unions may not use their general treasury funds to finance electioneering communications, but they remain free to organize and administer segregated funds, or PACs, for that purpose. Because corporations can still fund electioneering communications with PAC money, it is "simply wrong" to view the provision as a "complete ban" on expression rather than a regulation. *Beaumont*, 539 U. S., at 162. As we explained in *Beaumont:*

> "The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the sentiments of some shareholders or members, and it lets the government regulate campaign activity through registration and disclosure, see [2 U. S. C.] §§ 432–434, without jeopardizing the associational rights of advocacy organizations' members." *Id.*, at 163 (citation omitted).

See also *Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 658 (1990).

Rather than arguing that the prohibition on the use of general treasury funds is a complete ban that operates as a prior restraint, plaintiffs instead challenge the expanded regulation on the grounds that it is both overbroad and underinclusive. Our consideration of plaintiffs' challenge is informed by our earlier conclusion that the distinction between ex-

---

[87] The amendment is straightforward. Prior to BCRA, FECA § 316(a) made it "unlawful . . . for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with" certain federal elections. 2 U. S. C. § 441b(a) (2000 ed.). BCRA amends FECA § 316(b)(2)'s definition of the term "contribution or expenditure" to include "any applicable electioneering communication." § 441b(b)(2) (Supp. II).

press advocacy and so-called issue advocacy is not constitutionally compelled. In that light, we must examine the degree to which BCRA burdens First Amendment expression and evaluate whether a compelling governmental interest justifies that burden. *Id.*, at 657. The latter question—whether the state interest is compelling—is easily answered by our prior decisions regarding campaign finance regulation, which "represent respect for the 'legislative judgment that the special characteristics of the corporate structure require particularly careful regulation.'" *Beaumont, supra*, at 155 (quoting *National Right to Work*, 459 U. S., at 209–210). We have repeatedly sustained legislation aimed at "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin, supra*, at 660; see *Beaumont, supra*, at 154–155; *National Right to Work, supra*, at 209–210. Moreover, recent cases have recognized that certain restrictions on corporate electoral involvement permissibly hedge against "'circumvention of [valid] contribution limits.'" *Beaumont, supra*, at 155 (quoting *Colorado II*, 533 U. S., at 456, and n. 18.)

In light of our precedents, plaintiffs do not contest that the Government has a compelling interest in regulating advertisements that expressly advocate the election or defeat of a candidate for federal office. Nor do they contend that the speech involved in so-called issue advocacy is any more core political speech than are words of express advocacy. After all, "the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office," *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971), and "[a]dvocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation," *Buckley*, 424 U. S., at 48. Rather, plaintiffs argue that

the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications.

This argument fails to the extent that the issue ads broadcast during the 30- and 60-day periods preceding federal primary and general elections are the functional equivalent of express advocacy. The justifications for the regulation of express advocacy apply equally to ads aired during those periods if the ads are intended to influence the voters' decisions and have that effect. The precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief preelection timespans but had no electioneering purpose is a matter of dispute between the parties and among the judges on the District Court. See 251 F. Supp. 2d, at 307–312 (Henderson, J.); id., at 583–587 (Kollar-Kotelly, J.); id., at 796–798 (Leon, J.). Nevertheless, the vast majority of ads clearly had such a purpose. Annenberg Report 13–14; App. 1330–1348 (Krasno & Sorauf Expert Report); 251 F. Supp. 2d, at 573–578 (Kollar-Kotelly, J.); id., at 826–827 (Leon, J.). Moreover, whatever the precise percentage may have been in the past, in the future corporations and unions may finance genuine issue ads during those timeframes by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund.[88]

---

[88] As JUSTICE KENNEDY emphasizes in dissent, post, at 326–328, we assume that the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads. The premise that apparently underlies JUSTICE KENNEDY's principal submission is a conclusion that the two categories of speech are nevertheless entitled to the same constitutional protection. If that is correct, JUSTICE KENNEDY must take issue with the basic holding in Buckley and, indeed, with our recognition in First Nat. Bank of Boston v. Bellotti, 435 U. S. 765 (1978), that unusually important interests underlie the regulation of corporations' campaign-related speech. In Bellotti we cited Buckley, among other cases, for the proposition that "[p]reserving the integrity of the electoral

We are therefore not persuaded that plaintiffs have carried their heavy burden of proving that amended FECA §316(b)(2) is overbroad. See *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). Even if we assumed that BCRA will inhibit some constitutionally protected corporate and union speech, that assumption would not "justify prohibiting all enforcement" of the law unless its application to protected speech is substantial, "not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *Virginia* v. *Hicks*, 539 U. S. 113, 120, (2003). Far from establishing that BCRA's application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion.

Plaintiffs also argue that FECA §316(b)(2)'s segregated-fund requirement for electioneering communications is underinclusive because it does not apply to advertising in the print media or on the Internet. 2 U. S. C. §434(f) (3)(A) (Supp. II). The records developed in this litigation and by the Senate Committee adequately explain the reasons for this legislative choice. Congress found that corporations and unions used soft money to finance a virtual torrent of televised election-related ads during the periods immediately preceding federal elections, and that remedial legislation was needed to stanch that flow of money. 251 *F. Supp. 2d, at 569–573 (Kollar-Kotelly, J.); id., at 799 (Leon,* J.); 3 1998 Senate Report 4465, 4474–4481; 5 *id.*, at 7521–7525. As we held in *Buckley*, "reform may take one step at a time,

---

process, preventing corruption, and 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of the government' are interests of the highest importance." 435 U. S., at 788–789 (citations and footnote omitted). "Preservation of the individual citizen's confidence in government," we added, "is equally important." *Id.*, at 789. BCRA's fidelity to those imperatives sets it apart from the statute in *Bellotti*—and, for that matter, from the Ohio statute banning the distribution of anonymous campaign literature, struck down in *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995).

addressing itself to the phase of the problem which seems most acute to the legislative mind." 424 U. S., at 105 (internal quotation marks and citations omitted). One might just as well argue that the electioneering communication definition is underinclusive because it leaves advertising 61 days in advance of an election entirely unregulated. The record amply justifies Congress' line-drawing.

In addition to arguing that § 316(b)(2)'s segregated-fund requirement is underinclusive, some plaintiffs contend that it unconstitutionally discriminates in favor of media companies. FECA § 304(f)(3)(B)(i) excludes from the definition of electioneering communications any "communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate." 2 U. S. C. § 434(f)(3)(B)(i) (Supp. II). Plaintiffs argue this provision gives free rein to media companies to engage in speech without resort to PAC money. Section 304(f)(3)(B)(i)'s effect, however, is much narrower than plaintiffs suggest. The provision excepts news items and commentary only; it does not afford *carte blanche* to media companies generally to ignore FECA's provisions. The statute's narrow exception is wholly consistent with First Amendment principles. "A valid distinction . . . exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public." *Austin*, 494 U. S., at 668. Numerous federal statutes have drawn this distinction to ensure that the law "does not hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events." *Ibid.* (citations omitted); see, *e. g.*, 2 U. S. C. § 431(9)(B)(i) (exempting news stories, commentaries, and editorials from FECA's definition of "expenditure"); 15 U. S. C. §§ 1801–1804 (providing a limited antitrust exemption for newspapers); 47 U. S. C. § 315(a) (excepting newscasts, news

interviews, and news documentaries from the requirement that broadcasters provide equal time to candidates for public office).[89]

We affirm the District Court's judgment to the extent that it upheld the constitutionality of FECA §316(b)(2); to the extent that it invalidated any part of §316(b)(2), we reverse the judgment.

## BCRA §204's Application to Nonprofit Corporations

Section 204 of BCRA, which adds FECA §316(c)(6), applies the prohibition on the use of general treasury funds to pay for electioneering communications to not-for-profit corporations.[90]  Prior to the enactment of BCRA, FECA re-

---

[89] In a different but somewhat related argument, one set of plaintiffs contends that political campaigns and issue advocacy involve press activities, and that BCRA therefore interferes with speakers' rights under the Freedom of the Press Clause.  U. S. Const., Amdt. 1.  We affirm the District Court's conclusion that this contention lacks merit.

[90] The statutory scheme is somewhat complex.  In its provision dealing with "Rules Relating to Electioneering Communications," BCRA §203(c)(2) (adding FECA §316(c)(2)) makes a blanket exception for designated nonprofit organizations, which reads as follows:

"Exception

"Notwithstanding paragraph (1), the term 'applicable electioneering communication' does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of title 26) made under section 434(f)(2)(E) or (F) of this title if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of title 8).  For purposes of the preceding sentence, the term 'provided directly by individuals' does not include funds the source of which is an entity described in subsection (a) of this section."  2 U. S. C. §441b(c)(2) (Supp. II).

BCRA §204, however, amends FECA §316(c) to exclude "targeted communications" from that exception.  New FECA §316(c)(6) states that the §316(c)(2) exception "shall not apply in the case of a targeted communication that is made by an organization described" in §316(b)(2).  2 U. S. C. §441b(c)(6)(A).  Subparagraph (B) then defines the term "targeted communication" for the purpose of the provision as including all

quired such corporations, like business corporations, to pay for their express advocacy from segregated funds rather than from their general treasuries. Our recent decision in *Federal Election Comm'n v. Beaumont*, 539 U. S. 146 (2003), confirmed that the requirement was valid except insofar as it applied to a subcategory of corporations described as "*MCFL* organizations," as defined by our decision in *MCFL*, 479 U. S. 238 (1986).[91] The constitutional objection to applying FECA's segregated-fund requirement to so-called *MCFL* organizations necessarily applies with equal force to FECA § 316(c)(6).

Our decision in *MCFL* related to a carefully defined category of entities. We identified three features of the organization at issue in that case that were central to our holding:

> "*First*, it was formed for the express purpose of promoting political ideas, and cannot engage in business activities. If political fundraising events are expressly denominated as requests for contributions that will be used for political purposes, including direct expenditures, these events cannot be considered business activities. This ensures that political resources reflect political support. *Second*, it has no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with

electioneering communications. The parties and the judges on the District Court have assumed that amended FECA § 316(c)(6) completely canceled the exemption for nonprofit corporations set forth in § 316(c)(2). 251 F. Supp. 2d, at 804 (Leon, J.) ("Section 204 completely cancels out the exemption for all nonprofit corporations provided by Section 203").

[91] "[A] unanimous Court in *National Right to Work* did not think the regulatory burdens on PACs, including restrictions on their ability to solicit funds, rendered a PAC unconstitutional as an advocacy corporation's sole avenue for making political contributions. See 459 U. S., at 201–202. There is no reason to think the burden on advocacy corporations is any greater today, or to reach a different conclusion here." *Beaumont*, 539 U. S., at 163.

the organization will have no economic disincentive for disassociating with it if they disagree with its political activity. *Third,* MCFL was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities. This prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace." *Id.,* at 264.

That FECA § 316(c)(6) does not, on its face, exempt *MCFL* organizations from its prohibition is not a sufficient reason to invalidate the entire section. If a reasonable limiting construction "has been or could be placed on the challenged statute" to avoid constitutional concerns, we should embrace it. *Broadrick,* 413 U. S., at 613; *Buckley,* 424 U. S., at 44. Because our decision in the *MCFL* case was on the books for many years before BCRA was enacted, we presume that the legislators who drafted § 316(c)(6) were fully aware that the provision could not validly apply to *MCFL*-type entities. See *Bowen* v. *Massachusetts,* 487 U. S. 879, 896 (1988); *Cannon* v. *University of Chicago,* 441 U. S. 677, 696–697 (1979). Indeed, the Government itself concedes that § 316(c)(6) does not apply to *MCFL* organizations. As so construed, the provision is plainly valid. See *Austin,* 494 U. S., at 661–665 (holding that a segregated-fund requirement that did not explicitly carve out an *MCFL* exception could apply to a nonprofit corporation that did not qualify for *MCFL* status).

Accordingly, the judgment of the District Court upholding § 316(c)(6) as so limited is affirmed.

*BCRA § 212's Reporting Requirement for*
*$1,000 Expenditures*

Section 212 of BCRA amends FECA § 304 to add a new disclosure requirement, FECA § 304(g), which applies to persons making independent expenditures of $1,000 or more during the 20-day period immediately preceding an election.

Like FECA § 304(f)(5), discussed above, new § 304(g) treats the execution of a contract to make a disbursement as the functional equivalent of a payment for the goods or services covered by the contract.[92] In challenging this provision, plaintiffs renew the argument we rejected in the context of § 304(f)(5): that they have a constitutional right to postpone any disclosure until after the performance of the services purchased by their expenditure.

The District Court held that the challenge to FECA § 304(g) was not ripe because the FEC has issued regulations "provid[ing] Plaintiffs with the exact remedy they seek"— that is, specifically declining to "require disclosure of independent express advocacy expenditures prior to their 'public[c] disseminat[ion].'" 251 F. Supp. 2d, at 251, and n. 85 *(per curiam)* (citing 68 Fed. Reg. 404, 452 (2003) (codified at 11 CFR §§ 109.10(c), (d) (2003))). We are not certain that a regulation purporting to limit the range of circumstances in which a speech-burdening statute will be enforced can render nonjusticiable a facial challenge to the (concededly broader) underlying statute. Nevertheless, we need not separately address the constitutionality of § 304(g), for our ruling as to BCRA § 201, see *supra*, at 194–202, renders the issue essentially moot.

---

[92] New FECA § 304(g) provides:

"Time for reporting certain expenditures

"(1) Expenditures aggregating $1,000

"(A) Initial report

"A person (including a political committee) that makes or contracts to make independent expenditures aggregating $1,000 or more after the 20th day, but more than 24 hours, before the date of an election shall file a report describing the expenditures within 24 hours.

"(B) Additional reports

"After a person files a report under subparagraph (A), the person shall file an additional report within 24 hours after each time the person makes or contracts to make independent expenditures aggregating an additional $1,000 with respect to the same election as that to which the initial report relates." 2 U. S. C. § 434(g) (Supp. II).

## BCRA § 213's Requirement that Political Parties Choose Between Coordinated and Independent Expenditures After Nominating a Candidate

Section 213 of BCRA amends FECA § 315(d)(4) to impose certain limits on party spending during the postnomination, preelection period.[93] At first blush, the text of § 315(d)(4)(A) appears to require political parties to make a straightforward choice between using limited coordinated expenditures or unlimited independent expenditures to support their nominees. All three judges on the District Court concluded that the provision placed an unconstitutional burden on the parties' right to make unlimited independent expenditures.

---

[93] New FECA § 315(d)(4) reads as follows:

"Independent versus coordinated expenditures by party

"(A) In general

"On or after the date on which a political party nominates a candidate, no committee of the political party may make—

"(i) any coordinated expenditure under this subsection with respect to the candidate during the election cycle at any time after it makes any independent expenditure (as defined in section 431(17) of this title) with respect to the candidate during the election cycle; or

"(ii) any independent expenditure (as defined in section 431(17) of this title) with respect to the candidate during the election cycle at any time after it makes any coordinated expenditure under this subsection with respect to the candidate during the election cycle.

"(B) Application

"For purposes of this paragraph, all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee.

"(C) Transfers

"A committee of a political party that makes coordinated expenditures under this subsection with respect to a candidate shall not, during an election cycle, transfer any funds to, assign authority to make coordinated expenditures under this subsection to, or receive a transfer of funds from, a committee of the political party that has made or intends to make an independent expenditure with respect to the candidate." 2 U. S. C. § 441a(d)(4) (Supp. II).

251 F. Supp. 2d, at 388 (Henderson, J.); *id.*, at 650–651 (Kollar-Kotelly, J.), *id.*, at 805–808 (Leon, J.). In the end, we agree with that conclusion but believe it important to identify certain complexities in the text of §315(d)(4) that affect our analysis of the issue.

Section 315 of FECA sets forth various limitations on contributions and expenditures by individuals, political parties, and other groups. Section 315(a)(2) restricts "contributions" by parties to $5,000 per candidate. 2 U. S. C. §441a(a)(2). Because §315(a)(7) treats expenditures that are coordinated with a candidate as contributions to that candidate, 2 U. S. C. §441a(a)(7) (2000 ed. and Supp. II), the $5,000 limit also operates as a cap on parties' coordinated expenditures. Section 315(d), however, provides that, "[n]otwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions," political parties may make "expenditures" in support of their candidates under a formula keyed to the voting-age population of the candidate's home State or, in the case of a candidate for President, the voting-age population of the United States. 2 U. S. C. §§441a(d)(1)–(3) (2000 ed. and Supp. II).[94] In

---

[94] After exempting political parties from the general contribution and expenditure limitations of the statute, 2 U. S. C. §441a(d)(1) (Supp. II), FECA §315(d) imposes the following substitute limitations on party spending:

"(2) The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (e) of this section). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.

"(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election

the year 2000, that formula permitted expenditures ranging from $33,780 to $67,650 for House of Representatives races, and from $67,650 to $1.6 million for Senate races. *Colorado II*, 533 U. S., at 439, n. 3. We held in *Colorado I* that parties have a constitutional right to make unlimited independent expenditures, and we invalidated § 315(d) to the extent that it restricted such expenditures. As a result of that decision, § 315(d) applies only to coordinated expenditures, replacing the $5,000 cap on contributions set out in § 315(a)(2) with the more generous limitations prescribed by §§ 315(d)(1)–(3). We sustained that limited application in *Colorado II, supra.*

Section 213 of BCRA amends § 315(d) by adding a new paragraph (4). New § 315(d)(4)(A) provides that, after a party nominates a candidate for federal office, it must choose between two spending options. Under the first option, a party that "makes any independent expenditure (as defined in section [301(17)])" is thereby barred from making "any coordinated expenditure under this subsection." 2 U. S. C. § 441a(d)(4)(A)(i) (Supp. II). The phrase "this subsection" is a reference to subsection (d) of § 315. Thus, the consequence of making an independent expenditure is not a complete prohibition of any coordinated expenditure: Although the party cannot take advantage of the increased spending limits under §§ 315(d)(1)–(3), it still may make up to $5,000 in coordinated expenditures under § 315(a)(2). As *the difference between $5,000 and $1.6 million demonstrates,*

---

campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

"(A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

"(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

"(ii) $20,000; and

"(B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000." 2 U. S. C. §§ 441a(d)(2)–(3).

however, that is a significant cost to impose on the exercise of a constitutional right.

The second option is the converse of the first. It provides that a party that makes any coordinated expenditure "under this subsection" (*i. e.*, one that exceeds the ordinary $5,000 limit) cannot make "any independent expenditure (as defined in section [301(17)]) with respect to the candidate." 2 U. S. C. § 441a(d)(4)(A)(ii). Section 301(17) defines "'independent expenditure'" to mean a noncoordinated expenditure "expressly advocating the election or defeat of a clearly identified candidate." 2 U. S. C. § 431(17)(A).[95] Therefore, as was true of the first option, the party's choice is not as stark as it initially appears: The consequence of the larger coordinated expenditure is not a complete prohibition of any independent expenditure, but the forfeiture of the right to make independent expenditures *for express advocacy.* As we explained in our discussion of the provisions relating to electioneering communications, *supra*, at 189–194, express advocacy represents only a tiny fraction of the political communications made for the purpose of electing or defeating candidates during a campaign. Regardless of which option parties choose, they remain free to make independent ex-

---

[95] As amended by BCRA, § 301(17) provides:

"Independent expenditure

"The term 'independent expenditure' means an expenditure by a person—

"(A) expressly advocating the election or defeat of a clearly identified candidate; and

"(B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.". 2 U. S. C. § 431(17) (Supp. II).

The version of the definition prior to its amendment by BCRA also included the phrase "expressly advocating the election or defeat of a clearly identified candidate." 2 U. S. C. § 431(17) (2000 ed.). That definition had been adopted in 1976, presumably to reflect the narrowing construction that the Court adopted in *Buckley*. Federal Election Campaign Act Amendments of 1976, 90 Stat. 475.

penditures for the vast majority of campaign ads that avoid the use of a few magic words.

In sum, the coverage of new FECA § 315(d)(4) is much more limited than it initially appears. A party that wishes to spend more than $5,000 in coordination with its nominee is forced to forgo only the narrow category of independent expenditures that make use of magic words. But while the category of burdened speech is relatively small, it plainly is entitled to First Amendment protection. See *Buckley*, 424 U. S., at 44–45, 48. Under § 315(d)(4), a political party's exercise of its constitutionally protected right to engage in "core First Amendment expression," *id.*, at 48, results in the loss of a valuable statutory benefit that has been available to parties for many years. To survive constitutional scrutiny, a provision that has such consequences must be supported by a meaningful governmental interest.

The interest in requiring political parties to avoid the use of magic words is not such an interest. We held in *Buckley* that a $1,000 cap on expenditures that applied only to express advocacy could not be justified as a means of avoiding circumvention of contribution limits or preventing corruption and the appearance of corruption because its restrictions could easily be evaded: "So long as persons and groups eschew expenditures that in express terms advocate the election or defeat of a clearly identified candidate, they are free to spend as much as they want to promote the candidate and his views." *Id.*, at 45. The same is true in this litigation. Any claim that a restriction on independent express advocacy serves a strong Government interest is belied by the overwhelming evidence that the line between express advocacy and other types of election-influencing expression is, for Congress' purposes, functionally meaningless. Indeed, Congress enacted the new "electioneering communication[s]" provisions precisely because it recognized that the express advocacy test was woefully inadequate at capturing communications designed to influence candidate elections. In light of that recognition, we are hard pressed to conclude that any

meaningful purpose is served by §315(d)(4)'s burden on a party's right to engage independently in express advocacy.

The Government argues that §315(d)(4) nevertheless is constitutional because it is not an outright ban (or cap) on independent expenditures, but rather offers parties a voluntary choice between a constitutional right and a statutory benefit. Whatever merit that argument might have in the abstract, it fails to account for new §315(d)(4)(B), which provides:

> "For purposes of this paragraph, all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee." 2 U. S. C. §441a(d)(4)(B) (Supp. II).

Given that provision, it simply is not the case that each party committee can make a voluntary and independent choice between exercising its right to engage in independent advocacy and taking advantage of the increased limits on coordinated spending under §§315(d)(1)–(3). Instead, the decision resides solely in the hands of the first mover, such that a local party committee can bind both the state and national parties to its chosen spending option.[96] It is one thing to say that Congress may require a party committee to give

---

[96] Although the District Court and all the parties to this litigation endorse the interpretation set forth in the text, it is not clear that subparagraph (B) should be read so broadly: The reference to "a State" instead of "the States" suggests that Congress meant to distinguish between committees associated with the party for each State (which would be grouped together by State, with each grouping treated as a single committee for purposes of the choice) and committees associated with a national party (which would likewise be grouped together and treated as a separate political committee). We need not resolve the interpretive puzzle, however, because even under the more limited reading a local party committee would be able to tie the hands of a state committee or other local committees in the same State.

up its right to make independent expenditures if it believes that it can accomplish more with coordinated expenditures. It is quite another thing, however, to say that the RNC must limit itself to $5,000 in coordinated expenditures in support of its Presidential nominee if any state or local committee first makes an independent expenditure for an ad that uses magic words. That odd result undermines any claim that new § 315(d)(4) can withstand constitutional scrutiny simply because it is cast as a voluntary choice rather than an outright prohibition on independent expenditures.

The portion of the judgment of the District Court invalidating BCRA § 213 is affirmed.

### BCRA § 214's Changes in FECA's Provisions Covering Coordinated Expenditures

Ever since our decision in *Buckley*, it has been settled that expenditures by a noncandidate that are "controlled by or coordinated with the candidate and his campaign" may be treated as indirect contributions subject to FECA's source and amount limitations. 424 U. S., at 46. Thus, FECA § 315(a)(7)(B)(i) long has provided that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U. S. C. § 441a(a)(7)(B)(i). Section 214(a) of BCRA creates a new FECA § 315(a)(7)(B)(ii) that applies the same rule to expenditures coordinated with "a national, State, or local committee of a political party." 2 U. S. C. § 441a(a)(7)(B)(ii) (Supp. II).[97] Sections 214(b) and (c) direct the FEC to repeal

---

[97] The italicized portion of the following partial quotation of FECA § 315(a)(7) was added by § 214 of BCRA:

"For purposes of this subsection—

"(A) contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;

"(B)(i) expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his author-

its current regulations[98] and to promulgate new regulations dealing with "coordinated communications" paid for by persons other than candidates or their parties. Subsection (c) provides that the new "regulations shall not require agreement or formal collaboration to establish coordination." Note following 2 U. S. C. § 441a(a) (Supp. II).

Plaintiffs do not dispute that Congress may apply the same coordination rules to parties as to candidates. They argue instead that new FECA § 315(a)(7)(B)(ii) and its implementing regulations are overbroad and unconstitutionally vague because they permit a finding of coordination even in the absence of an agreement. Plaintiffs point out that political supporters may be subjected to criminal liability if they exceed the contribution limits with expenditures that ultimately are deemed coordinated. Thus, they stress the importance of a clear definition of "coordination" and argue any definition that does not hinge on the presence of an agreement cannot provide the "precise guidance" that the First Amendment demands. Brief for Appellant Chamber of Commerce of the United States et al. in No. 02–1756, p. 48. As plaintiffs readily admit, that argument reaches beyond BCRA, calling into question FECA's pre-existing provisions governing expenditures coordinated with candidates.

---

ized political committees, or their agents, shall be considered to be a contribution to such candidate;

"(ii) *expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee* . . . ." 2 U. S. C. § 441a(a)(7) (2000 ed. and Supp. II).

[98] Pre-BCRA FEC regulations defined coordinated expenditures to include expenditures made "[a]t the request or suggestion of" a candidate or party; communications in which a candidate or party "exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement"; and communications produced "[a]fter substantial discussion or negotiation" with a party or candidate, "the result of which is collaboration or agreement." 11 CFR § 100.23(c)(2) (2001).

We are not persuaded that the presence of an agreement marks the dividing line between expenditures that are coordinated—and therefore may be regulated as indirect contributions—and expenditures that truly are independent. We repeatedly have struck down limitations on expenditures "made totally independently of the candidate and his campaign," *Buckley*, 424 U. S., at 47, on the ground that such limitations "impose far greater restraints on the freedom of speech and association" than do limits on contributions and coordinated expenditures, *id.*, at 44, while "fail[ing] to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process," *id.*, at 47–48. See also *Colorado I*, 518 U. S., at 613–614 (striking down limit on expenditure made by party officials prior to nomination of candidates and without any consultation with potential nominees). We explained in *Buckley:*

> "Unlike contributions, . . . independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." 424 U. S., at 47.

Thus, the rationale for affording special protection to wholly independent expenditures has nothing to do with the absence of an agreement and everything to do with the functional consequences of different types of expenditures. Independent expenditures "are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view." *Colorado II*, 533 U. S., at 446. By contrast, expenditures made after a "wink or nod" often will be "as useful to the candidate as cash." *Id.*, at 442, 446. For that reason, Congress has always

treated expenditures made "at the request or suggestion of" a candidate as coordinated.[99]  2 U. S. C. § 441a(a)(7)(B)(i).   A supporter easily could comply with a candidate's request or suggestion without first agreeing to do so, and the resulting expenditure would be "'virtually indistinguishable from [a] simple contributio[n],'" *Colorado II, supra,* at 444–445. Therefore, we cannot agree with the submission that new FECA § 315(a)(7)(B)(ii) is overbroad because it permits a finding of coordination or cooperation notwithstanding the absence of a pre-existing agreement.

Nor are we persuaded that the absence of an agreement requirement renders § 315(a)(7)(B)(ii) unconstitutionally vague.   An agreement has never been required to support a finding of coordination with a candidate under § 315(a)(7) (B)(i), which refers to expenditures made "in cooperation, consultation, or concer[t] with, or at the request or suggestion of" a candidate.   Congress used precisely the same language in new § 315(a)(7)(B)(ii) to address expenditures coordinated with parties.   FECA's longstanding definition of coordination "delineates its reach in words of common understanding." *Cameron v. Johnson,* 390 U. S. 611, 616 (1968). Not surprisingly, therefore, the relevant statutory language has survived without constitutional challenge for almost three decades.   Although that fact does not insulate the definition from constitutional scrutiny, it does undermine plaintiffs' claim that the language of § 315(a)(7)(B)(ii) is intolerably vague.   Plaintiffs do not present any evidence that

---

[99] Contrary to plaintiffs' contention, the statutory framework was not significantly different at the time of our decision in *Buckley*.   The relevant provision, 18 U. S. C. § 608(e)(1) (1970 ed.; Supp. IV), treated as coordinated any expenditures "authorized *or requested* by the candidate." (Emphasis added.)   And the legislative history, on which we relied for "guidance in differentiating individual expenditures that are contributions . . . from those treated as independent expenditures," described as "independent" an expenditure made by a supporter "'completely on his own, and not at the request or suggestion of the candidate or his agen[t].'"   424 U. S., at 46–47, n. 53 (quoting S. Rep. No. 93–689, p. 18 (1974)).

the definition has chilled political speech, whether between candidates and their supporters or by the supporters to the general public. See *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874 (1997) (noting risk that vague statutes may chill protected expression). And, although plaintiffs speculate that the FEC could engage in intrusive and politically motivated investigations into alleged coordination, they do not even attempt to explain why an agreement requirement would solve that problem. Moreover, the only evidence plaintiffs have adduced regarding the enforcement of the coordination provision during its 27-year history concerns three investigations in the late 1990's into groups on different sides of the political aisle. Such meager evidence does not support the claim that § 315(a)(7)(B)(ii) will "foster 'arbitrary and discriminatory application.'" *Buckley, supra,* at 41, n. 48 (quoting *Grayned* v. *City of Rockford,* 408 U. S., at 108–109). We conclude that FECA's definition of coordination gives "fair notice to those to whom [it] is directed," *American Communications Assn.* v. *Douds,* 339 U. S. 382, 412 (1950), and is not unconstitutionally vague.

Finally, portions of plaintiffs' challenge to BCRA § 214 focus on the regulations the FEC has promulgated under § 214(c). 11 CFR § 109.21 (2003). As the District Court explained, issues concerning the regulations are not appropriately raised in this facial challenge to BCRA, but must be *pursued in a separate proceeding. Thus, we agree with the* District Court that plaintiffs' challenge to §§ 214(b) and (c) is not ripe to the extent that the alleged constitutional infirmities are found in the implementing regulations rather than the statute itself.

The portions of the District Court judgment rejecting plaintiffs' challenges to BCRA § 214 are affirmed.

## V

Many years ago we observed that "[t]o say that Congress is without power to pass appropriate legislation to safe-

guard . . . an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection." *Burroughs* v. *United States*, 290 U. S., at 545. We abide by that conviction in considering Congress' most recent effort to confine the ill effects of aggregated wealth on our political system. We are under no illusion that BCRA will be the last congressional statement on the matter. Money, like water, will always find an outlet. What problems will arise, and how Congress will respond, are concerns for another day. In the main we uphold BCRA's two principal, complementary features: the control of soft money and the regulation of electioneering communications. Accordingly, we affirm in part and reverse in part the District Court's judgment with respect to Titles I and II.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court with respect to BCRA Titles III and IV.*

This opinion addresses issues involving miscellaneous Title III and IV provisions of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81. For the reasons discussed below, we affirm the judgment of the District Court with respect to these provisions.

## *BCRA § 305*

BCRA § 305 amends the federal Communications Act of 1934 (Communications Act) § 315(b), 48 Stat. 1088, as amended, 86 Stat. 4, which requires that, 45 days before a primary or 60 days before a general election, broadcast stations must sell a qualified candidate the "lowest unit charge

---

*JUSTICE O'CONNOR, JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE SOUTER join this opinion in its entirety. JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join this opinion, except with respect to BCRA § 305. JUSTICE THOMAS joins this opinion with respect to BCRA §§ 304, 305, 307, 316, 319, and 403(b).

of the station for the same class and amount of time for the same period," 47 U. S. C. § 315(b)(1). Section 305's amendment, in turn, denies a candidate the benefit of that lowest unit charge unless the candidate "provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office," or the candidate, in the manner prescribed in BCRA § 305(a)(3), clearly identifies herself at the end of the broadcast and states that she approves of the broadcast. 47 U. S. C. §§ 315(b)(2)(A), (C) (Supp. II).

The McConnell plaintiffs challenge § 305. They argue that Senator McConnell's testimony that he plans to run advertisements critical of his opponents in the future and that he had run them in the past is sufficient to establish standing. We think not.

Article III of the Constitution limits the "judicial power" to the resolution of "cases" and "controversies." One element of the "bedrock" case-or-controversy requirement is that plaintiffs must establish that they have standing to sue. *Raines* v. *Byrd*, 521 U. S. 811, 818 (1997). On many occasions, we have reiterated the three requirements that constitute the " 'irreducible constitutional minimum' " of standing. *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 771 (2000). First, a plaintiff must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent." *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990) (internal quotation marks and citation omitted). Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] some third party not before the court.' " *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992) (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41–42 (1976)). Third, a plaintiff must show the

" 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Stevens, supra,* at 771.

As noted above, § 305 amended the Communications Act's requirements with respect to the lowest unit charge for broadcasting time. But this price is not available to qualified candidates until 45 days before a primary election or 60 days before a general election. Because Senator McConnell's current term does not expire until 2009, the earliest day he could be affected by § 305 is 45 days before the Republican primary election in 2008. This alleged injury in fact is too remote temporally to satisfy Article III standing. See *Whitmore, supra,* at 158 ("A threatened injury must be *certainly impending* to constitute injury in fact" (internal quotation marks and citations omitted)); see also *Los Angeles* v. *Lyons,* 461 U. S. 95, 102 (1983) (A plaintiff seeking injunctive relief must show he is " 'immediately in danger of sustaining some direct injury' as [a] result" of the challenged conduct). Because we hold that the McConnell plaintiffs lack standing to challenge § 305, we affirm the District Court's dismissal of the challenge to BCRA § 305.

### BCRA § 307

BCRA § 307, which amends § 315(a)(1) of the Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3, as added, 90 Stat. 487, increases and indexes for inflation certain FECA contribution limits. The Adams and Paul plaintiffs challenge § 307 in this Court. Both groups contend that they have standing to sue. Again, we disagree.

The Adams plaintiffs, a group consisting of voters, organizations representing voters, and candidates, allege two injuries, and argue each is legally cognizable, "as established by case law outlawing electoral discrimination based on economic status . . . and upholding the right to an equally meaningful vote . . . ." *Brief for Appellant Adams et al. in* No. 02–1740, p. 31.

First, they assert that the increases in hard-money limits enacted by §307 deprive them of an equal ability to participate in the election process based on their economic status. But, to satisfy our standing requirements, a plaintiff's alleged injury must be an invasion of a concrete and particularized legally protected interest. *Lujan, supra,* at 560. We have noted that "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, . . . it often turns on the nature and source of the claim asserted." *Warth* v. *Seldin,* 422 U. S. 490, 500 (1975) (internal quotation marks and citations omitted). We have never recognized a legal right comparable to the broad and diffuse injury asserted by the Adams plaintiffs. Their reliance on this Court's voting rights cases is misplaced. They rely on cases requiring nondiscriminatory access to the ballot and a single, equal vote for each voter. See, *e. g., Lubin* v. *Panish,* 415 U. S. 709 (1974) (invalidating a statute requiring a ballot-access fee fixed at a percentage of the salary for the office sought because it unconstitutionally burdened the right to vote); *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 666–668 (1966) (invalidating a state poll tax because it effectively denied the right to vote).

None of these plaintiffs claims a denial of equal access to the ballot or the right to vote. Instead, the plaintiffs allege a curtailment of the scope of their participation in the electoral process. But we have noted that "[p]olitical 'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources." *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U. S. 238, 257 (1986); see also *Buckley* v. *Valeo,* 424 U. S. 1, 48 (1976) *(per curiam)* (rejecting the asserted government interest of "equalizing the relative ability of individuals and groups to influence the outcome of elections" to justify the burden on speech presented by expenditure limits). This claim of injury by the Adams plaintiffs is, therefore, not to a legally cognizable right.

Second, the Adams plaintiffs-candidates contend that they have suffered a competitive injury. Their candidates "do not wish to solicit or accept large campaign contributions as permitted by BCRA" because "[t]hey believe such contributions create the appearance of unequal access and influence." Adams Complaint ¶ 53. As a result, they claim that BCRA § 307 puts them at a "fundraising disadvantage," making it more difficult for them to compete in elections. See id., ¶ 56.

The second claimed injury is based on the same premise as the first: BCRA § 307's increased hard-money limits allow plaintiffs-candidates' opponents to raise more money, and, consequently, the plaintiffs-candidates' ability to compete or participate in the electoral process is diminished. But they cannot show that their alleged injury is "fairly traceable" to BCRA § 307. See Lujan, 504 U.S. at 562. Their alleged inability to compete stems not from the operation of § 307, but from their own personal "wish" not to solicit or accept large contributions, i.e., their personal choice. Accordingly, the Adams plaintiffs fail here to allege an injury in fact that is "fairly traceable" to BCRA.

The Paul plaintiffs maintain that BCRA § 307 violates the Freedom of Press Clause of the First Amendment. They contend that their political campaigns and public interest advocacy involve traditional press activities and that, therefore, they are protected by the First Amendment's guarantee of the freedom of press. The Paul plaintiffs argue that the contribution limits imposed by BCRA § 307, together with the individual and political action committee contribution limitations of FECA § 315, impose unconstitutional editorial control upon candidates and their campaigns. The Paul plaintiffs argue that by imposing economic burdens upon them, but not upon the institutional media, see 2 U.S.C. § 431(9)(B)(i) (exempting "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled

by any political party, political committee, or candidate" from the definition of expenditure), BCRA § 307 and FECA § 315 violate the freedom of the press.

The Paul plaintiffs cannot show the "'substantial likelihood' that the requested relief will remedy [their] alleged injury in fact," *Stevens*, 529 U. S., at 771. The relief the Paul plaintiffs seek is for this Court to strike down the contribution limits, removing the alleged disparate editorial controls and economic burdens imposed on them. But § 307 merely increased and indexed for inflation certain FECA contribution limits. This Court has no power to adjudicate a challenge to the FECA limits in this litigation because challenges to the constitutionality of FECA provisions are subject to direct review before an appropriate en banc court of appeals, as provided in 2 U. S. C. § 437h, not in the three-judge District Court convened pursuant to BCRA § 403(a). Although the Court has jurisdiction to hear a challenge to § 307, if the Court were to strike down the increases and indexes established by BCRA § 307, it would not remedy the Paul plaintiffs' alleged injury because both the limitations imposed by FECA and the exemption for news media would remain unchanged. A ruling in the Paul plaintiffs' favor, therefore, would not redress their alleged injury, and they accordingly lack standing. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 105–110 (1998).

For the reasons above, we affirm the District Court's dismissal of the Adams and Paul plaintiffs' challenges to BCRA § 307 for lack of standing.

### BCRA §§ 304, 316, and 319

BCRA §§ 304 and 316, which amend FECA § 315, and BCRA § 319, which adds FECA § 315A, collectively known as the "millionaire provisions," provide for a series of staggered increases in otherwise applicable contribution-to-candidate limits if the candidate's opponent spends a triggering amount

of his personal funds.[1]  The provisions also eliminate the co-ordinated expenditure limits in certain circumstances.[2]

In their challenge to the millionaire provisions, the Adams plaintiffs allege the same injuries that they alleged with regard to BCRA § 307.  For the reasons discussed above, they fail to allege a cognizable injury that is "fairly traceable" to BCRA.  Additionally, as the District Court noted, "none of the Adams plaintiffs is a candidate in an election affected by the millionaire provisions—i. e., one in which an opponent chooses to spend the triggering amount in his own funds— and it would be purely 'conjectural' for the court to assume that any plaintiff ever will be."  251 F. Supp. 2d 176, 431 (DC 2003) (case below) (Henderson, J., concurring in judgment in part and dissenting in part) (quoting *Lujan*, 504 U. S., at 560).  We affirm the District Court's dismissal of the Adams plaintiffs' challenge to the millionaire provisions for lack of standing.

### BCRA § 311

FECA § 318 requires that certain communications "authorized" by a candidate or his political committee clearly identify the candidate or committee or, if not so authorized, identify the payor and announce the lack of authorization.  2 U. S. C. § 441d (2000 ed. and Supp. II).  BCRA § 311 makes several amendments to FECA § 318, among them the expansion of this identification regime to include disbursements for "electioneering communications" as defined in BCRA § 201.

---

[1] To qualify for increased candidate contribution limits, the "opposition personal funds amount," which depends on expenditures by a candidate and her self-financed opponent, must exceed a "threshold amount."  2 U. S. C. §§ 441a(i)(1)(D), 441a–1(a)(2)(A) (Supp. II).

[2] If the "opposition personal funds amount" is at least 10 times the "threshold amount" in a Senate race, or exceeds $350,000 in a House of Representatives race, the coordinated party expenditure limits do not apply.  §§ 441a(i)(1)(C)(iii), 441a–1(a)(1)(C).

The McConnell and Chamber of Commerce plaintiffs challenge BCRA § 311 by simply noting that § 311, along with all of the "electioneering communications" provisions of BCRA, is unconstitutional. We disagree. We think BCRA § 311's inclusion of electioneering communications in the FECA § 318 disclosure regime bears a sufficient relationship to the important governmental interest of "shed[ding] the light of publicity" on campaign financing. *Buckley,* 424 U. S., at 81. Assuming as we must that FECA § 318 is valid to begin with, and that FECA § 318 is valid as amended by BCRA § 311's amendments other than the inclusion of electioneering communications, the challenged inclusion of electioneering communications is not itself unconstitutional. We affirm the District Court's decision upholding § 311's expansion of FECA § 318(a) to include disclosure of disbursements for electioneering communications.

## *BCRA § 318*

BCRA § 318, which adds FECA § 324, prohibits individuals "17 years old or younger" from making contributions to candidates and contributions or donations to political parties. 2 U. S. C. § 441k (Supp. II). The McConnell and Echols plaintiffs challenge the provision; they argue that § 318 violates the First Amendment rights of minors. We agree.

Minors enjoy the protection of the First Amendment. See, *e. g., Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 511–513 (1969). Limitations on the amount that an individual may contribute to a candidate or political committee impinge on the protected freedoms of expression and association. See *Buckley, supra,* at 20–22. When the Government burdens the right to contribute, we apply heightened scrutiny. See *ante,* at 136 (joint opinion of STEVENS and O'CONNOR, JJ.) ("[A] contribution limit involving even '"significant interference"' with associational rights is nevertheless valid if it satisfies the 'lesser demand' of being '"closely drawn"' to match a '"sufficiently important

interest" ' " (quoting *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 162 (2003))). We ask whether there is a "sufficiently important interest" and whether the statute is "closely drawn" to avoid unnecessary abridgment of First Amendment freedoms. *Ante*, at 136; *Buckley, supra*, at 25. The Government asserts that the provision protects against corruption by conduit; that is, donations by parents through their minor children to circumvent contribution limits applicable to the parents. But the Government offers scant evidence of this form of evasion.[3] Perhaps the Government's slim evidence results from sufficient deterrence of such activities by § 320 of FECA, which prohibits any person from "mak[ing] a contribution in the name of another person" or "knowingly accept[ing] a contribution made by one person in the name of another," 2 U. S. C. § 441f. Absent a more convincing case of the claimed evil, this interest is simply too attenuated for § 318 to withstand heightened scrutiny. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

Even assuming, *arguendo*, the Government advances an important interest, the provision is overinclusive. The States have adopted a variety of more tailored approaches— *e. g.*, counting contributions by minors against the total permitted for a parent or family unit, imposing a lower cap on contributions by minors, and prohibiting contributions by very young children. Without deciding whether any of these alternatives is sufficiently tailored, we hold that the provision here sweeps too broadly. We therefore affirm the District Court's decision striking down § 318 as unconstitutional.

---

[3] Although some examples were presented to the District Court, 251 F. Supp. 2d 176, 588–590 (DC 2003) (Kollar-Kotelly, J.), none were offered to this Court.

*BCRA § 403(b)*

The National Right to Life plaintiffs argue that the District Court's grant of intervention to the intervenor-defendants, pursuant to Federal Rule of Civil Procedure 24(a) and BCRA § 403(b), must be reversed because the intervenor-defendants lack Article III standing. It is clear, however, that the Federal Election Commission (FEC) has standing, and therefore we need not address the standing of the intervenor-defendants, whose position here is identical to the FEC's. See, *e. g., Clinton* v. *City of New York*, 524 U. S. 417, 431–432, n. 19 (1998); *Bowsher* v. *Synar*, 478 U. S. 714, 721 (1986). Cf. *Diamond* v. *Charles*, 476 U. S. 54, 68–69, n. 21 (1986) (reserving the question for another day).

For the foregoing reasons, we affirm the District Court's judgment finding the plaintiffs' challenges to BCRA § 305, § 307, and the millionaire provisions nonjusticiable, striking down as unconstitutional BCRA § 318, and upholding BCRA § 311. The judgment of the District Court is

*Affirmed.*

JUSTICE BREYER delivered the opinion of the Court with respect to BCRA Title V.*

We consider here the constitutionality of § 504 of the Bipartisan Campaign Reform Act of 2002 (BCRA), amending the Communications Act of 1934. That section requires broadcasters to keep publicly available records of politically related broadcasting requests. 47 U. S. C. § 315(e) (Supp. II). The McConnell plaintiffs, who include the National Association of Broadcasters, argue that § 504 imposes onerous administrative burdens, lacks any offsetting justification, and consequently violates the First Amendment. For similar reasons, the three judges on the District Court found BCRA § 504 unconstitutional on its face. 251 F. Supp. 2d

---

*JUSTICE STEVENS, JUSTICE O'CONNOR, JUSTICE SOUTER, and JUSTICE GINSBURG join this opinion in its entirety.

176, 186 (DC 2003) *(per curiam)* (case below). We disagree, and we reverse that determination.

I

BCRA § 504's key requirements are the following:

(1) A "candidate request" requirement calls for broadcasters to keep records of broadcast requests "made by or on behalf of" any "legally qualified candidate for public office." 47 U. S. C. § 315(e)(1)(A) (Supp. II).

(2) An "election message request" requirement calls for broadcasters to keep records of requests (made by anyone) to broadcast "message[s]" that refer either to a "legally qualified candidate" or to "any election to Federal office." §§ 315(e)(1)(B)(i), (ii).

(3) An "issue request" requirement calls for broadcasters to keep records of requests (made by anyone) to broadcast "message[s]" related to a "national legislative issue of public importance," § 315(e)(1)(B)(iii), or otherwise relating to a "political matter of national importance," § 315(e)(1)(B).

We shall consider each provision in turn.

II

BCRA § 504's "candidate request" requirements are virtually identical to those contained in a regulation that the Federal Communications Commission (FCC) promulgated as early as 1938 and which with slight modifications the FCC has maintained in effect ever since. 47 CFR § 73.1943 (2002); compare 3 Fed. Reg. 1692 (1938) (47 CFR § 36a4); 13 Fed. Reg. 7486 (1948) (47 CFR §§ 3.190(d), 3.290(d), 3.690(d)); 17 Fed. Reg. 4711 (1952) (47 CFR § 3.590(d)); 19 Fed. Reg. 5949 (1954); 23 Fed. Reg. 7817 (1958); 28 Fed. Reg. 13593 (1963) (47 CFR § 73.120(d)); 43 Fed. Reg. 32796 (1978) (47 CFR § 73.1940(d)); 57 Fed. Reg. 210 (1992) (47 CFR § 73.1943). See generally Brief in Opposition to Motion of Appellee National Association of Broadcasters for Summary

Affirmance in No. 02–1676, pp. 9–10 (hereinafter Brief Opposing Summary Affirmance).

In its current form the FCC regulation requires broadcast licensees to "keep" a publicly available file "of all requests for broadcast time made by or on behalf of a candidate for public office," along with a notation showing whether the request was granted, and (if granted) a history that includes "classes of time," "rates charged," and when the "spots actually aired." 47 CFR § 73.1943(a) (2002); § 76.1701(a) (same for cable systems). These regulation-imposed requirements mirror the statutory requirements imposed by BCRA § 504 with minor differences which no one here challenges. Compare 47 CFR § 73.1943 with 47 U. S. C. § 315(e)(2) (Supp. II) (see Appendix, *infra*).

The McConnell plaintiffs argue that these requirements are "intolerabl[y]" "burdensome and invasive." Brief for Appellant/Cross-Appellee Sen. Mitch McConnell et al. in No. 02–1674 et al., p. 74 (hereinafter Brief for McConnell Plaintiffs). But we do not see how that could be so. The FCC has consistently estimated that its "candidate request" regulation imposes upon each licensee an additional administrative burden of six to seven hours of work per year. See 66 Fed. Reg. 37468 (2001); *id.*, at 18090; 63 Fed. Reg. 26593 (1998); *id.*, at 10379; 57 Fed. Reg. 18492 (1992); see also 66 Fed. Reg. 29963 (2001) (total annual burden of one hour per cable system). That burden means annual costs of a few hundred dollars at most, a microscopic amount compared to the many millions of dollars of revenue broadcasters receive from candidates who wish to advertise.

Perhaps for this reason, broadcasters in the past did not strongly oppose the regulation or its extension. Cf., *e. g.*, 17 Fed. Reg. 4711 (1952) ("No comments adverse to the adoption of the proposed rule have been received"); 43 Fed. Reg. 32794 (1978) (no adverse comments). Indeed in 1992, "CBS" itself "suggest[ed]" that the candidate file "include a record of all requests for time." 57 Fed. Reg. 206 (1992); cf. 63 Fed. Reg.

49493 (1998) (FCC "not persuaded that the current retention period [two years] is overly burdensome to licensees").

In any event, as the FCC wrote in an analogous context, broadcaster recordkeeping requirements "'simply run with the territory.'" 40 Fed. Reg. 18398 (1975). Broadcasters must keep and make publicly available numerous records. See 47 CFR § 73.3526 (2002) (general description of select recordkeeping requirements for commercial stations); see also §§ 73.1202, 73.3526(e)(9)(i) (retention of all "written comments and suggestions [including letters and e-mail] received from the public regarding operation of the station" for three years); § 73.1212(e) (sponsorship identification records, including the identification of a sponsoring entity's executive officers and board-level members when sponsoring "political matter or matter involving the discussion of a controversial issue of public importance"); § 73.1840 (retention of station logs); § 73.1942 (candidate broadcast records); § 73.2080 (equal employment opportunities records); §§ 73.3526(e)(11)(i), (e)(12) ("list of programs that have provided the station's most significant treatment of community issues during the preceding three month period," including "brief narrative describing [the issues, and] time, date, duration, and title"); §§ 73.3526(e)(11)(ii), (iii) (reports of children's program, and retention of records sufficient to substantiate "compliance with the commercial limits on children's programming"); § 73.3613(a) (network affiliation contracts); §§ 73.3613(b), 73.3615, 73.3526(e)(5) (ownership-related reports); § 73.3613(c) ("[m]anagement consultant agreements"); § 73.3613(d) ("[t]ime brokerage agreements"). Compared to these longstanding recordkeeping requirements, an additional six to seven hours is a small drop in a very large bucket.

The McConnell plaintiffs also claim that the "candidate requests" requirement fails significantly to further any important governmental interest. Brief for McConnell Plaintiffs 74. But, again, we cannot agree. The FCC has pointed out

that "[t]hese records are necessary to permit political candidates and others to verify that licensees have complied with their obligations relating to use of their facilities by candidates for political office" pursuant to the "equal time" provision of 47 U. S. C. § 315(a). 63 Fed. Reg. 49493 (1998). They also help the FCC determine whether broadcasters have violated their obligation to sell candidates time at the "lowest unit charge." 47 U. S. C. § 315(b). As reinforced by BCRA, the "candidate request" requirements will help the FCC, the Federal Election Commission, and "the public to evaluate whether broadcasters are processing [candidate] requests in an evenhanded fashion," Brief Opposing Summary Affirmance 10, thereby helping to assure broadcasting fairness. 47 U. S. C. § 315(a); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969). They will help make the public aware of how much money candidates may be prepared to spend on broadcast messages. 2 U. S. C. § 434 (2000 ed. and Supp. II); see *ante*, at 194–199 (joint opinion of STEVENS and O'CONNOR, JJ.) (hereinafter joint opinion). And they will provide an independently compiled set of data for purposes of verifying candidates' compliance with the disclosure requirements and source limitations of BCRA and the Federal Election Campaign Act of 1971. 2 U. S. C. § 434; cf. *Adventure Communications, Inc.* v. *Kentucky Registry of Election Finance*, 191 F. 3d 429, 433 (CA4 1999) (candidate compliance verification); 63 Fed. Reg. 49493 (1998) (FCC finding record retention provision provides public with "necessary and adequate access").

We note, too, that the FCC's regulatory authority is broad. *Red Lion, supra,* at 380 ("broad" mandate to assure broadcasters operate in public interest); *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 219 (1943) (same). And we have previously found broad governmental authority for agency information demands from regulated entities. Compare *United States* v. *Morton Salt Co.,* 338 U. S. 632, 642–643 (1950); *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S.

186, 209 (1946); *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408, 414–415 (1984).

THE CHIEF JUSTICE suggests that the Government has not made these particular claims. But it has—though succinctly—for it has cross-referenced the relevant regulatory rules. Compare *post,* at 359–361 (REHNQUIST, C. J., dissenting), with Brief Opposing Summary Affirmance; Brief for McConnell Plaintiffs 73–74; Brief for FEC et al. in No. 02–1674 et al., pp. 132–133. And succinctness through cross-reference was necessary given our procedural requirement that the Government set forth in a 140-page brief *all* its arguments concerning each of the *20* BCRA provisions here under contest. 251 F. Supp. 2d, at 186–188.

In sum, given the Government's reference to the 65-year-old FCC regulation and the related considerations we have mentioned, we cannot accept the argument that the constitutionality of the "candidate request" provision lacks evidentiary support. The challengers have made no attempt to explain away the FCC's own contrary conclusions and the mass of evidence in related FCC records and proceedings. *E. g.,* 57 Fed. Reg. 189 (1992); cf. *supra,* at 235–236; *ante,* at 222–223 (joint opinion) (upholding BCRA's coordination provision based, in part, on prior experience under similar provision). Because we cannot, on the present record, find the longstanding FCC regulation unconstitutional, we likewise cannot strike down the "candidate request" provision in BCRA § 504; for the latter simply embodies the regulation in a statute, thereby blocking any agency attempt to repeal it.

## III

BCRA § 504's "election message request" requirements call for broadcasters to keep records of requests (made by any member of the public) to broadcast a "message" about "a legally qualified candidate" or "any election to Federal office." 47 U. S. C. §§ 315(e)(1)(B)(i), (ii) (Supp. II). Although these requirements are somewhat broader than the

"candidate request" requirement, they serve much the same purposes. A candidate's supporters or opponents account for many of the requests to broadcast "message[s]" about a "candidate." Requests to broadcast messages about an "election" may include messages that favor one candidate or another, along with other messages that may be more neutral.

Given the nature of many of the messages, recordkeeping can help both the regulatory agencies and the public evaluate broadcasting fairness, and determine the amount of money that individuals or groups, supporters or opponents, intend to spend to help elect a particular candidate. Cf. *ante*, at 206–207 (joint opinion) (upholding stringent restrictions on *all* election-time advertising that refers to a candidate because such advertising will *often* convey message of support or opposition). Insofar as the request is to broadcast neutral material about a candidate or election, the disclosure can help the FCC carry out other statutory functions, for example, determining whether a broadcasting station is fulfilling its licensing obligation to broadcast material important to the community and the public. 47 U. S. C. § 315(a) ("obligation . . . to afford reasonable opportunity for the discussion of conflicting views on issues of public importance"); 47 CFR § 73.1910 (2002); §§ 73.3526(e)(11)(i), (e)(12) (recordkeeping requirements for issues important to the community).

For reasons previously discussed, *supra*, at 235–236, and on the basis of the material presented, we cannot say that these requirements will impose disproportionate administrative burdens. They ask the broadcaster to keep information about the disposition of the request, and information identifying the individual or company requesting the broadcast time (name, address, contact information, or, if the requester is not an individual, the names of company officials). 47 U. S. C. § 315(e)(2) (Supp. II). Insofar as the "request" is made by a candidate's "supporters," the "candidate request" regulation apparently already requires broadcasters

to keep such records. 43 Fed. Reg. 32794 (1978). Regardless, the information should prove readily available, for the individual requesting a broadcast must provide it to the broadcaster should the broadcaster accept the request. 47 CFR § 73.1212(e) (2002). And as we have previously pointed out, the recordkeeping requirements do not reach significantly beyond other FCC recordkeeping rules, for example, those requiring broadcasting licensees to keep material showing compliance with their license-related promises to broadcast material on issues of public importance. See, e. g., §§ 73.3526(e)(11)(i), (e)(12) (recordkeeping requirements for issues important to the community); supra, at 236 (collecting regulations); Office of Communication of United Church of Christ v. FCC, 707 F. 2d 1413, 1421–1422 (CADC 1983) (describing FCC rules, in force during 1960–1981, that required nonentertainment programming in 14 specific areas and mandated publicly available records detailing date, time, source, and description to substantiate compliance). If, as we have held, the "candidate request" requirements are constitutional, supra, at 238, the "election message" requirements, which serve similar governmental interests and impose only a small incremental burden, must be constitutional as well.

## IV

The "issue request" requirements call for broadcasters to keep records of requests (made by any member of the public) to broadcast "message[s]" about "a national legislative issue of public importance" or "any political matter of national importance." 47 U. S. C. §§ 315(e)(1)(B), (e)(1)(B)(iii) (Supp. II). These recordkeeping requirements seem likely to help the FCC determine whether broadcasters are carrying out their "obligations to afford reasonable opportunity for the discussion of conflicting views on issues of public importance," 47 CFR § 73.1910 (2002), and whether broadcasters are too heavily favoring entertainment, and discriminating

against broadcasts devoted to public affairs, see *ibid.;* 47 U. S. C. § 315(a); *Red Lion,* 395 U. S., at 380.

The McConnell plaintiffs claim that the statutory language—"political matter of national importance" or "national legislative issue of public importance"—is unconstitutionally vague or overbroad. Brief for McConnell Plaintiffs 74–75. But that language is no more general than the language that Congress has used to impose other obligations upon broadcasters. Compare 47 U. S. C. § 315(e)(1)(B) (Supp. II) ("political matter of national importance") and § 315(e)(1)(B)(iii) ("national legislative issue of public importance") (both added by BCRA § 504), with 47 U. S. C. § 315(a) ("obligation . . . to operate in the public interest" and to afford reasonable opportunity for discussion of "issues of public importance"); § 317(a)(2) (FCC disclosure requirements relating to any "political program" or "discussion of any controversial issue"); cf. 47 CFR § 73.1212(e) (2002) ("political matter or . . . a controversial issue of public importance") and 9 Fed. Reg. 14734 (1944) ("public controversial issues"); *ante,* at 222–223 (joint opinion) (noting that the experience under longstanding regulations undermines claims of chilling effect). And that language is also roughly comparable to other language in BCRA that we uphold today. *E. g., ante,* at 169–170, and n. 64 (joint opinion) (upholding 2 U. S. C. § 431(20)(A)(iii) (Supp. II) ("public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or. supports a candidate for that office, or attacks or opposes a candidate for that office")); *ante,* at 222–223 (upholding 2 U. S. C. § 441a(a)(7)(B)(ii) (Supp. II) (counting as coordinated disbursements that are made "in cooperation, consultation, or concert with, or at the request or suggestion of [a political party]") against challenge and noting that an "agreement" is not necessary for precision).

Whether these requirements impose disproportionate administrative burdens is more difficult to say. On the one

hand, the burdens are likely less heavy than many that other FCC regulations have imposed, for example, the burden of keeping and disclosing "[a]ll written comments and suggestions" received from the public, including every e-mail. 47 CFR §§ 73.1202, 73.3526(e)(9) (2002); see also *supra*, at 236. On the other hand, the burdens are likely heavier than those imposed by BCRA § 504's other provisions, previously discussed.

The regulatory burden, in practice, will depend on how the FCC interprets and applies this provision. The FCC has adequate legal authority to write regulations that may limit, and make more specific, the provision's potential linguistic reach. 47 U. S. C. § 315(d). It has often ameliorated regulatory burdens by interpretation in the past, and there is no reason to believe it will not do so here. See 14 FCC Rcd. 4653, 4665, ¶ 25 (1999) (relaxing the recordkeeping requirements in respect to cable systems that serve fewer than 5,000 subscribers); 14 FCC Rcd. 11113, 11121–11122, ¶¶ 20–22 (1999) (requiring candidates to inspect the political file at a station rather than requiring licensees to send out photocopies of the files to candidates upon telephone request). The parties remain free to challenge the provisions, as interpreted by the FCC in regulations, or as otherwise applied. Any such challenge will likely provide greater information about the provisions' justifications and administrative burdens. Without that additional information, we cannot now say that the burdens are so great, or the justifications so minimal, as to warrant finding the provisions unconstitutional on their face.

The McConnell plaintiffs and THE CHIEF JUSTICE make one final claim. They say that the "issue request" requirement will force them to disclose information that will reveal their political strategies to opponents, perhaps prior to a broadcast. See *post*, at 362 (dissenting opinion). We are willing to assume that the Constitution includes some form of protection against premature disclosure of campaign strat-

egy—though, given the First Amendment interest in free and open discussion of campaign issues, we make this assumption purely for argument's sake. Nonetheless, even on that assumption we do not see how BCRA § 504 can be unconstitutional on its face.

For one thing, the statute requires disclosure of names, addresses, and the fact of a request; it does not require disclosure of substantive campaign content. See 47 U. S. C. § 315(e)(2) (Supp. II). For another, the statutory words "as soon as possible," § 315(e)(3), would seem to permit FCC disclosure-timing rules that would avoid any premature disclosure that the Constitution itself would forbid. Further, the plaintiffs do not point to—and our own research cannot find—any specific indication of such a "strategy-disclosure" problem arising during the past 65 years in respect to the existing FCC "candidate request" requirement, where the strategic problem might be expected to be more acute. Finally, we today reject an analogous facial attack—premised on speculations of "advance disclosure"—on a similar BCRA provision. See *ante*, at 200–201 (joint opinion). Thus, the "strategy disclosure" argument does not show that BCRA § 504 is unconstitutional on its face, but the plaintiffs remain free to raise this argument when § 504 is applied.

## V

THE CHIEF JUSTICE makes two important arguments in response to those we have set forth. First, he says that we "approac[h] § 504 almost exclusively from the perspective of the broadcast licensees, ignoring the interests of candidates and other purchasers, whose speech and association rights are affected." *Post*, at 359 (dissenting opinion). THE CHIEF JUSTICE is certainly correct in emphasizing the importance of the speech interests of candidates and other potential speakers, but we have not ignored their First Amendment "perspective."

To the contrary, we have discussed the speakers' interests together with the broadcasters' interests because the two sets of interests substantially overlap. For example, the speakers' vagueness argument is no different from the broadcasters', and it fails for the same reasons, *e. g.,* the fact that BCRA § 504's language is just as definite and precise as other language that we today uphold. See *supra,* at 241.

We have separately discussed the *one and only* speech-related claim advanced on behalf of candidates (or other speakers) that differs from the claims set forth by the broadcasters. See *supra,* at 242–243. This is the claim that the statute's disclosure requirements will require candidates to reveal their political strategies to opponents. We just said, and we now repeat, that BCRA § 504 can be applied, in a significant number of cases, without requiring any such political-strategy disclosure—either because disclosure in many cases will not create any such risk or because the FCC may promulgate rules requiring disclosure only after any such risk disappears, or both.

Moreover, candidates (or other speakers) whom § 504 affects adversely in this way (or in other ways) remain free to challenge the lawfulness of FCC implementing regulations and to challenge the constitutionality of § 504 as applied. To find that the speech-related interests of candidates and others may be vindicated in an as-applied challenge is not to "ignor[e]" those interests.

Second, THE CHIEF JUSTICE says that "the Government, in its brief, proffers no interest whatever to support § 504 as a whole," adding that the existence of "pre-existing unchallenged agency regulations imposing similar disclosure requirements" cannot "compel the conclusion that § 504 is constitutional," nor somehow "relieve the Government of its burden of advancing a constitutionally sufficient justification for § 504." *Post,* at 359–360, 361 (dissenting opinion).

Again THE CHIEF JUSTICE is correct in saying that the mere *existence* of similar FCC regulation-imposed require-

ments—even if unchallenged for at least 65 years—cannot prove that those requirements are constitutional. But the existence of those regulations means that we must read beyond the briefs in these cases before holding those requirements unconstitutional. Before evaluating the relevant burdens and justifications, we must at least become acquainted with the FCC's own view of the matter. We must follow the Government's regulation-related references to the relevant regulatory records, related FCC regulatory conclusions, and the FCC's enforcement experience. We must take into account, for example, the likelihood that the *reason* there is "nothing in the record that indicates licensees have treated purchasers unfairly," *post*, at 361 (REHNQUIST, C. J., dissenting), is that for many decades similar FCC regulations have made that unfair treatment unlawful. And, if we are to avoid disrupting related agency law, we must evaluate what we find in agency records and related experience before holding this similar statutory provision unconstitutional on its face.

Even a superficial examination of those relevant agency materials reveals strong supporting justifications, and a lack of significant administrative burdens. And any additional burden that the statute, viewed facially, imposes upon interests protected by the First Amendment seems slight compared to the strong enforcement-related interests that it serves. Given the FCC regulations and their history, the statutory requirements must survive a *facial* attack under any potentially applicable First Amendment standard, including that of heightened scrutiny.

That is why the regulations are relevant. That is why the brevity of the Government's discussion here cannot be determinative. That is why we fear that THE CHIEF JUSTICE's contrary view would lead us into an unfortunate—and at present unjustified—revolution in communications law. And that is why we disagree with his dissent.

The portion of the judgment of the District Court invalidating BCRA § 504 is reversed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

Title 47 U. S. C. § 315(e) (Supp. II), as amended by BCRA § 504, provides:

"Political record

"(1) In general

"A licensee shall maintain, and make available for public inspection, a complete record of a request to purchase broadcast time that—

"(A) is made by or on behalf of a legally qualified candidate for public office; or

"(B) communicates a message relating to any political matter of national importance, including—

"(i) a legally qualified candidate;

"(ii) any election to Federal office; or

"(iii) a national legislative issue of public importance.

"(2) Contents of record

"A record maintained under paragraph (1) shall contain information regarding—

"(A) whether the request to purchase broadcast time is accepted or rejected by the licensee;

"(B) the rate charged for the broadcast time;

"(C) the date and time on which the communication is aired;

"(D) the class of time that is purchased;

"(E) the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers (as applicable);

"(F) in the case of a request made by, or on behalf of, a candidate, the name of the candidate, the authorized

committee of the candidate, and the treasurer of such committee; and

"(G) in the case of any other request, the name of the person purchasing the time, the name, address, and phone number of a contact person for such person, and a list of the chief executive officers or members of the executive committee or of the board of directors of such person.

"(3) Time to maintain file

"The information required under this subsection shall be placed in a political file as soon as possible and shall be retained by the licensee for a period of not less than 2 years."

Title 47 CFR § 73.1943 (2002) provides:

"Political file.

"(a) Every licensee shall keep and permit public inspection of a complete and orderly record (political file) of all requests for broadcast time made by or on behalf of a candidate for public office, together with an appropriate notation showing the disposition made by the licensee of such requests, and the charges made, if any, if the request is granted. The 'disposition' includes the schedule of time purchased, when spots actually aired, the rates charged, and the classes of time purchased.

"(b) When free time is provided for use by or on behalf of candidates, a record of the free time provided shall be placed in the political file.

"(c) All records required by this paragraph shall be placed in the political file as soon as possible and shall be retained for a period of two years. As soon as possible means immediately absent unusual circumstances."

JUSTICE SCALIA, concurring with respect to BCRA Titles III and IV, dissenting with respect to BCRA Titles I and V,

and concurring in the judgment in part and dissenting in part with respect to BCRA Title II.

With respect to Titles I, II, and V: I join in full the dissent of THE CHIEF JUSTICE; I join the opinion of JUSTICE KENNEDY, except to the extent it upholds new § 323(e) of the Federal Election Campaign Act of 1971 (FECA) and § 202 of the Bipartisan Campaign Reform Act of 2002 (BCRA) in part; and because I continue to believe that *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, was wrongly decided, I also join Parts I, II–A, and II–B of the opinion of JUSTICE THOMAS. With respect to Titles III and IV, I join THE CHIEF JUSTICE's opinion for the Court. Because these cases are of such extraordinary importance, I cannot avoid adding to the many writings a few words of my own.

This is a sad day for the freedom of speech. Who could have imagined that the same Court which, within the past four years, has sternly disapproved of restrictions upon such inconsequential forms of expression as virtual child pornography, *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234 (2002), tobacco advertising, *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525 (2001), dissemination of illegally intercepted communications, *Bartnicki* v. *Vopper*, 532 U. S. 514 (2001), and sexually explicit cable programming, *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803 (2000), would smile with favor upon a law that cuts to the heart of what the First Amendment is meant to protect: the right to criticize the government. For that is what the most offensive provisions of this legislation are all about. We are governed by Congress, and this legislation prohibits the criticism of Members of Congress by those entities most capable of giving such criticism loud voice: national political parties and corporations, both of the commercial and the not-for-profit sort. It forbids pre-election criticism of incumbents by corporations, even not-for-profit corporations, by use of their general funds; and forbids national-party use of "soft" money to fund "issue ads" that incumbents find so offensive.

To be sure, the legislation is evenhanded: It similarly prohibits criticism of the candidates who oppose Members of Congress in their reelection bids. But as everyone knows, this is an area in which evenhandedness is not fairness. If *all* electioneering were evenhandedly prohibited, incumbents would have an enormous advantage. Likewise, if incumbents and challengers are limited to the same quantity of electioneering, incumbents are favored. In other words, *any* restriction upon a type of campaign speech that is equally available to challengers and incumbents tends to favor incumbents.

Beyond that, however, the present legislation *targets* for prohibition certain categories of campaign speech that are particularly harmful to incumbents. Is it accidental, do you think, that incumbents raise about three times as much "hard money"—the sort of funding generally *not* restricted by this legislation—as do their challengers? See FEC, 1999–2000 Financial Activity of All Senate and House Campaigns (Jan. 1, 1999–Dec. 31, 2000) (last modified on May 15, 2001), http://www.fec.gov/press/051501congfinact/tables/allcong2000.xls (all Internet materials as visited Dec. 4, 2003, and available in Clerk of Court's case file). Or that lobbyists (who seek the favor of incumbents) give 92 percent of their money in "hard" contributions? See U. S. Public Interest Research Group, The Lobbyist's Last Laugh: How K Street Lobbyists Would Benefit from the McCain-Feingold Campaign Finance Bill 3 (July 5, 2001), http://www.pirg.org/democracy/democracy.asp?id2=5068. Is it an oversight, do you suppose, that the so-called "millionaire provisions" raise the contribution limit for a candidate running against an individual who devotes to the campaign (as challengers often do) great personal wealth, but do not raise the limit for a candidate running against an individual who devotes to the campaign (as incumbents often do) a massive election "war chest"? See BCRA §§ 304, 316, and 319. And is it mere happenstance, do you estimate, that national-party funding,

which is severely limited by the Act, is more likely to assist cash-strapped challengers than flush-with-hard-money incumbents? See A. Gierzynski & D. Breaux, The Financing Role of Parties, in Campaign Finance in State Legislative Elections 195–200 (J. Thompson & S. Moncrief eds. 1998). Was it unintended, by any chance, that incumbents are free personally to receive some soft money and even to solicit it for other organizations, while national parties are not? See new FECA §§ 323(a) and (e).

I wish to address three fallacious propositions that might be thought to justify some or all of the provisions of this legislation—only the last of which is explicitly embraced by the principal opinion for the Court, but all of which underlie, I think, its approach to these cases.

### (a) Money is Not Speech

It was said by congressional proponents of this legislation, see 143 Cong. Rec. 20746 (1997) (remarks of Sen. Boxer); 145 Cong. Rec. S12612 (Oct. 14, 1999) (remarks of Sen. Cleland); 147 Cong. Rec. S2436 (Mar. 19, 2001) (remarks of Sen. Dodd), with support from the law reviews, see, e. g., Wright, Politics and the Constitution: Is Money Speech? 85 Yale L. J. 1001 (1976), that since this legislation regulates nothing but the expenditure of money for speech, as opposed to speech itself, the burden it imposes is not subject to full First Amendment scrutiny; the government may regulate the raising and spending of campaign funds just as it regulates other forms of conduct, such as burning draft cards, see *United States* v. *O'Brien*, 391 U. S. 367 (1968), or camping out on the National Mall, see *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984). That proposition has been endorsed by one of the two authors of today's principal opinion: "The right to use one's own money to hire gladiators, [and] to fund 'speech by proxy,' . . . [are] property rights . . . not entitled to the same protection as the right to say what one pleases." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377,

399 (2000) (STEVENS, J., concurring). Until today, however, that view has been categorically rejected by our jurisprudence. As we said in *Buckley*, 424 U. S., at 16, "this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment."

Our traditional view was correct, and today's cavalier attitude toward regulating the financing of speech (the "exacting scrutiny" test of *Buckley*, see *ibid.*, is not uttered in any majority opinion, and is not observed in the ones from which I dissent) frustrates the fundamental purpose of the First Amendment. In any economy operated on even the most rudimentary principles of division of labor, effective public communication requires the speaker to make use of the services of others. An author may write a novel, but he will seldom publish and distribute it himself. A freelance reporter may write a story, but he will rarely edit, print, and deliver it to subscribers. To a government bent on suppressing speech; this mode of organization presents opportunities: Control any cog in the machine, and you can halt the whole apparatus. License printers, and it matters little whether authors are still free to write. Restrict the sale of books, and it matters little who prints them. Predictably, *repressive regimes have exploited these principles by at-* tacking all levels of the production and dissemination of ideas. See, *e. g.*, Printing Act of 1662, 14 Car. II, ch. 33, §§ 1, 4, 7 (punishing printers, importers, and booksellers); Printing Act of 1649, 2 Acts and Ordinances of the Interregnum 245, 246, 250 (punishing authors, printers, booksellers, importers, and buyers). In response to this threat, we have interpreted the First Amendment broadly. See, *e. g.*, *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 65, n. 6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication . . .").

Division of labor requires a means of mediating exchange, and in a commercial society, that means is supplied by money. The publisher pays the author for the right to sell his book; it pays its staff who print and assemble the book; it demands payments from booksellers who bring the book to market. This, too, presents opportunities for repression: Instead of regulating the various parties to the enterprise individually, the government can suppress their ability to coordinate by regulating their use of money. What good is the right to print books without a right to buy works from authors? Or the right to publish newspapers without the right to pay deliverymen? The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.

This is not to say that *any* regulation of money is a regulation of speech. The government may apply general commercial regulations to those who use money for speech if it applies them evenhandedly to those who use money for other purposes. But where the government singles out money used to fund speech as its legislative object, it is acting against speech as such, no less than if it had targeted the paper on which a book was printed or the trucks that deliver it to the bookstore.

History and jurisprudence bear this out. The best early examples derive from the British efforts to tax the press after the lapse of licensing statutes by which the press was first regulated. The Stamp Act of 1712 imposed levies on all newspapers, including an additional tax for each advertisement. 10 Anne, ch. 18, § 113. It was a response to unfavorable war coverage, "obvious[ly] . . . designed to check the publication of those newspapers and pamphlets which depended for their sale on their cheapness and sensationalism." F. Siebert, Freedom of the Press in England, 1476–1776, pp. 309–310 (1952). It succeeded in killing off approximately half the newspapers in England in its first year. *Id.*, at 312. In 1765, Parliament applied a similar Act to the Col-

onies. 5 Geo. III, ch. 12, § 1. The colonial Act likewise placed exactions on sales and advertising revenue, the latter at 2s. per advertisement, which was "by any standard . . . excessive, since the publisher himself received only from 3 to 5s. and still less for repeated insertions." A. Schlesinger, Prelude to Independence: The Newspaper War on Britain, 1764–1776, p. 68 (1958). The founding generation saw these taxes as grievous incursions on the freedom of the press. See, e. g., 1 D. Ramsay, History of the American Revolution 61–62 (L. Cohen ed. 1990); J. Adams, A Dissertation on the Canon and Feudal Law (1765), reprinted in 3 Life and Works of John Adams 445, 464 (C. Adams ed. 1851). See generally Grosjean v. American Press Co., 297 U. S. 233, 245–249 (1936); Schlesinger, supra, at 67–84.

We have kept faith with the Founders' tradition by prohibiting the selective taxation of the press. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U. S. 575 (1983) (ink and paper tax); Grosjean, supra (advertisement tax). And we have done so whether the tax was the product of illicit motive or not. See Minneapolis Star & Tribune Co., supra, at 592. These press-taxation cases belie the claim that regulation of money used to fund speech is not regulation of speech itself. A tax on a newspaper's advertising revenue does not prohibit anyone from saying anything; it merely appropriates part of the revenue that a speaker would otherwise obtain. That is even a step short of totally prohibiting advertising revenue—which would be analogous to the total prohibition of certain campaign-speech contributions in the present cases. Yet it is unquestionably a violation of the First Amendment.

Many other cases exemplify the same principle that an attack upon the funding of speech is an attack upon speech itself. In Schaumburg v. Citizens for a Better Environment, 444 U. S. 620 (1980), we struck down an ordinance limiting the amount charities could pay their solicitors. In Simon & Schuster, Inc. v. Members of N. Y. State Crime Vic-

*tims Bd.*, 502 U. S. 105 (1991), we held unconstitutional a state statute that appropriated the proceeds of criminals' biographies for payment to the victims. And in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), we held unconstitutional a university's discrimination in the disbursement of funds to speakers on the basis of viewpoint. Most notable, perhaps, is our famous opinion in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), holding that paid advertisements in a newspaper were entitled to full First Amendment protection:

> "Any other conclusion would discourage newspapers from carrying 'editorial advertisements' of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press. The effect would be to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.'" *Id.*, at 266 (citations omitted).

This passage was relied on in *Buckley* for the point that restrictions on the expenditure of money for speech are equivalent to restrictions on speech itself. 424 U. S., at 16–17. That reliance was appropriate. If denying protection to paid-for speech would "shackle the First Amendment," so also does forbidding or limiting the right to pay for speech.

It should be obvious, then, that a law limiting the amount a person can spend to broadcast his political views is a direct restriction on speech. That is no different from a law limiting the amount a newspaper can pay its editorial staff or the amount a charity can pay its leafletters. It is equally clear that a limit on the amount a candidate can *raise* from any one individual for the purpose of speaking is also a direct limitation on speech. That is no different from a law limit-

ing the amount a publisher can accept from any one share-holder or lender, or the amount a newspaper can charge any one advertiser or customer.

### (b) Pooling Money is Not Speech

Another proposition which could explain at least some of the results of today's opinion is that the First Amendment right to spend money for speech does not include the right to combine with others in spending money for speech. Such a proposition fits uncomfortably with the concluding words of our Declaration of Independence: "And for the support of this Declaration, . . . we mutually pledge to each other our Lives, *our Fortunes* and our sacred Honor." (Emphasis added.) The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.

> "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *NAACP* v. *Button, 371 U. S. 415, 431 (1963)* (internal quotation marks omitted).

> "The First Amendment protects political association as well as political expression. The constitutional right of association explicated in *NAACP* v. *Alabama,* 357 U. S. 449, 460 (1958), stemmed from the Court's recognition that '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.' Subsequent decisions have made clear that the First and Fourteenth Amendments guarantee ' "freedom to associate with oth-

ers for the common advancement of political beliefs and ideas," ' . . . ." *Buckley, supra,* at 15.

We have said that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts* v. *United States Jaycees,* 468 U. S. 609, 622 (1984). That "right to associate . . . in pursuit" includes the right to pool financial resources.

If it were otherwise, Congress would be empowered to enact legislation requiring newspapers to be sole proprietorships, banning their use of partnership or corporate form. That sort of restriction would be an obvious violation of the First Amendment, and it is incomprehensible why the conclusion should change when what is at issue is the pooling of funds for the most important (and most perennially threatened) category of speech: electoral speech. The principle that such financial association does not enjoy full First Amendment protection threatens the existence of all political parties.

### (c) Speech by Corporations Can Be Abridged

The last proposition that might explain at least some of today's casual abridgment of free-speech rights is this: that the particular form of association known as a corporation does not enjoy full First Amendment protection. Of course the text of the First Amendment does not limit its application in this fashion, even though "[b]y the end of the eighteenth century the corporation was a familiar figure in American economic life." C. Cooke, Corporation, Trust and Company 92 (1951). Nor is there any basis in reason why First Amendment rights should not attach to corporate associations—and we have said so. In *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978), we held unconstitutional a state prohibition of corporate speech designed to influence the vote on referendum proposals. We said:

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs. If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *Id.*, at 776–777 (internal quotation marks, footnotes, and citations omitted).

In *NAACP* v. *Button, supra,* at 428–429, 431, we held that the NAACP could assert First Amendment rights "on its own behalf, . . . though a corporation," and that the activities of the corporation were "modes of expression and association protected by the First and Fourteenth Amendments." In *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.,* 475 U. S. 1, 8 (1986), we held unconstitutional a state effort to compel corporate speech. "The identity of the speaker," we said, "is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." And in *Buckley,* 424 U. S. 1, we held unconstitutional FECA's limitation upon independent corporate expenditures.

The Court changed course in *Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652 (1990), upholding a state prohibition of an independent corporate expenditure in support of a candidate for state office. I dissented in that case, see *id.,* at 679, and remain of the view that it was error. In the modern world, giving the government power to exclude corporations from the political debate enables it effectively to muffle the voices that best represent the most significant

segments of the economy and the most passionately held social and political views. . People who associate—who pool their financial resources—for purposes of economic enterprise overwhelmingly do so in the corporate form; and with increasing frequency, incorporation is chosen by those who associate to defend and promote particular ideas—such as the American Civil Liberties Union and the National Rifle Association, parties to these cases. Imagine, then, a government that wished to suppress nuclear power—or oil and gas exploration, or automobile manufacturing, or gun ownership, or civil liberties—and that had the power to prohibit corporate advertising against its proposals. To be sure, the individuals involved in, or benefited by, those industries, or interested in those causes, could (given enough time) form political action committees or other associations to make their case. But the organizational form in which those enterprises already *exist*, and in which they can most quickly and most effectively get their message across, is the corporate form. The First Amendment does not in my view permit the restriction of that political speech. And the same holds true for corporate electoral speech: A candidate should not be insulated from the most effective speech that the major participants in the economy and major incorporated interest groups can generate.

But what about the danger to the political system posed by "amassed wealth"? The most direct threat from that source comes in the form of undisclosed favors and payoffs to elected officials—which have already been criminalized, and will be rendered no more discoverable by the legislation at issue here. The use of corporate wealth (like individual wealth) to speak to the electorate is unlikely to "distort" elections—*especially* if disclosure requirements *tell* the people where the speech is coming from. The premise of the First Amendment is that the American people are neither sheep nor fools, and hence fully capable of considering both the substance of the speech presented to them and its proxi-

mate and ultimate source. If that premise is wrong, our democracy has a much greater problem to overcome than merely the influence of amassed wealth. Given the premises of democracy, there is no such thing as *too much* speech.

But, it is argued, quite apart from its effect upon the electorate, corporate speech in the form of contributions to the candidate's campaign, or even in the form of independent expenditures supporting the candidate, engenders an obligation which is later paid in the form of greater access to the officeholder, or indeed in the form of votes on particular bills. Any *quid-pro-quo* agreement for votes would of course violate criminal law, see 18 U. S. C. § 201, and actual payoff *votes* have not even been claimed by those favoring the restrictions on corporate speech. It cannot be denied, however, that corporate (like noncorporate) allies will have greater access to the officeholder, and that he will tend to favor the same causes as those who support him (which is usually *why* they supported him). That is the nature of politics—if not indeed human nature—and how this can properly be considered "corruption" (or "the appearance of corruption") with regard to corporate allies and not with regard to other allies is beyond me. If the Bill of Rights had intended an exception to the freedom of speech in order to combat this malign proclivity of the officeholder to agree with those who agree with him, and to speak more with his supporters than his opponents, it would surely have said so. It did not do so, I think, because the juice is not worth the squeeze. Evil corporate (and private affluent) influences are well enough checked (so long as adequate campaign-expenditure disclosure rules exist) by the politician's fear of being portrayed as "in the pocket" of so-called moneyed interests. The incremental benefit obtained by muzzling corporate speech is more than offset by loss of the information and persuasion that corporate speech can contain. That, at least, is the assumption of a constitutional guarantee which prescribes that Congress shall make no law abridging the freedom of speech.

But let us not be deceived. While the Government's briefs and arguments before this Court focused on the horrible "appearance of corruption," the most passionate floor statements during the debates on this legislation pertained to so-called attack ads, which the Constitution surely protects, but which Members of Congress analogized to "crack cocaine," 144 Cong. Rec. 1601 (1998) (remarks of Sen. Daschle), "drive-by shooting[s]," *id.*, at 1613 (remarks of Sen. Durbin), and "air pollution," 143 Cong. Rec. 20505 (1997) (remarks of Sen. Dorgan). There is good reason to believe that the ending of negative campaign ads was the principal attraction of the legislation. A Senate sponsor said, "I hope that we will not allow our attention to be distracted from the real issues at hand—how to raise the tenor of the debate in our elections and give people real choices. No one benefits from negative ads. They don't aid our Nation's political dialog." *Id.*, at 20521–20522 (remarks of Sen. McCain). He assured the body that "[y]ou cut off the soft money, you are going to see a lot less of that [attack ads]. Prohibit unions and corporations, and you will see a lot less of that. If you demand full disclosure for those who pay for those ads, you are going to see a lot less of that. . . ." 147 Cong. Rec. S3116 (Mar. 29, 2001). See also, *e. g.*, 148 Cong. Rec. S2117 (Mar. 20, 2002) (remarks of Sen. Cantwell) ("This bill is about slowing the ad war. . . . It is about slowing political advertising and making sure the flow of negative ads by outside interest groups does not continue to permeate the airwaves"); 143 Cong. Rec. 20746 (1997) (remarks of Sen. Boxer) ("These so-called issues ads are not regulated at all and mention candidates by name. They directly attack candidates without any accountability. It is brutal. . . . We have an opportunity in the McCain-Feingold bill to stop that . . ."); 145 Cong. Rec. S12606–S12607 (Oct. 14, 1999) (remarks of Sen. Wellstone) ("I think these issue advocacy ads are a nightmare. I think all of us should hate them. . . . [By passing the legislation], [w]e could get some of this poison politics off television").

Another theme prominent in the legislative debates was the notion that there is too much money spent on elections. The first principle of "reform" was that "there should be less money in politics." 147 Cong. Rec. S3236 (Apr. 2, 2001) (remarks of Sen. Murray). "The enormous amounts of special interest money that flood our political system have become a cancer in our democracy." 148 Cong. Rec. S2151 (Mar. 20, 2002) (remarks of Sen. Kennedy). "[L]arge sums of money drown out the voice of the average voter." *Id.*, at H373 (Feb. 13, 2002) (remarks of Rep. Langevin). The system of campaign finance is "drowning in money." *Id.*, at H404 (remarks of Rep. Menendez). And most expansively:

> "Despite the ever-increasing sums spent on campaigns, we have not seen an improvement in campaign discourse, issue discussion or voter education. More money does not mean more ideas, more substance or more depth. Instead, it means more of what voters complain about most. More 30-second spots, more negativity and an increasingly longer campaign period." *Id.*, at S2150 (Mar. 20, 2002) (remarks of Sen. Kerry).

Perhaps voters do detest these 30-second spots—though I suspect they detest even more hour-long campaign-debate interruptions of their favorite entertainment programming. *Evidently, however, these ads do persuade voters, or else* they would not be so routinely used by sophisticated politicians of all parties. The point, in any event, is that it is not the proper role of those who govern us to judge which campaign speech has "substance" and "depth" (do you think it might be that which is least damaging to incumbents?) and to abridge the rest.

And what exactly are these outrageous sums frittered away in determining who will govern us? A report prepared for Congress concluded that the total amount, in hard and soft money, spent on the 2000 federal elections was be-

tween $2.4 and $2.5 billion. J. Cantor, CRS Report for Congress, Campaign Finance in the 2000 Federal Elections: Overview and Estimates of the Flow of Money (2001). *All* campaign spending in the United States, including state elections, ballot initiatives, and judicial elections, has been estimated at $3.9 billion for 2000, Nelson, Spending in the 2000 Elections, in Financing the 2000 Election 24, Tbl. 2–1 (D. Magleby ed. 2002), which was a year that "shattered spending and contribution records," *id.*, at 22. Even taking this last, larger figure as the benchmark, it means that Americans spent about half as much electing all their Nation's officials, state and federal, as they spent on movie tickets ($7.8 billion); about a fifth as much as they spent on cosmetics and perfume ($18.8 billion); and about a sixth as much as they spent on pork (the nongovernmental sort) ($22.8 billion). See U. S. Dept. of Commerce, Bureau of Economic Analysis, Personal Consumption Expenditures, Tbl. 2.6U (col. AS; rows 356, 214, and 139). If our democracy is drowning from this much spending, it cannot swim.

\*     \*     \*

Which brings me back to where I began: This litigation is about preventing criticism of the government. I cannot say for certain that many, or some, or even any, of the Members of Congress who voted for this legislation did so not to produce "fairer" campaigns, but to mute criticism of their records and facilitate reelection. Indeed, I will stipulate that all those who voted for BCRA believed they were acting for the good of the country. There remains the problem of the Charlie Wilson Phenomenon, named after Charles Wilson, former president of General Motors, who is supposed to have said during the Senate hearing on his nomination as Secretary of Defense that "what's good for General Motors

is good for the country."*   Those in power, even giving them the benefit of the greatest good will, are inclined to believe that what is good for them is good for the country.   Whether in prescient recognition of the Charlie Wilson Phenomenon, or out of fear of good old-fashioned, malicious, self-interested manipulation, "[t]he fundamental approach of the First Amendment . . . was to assume the worst, and to rule the regulation of political speech 'for fairness' sake' simply out of bounds."   *Austin,* 494 U. S., at 693 (SCALIA, J., dissenting). Having abandoned that approach to a limited extent in *Buckley,* we abandon it much further today.

We will unquestionably be called upon to abandon it further still in the future.   The most frightening passage in the lengthy floor debates on this legislation is the following assurance given by one of the cosponsoring Senators to his colleagues:

> "This is a modest step, it is a first step, it is an essential step, but it does not even begin to address, in some ways, the fundamental problems that exist with the hard money aspect of the system."   148 Cong. Rec. S2101 (Mar. 20, 2002) (statement of Sen. Feingold).

The system indeed.   The first instinct of power is the retention of power, and, under a Constitution that requires periodic elections, that is best achieved by the suppression of election-time speech.   We have witnessed merely the second scene of Act I of what promises to be a lengthy tragedy. In scene 3 the Court, having abandoned most of the First Amendment weaponry that *Buckley* left intact, will be even less equipped to resist the incumbents' writing of the rules

---

*It is disillusioning to learn that the fabled quote is inaccurate.   Wilson actually said: "[F]or years I thought what was good for our country was good for General Motors, and vice versa.   The difference did not exist." Hearings before the Senate Committee on Armed Services, 83d Cong., 1st Sess., 26 (1953).

of political debate. The federal election campaign laws, which are already (as today's opinions show) so voluminous, so detailed, so complex, that no ordinary citizen dare run for office, or even contribute a significant sum, without hiring an expert adviser in the field, can be expected to grow more voluminous, more detailed, and more complex in the years to come—and always, always, with the objective of reducing the excessive amount of speech.

JUSTICE THOMAS, concurring with respect to BCRA Titles III and IV, except for BCRA §§ 311 and 318, concurring in the result with respect to BCRA § 318, concurring in the judgment in part and dissenting in part with respect to BCRA Title II, and dissenting with respect to BCRA Titles I, V, and § 311.*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." Nevertheless, the Court today upholds what can only be described as the most significant abridgment of the freedoms of speech and association since the Civil War. With breathtaking scope, the Bipartisan Campaign Reform Act of 2002 (BCRA), directly targets and constricts core political speech, the "primary object of First Amendment protection." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 410–411 (2000) (THOMAS, J., dissenting). Because "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 223 (1989) (quoting *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971)), our duty is to approach these restrictions "with the utmost skepticism" and subject them to the "strictest scrutiny." *Shrink Missouri, supra,* at 412 (THOMAS, J., dissenting).

---

* JUSTICE SCALIA joins Parts I, II–A, and II–B of this opinion.

In response to this assault on the free exchange of ideas and with only the slightest consideration of the appropriate standard of review or of the Court's traditional role of protecting First Amendment freedoms, the Court has placed its *imprimatur* on these unprecedented restrictions. The very "purpose of the First Amendment [is] to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969). Yet today the fundamental principle that "the best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting), is cast aside in the purported service of preventing "corruption," or the mere "appearance of corruption." *Buckley* v. *Valeo*, 424 U. S. 1, 26 (1976) *(per curiam)*. Apparently, the marketplace of ideas is to be fully open only to defamers, *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); nude dancers, *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991) (plurality opinion); pornographers, *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234 (2002); flag burners, *United States* v. *Eichman*, 496 U. S. 310 (1990); and cross burners, *Virginia* v. *Black*, 538 U. S. 343 (2003).

Because I cannot agree with the treatment given by JUSTICE STEVENS' and JUSTICE O'CONNOR's opinion (hereinafter joint opinion) to speech that is "indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society," *Thornhill* v. *Alabama*, 310 U. S. 88, 103 (1940), I respectfully dissent. I also dissent from JUSTICE BREYER's opinion upholding BCRA § 504. I join THE CHIEF JUSTICE's opinion in regards to BCRA §§ 304, 305, 307, 316, 319, and 403(b); concur in the result as to § 318; and dissent from the opinion as to § 311. I also fully agree with JUSTICE KENNEDY's discussion of § 213 and join that portion of his opinion. *Post*, at 320.

I

A

"[C]ampaign finance laws are subject to strict scrutiny," *Federal Election Comm'n* v. *Beaumont,* 539 U. S. 146, 164 (2003) (THOMAS, J., dissenting), and thus Title I must satisfy that demanding standard even if it were (incorrectly) conceived of as nothing more than a contribution limitation. The defendants do not even attempt to defend Title I under this standard, and for good reason: The various restrictions imposed by Title I are much less narrowly tailored to target only corrupting or problematic donations than even the contribution limits in *Shrink Missouri.* See 528 U. S., at 427–430 (THOMAS, J., dissenting); see also *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 641–644 (1996) *(Colorado I)* (THOMAS, J., concurring in judgment and dissenting in part). And, as I have previously noted, it is unclear why "[b]ribery laws [that] bar precisely the *quid pro quo* arrangements that are targeted here" and "disclosure laws" are not "less restrictive means of addressing [the Government's] interest in curtailing corruption." *Shrink Missouri, supra,* at 428.

The joint opinion not only continues the errors of *Buckley* v. *Valeo,* by applying a low level of scrutiny to contribution ceilings, but also builds upon these errors by expanding the anticircumvention rationale beyond reason. Admittedly, exploitation of an anticircumvention concept has a long pedigree, going back at least to *Buckley* itself. *Buckley* upheld a $1,000 contribution ceiling as a way to combat both the "actuality and appearance of corruption." 424 U. S., at 26. The challengers in *Buckley* contended both that bribery laws represented "a less restrictive means of dealing with 'proven and suspected *quid pro quo* arrangements,'" *id.,* at 27, and that the $1,000 contribution ceiling was overbroad as "most large contributors do not seek improper influence over a candidate's position or an officeholder's action," *id.,* at 29. The

Court rejected the first argument on the grounds that "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action," *id.*, at 27–28, and rejected the second on the grounds that "it [is] difficult to isolate suspect contributions," *id.*, at 30.[1] But a broadly drawn bribery law[2] would cover even subtle and general attempts to influence government officials corruptly, eliminating the Court's first concern. And, an effective bribery law would deter actual *quid pro quos* and would, in all likelihood, eliminate any appearance of corruption in the system.

Hence, at root, the *Buckley* Court was concerned that bribery laws could not be effectively enforced to prevent *quid pro quos* between donors and officeholders, and the only rational reading of *Buckley* is that it approved the $1,000 contribution ceiling on this ground. The Court then, however, having at least in part concluded that individual contribution ceilings were necessary to prevent easy evasion of bribery laws, proceeded to uphold a separate contribution limitation, using, as the only justification, the "prevent[ion] [of] evasion of the $1,000 contribution limitation." *Id.*, at 38. The need to prevent circumvention of a limitation that was itself an anticircumvention measure led to the upholding of

---

[1] The Court also rejected an overbreadth challenge, reasoning that "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." *Buckley*, 424 U. S., at 30. But this justification was inextricably intertwined with the Court's concern over the difficulty of isolating suspect contributions. If it were easy to isolate suspect contributions, and if bribery laws could be quickly and effectively enforced, then there would be no "opportunity for abuse inherent in the process," *ibid.*, and hence no need for an otherwise overbroad contribution ceiling.

[2] Arguably, the current antibribery statute, 18 U. S. C. §201, is broad enough to cover the unspecified other "attempts . . . to influence governmental action" that the *Buckley* Court seemed worried about. 424 U. S., at 28.

another significant restriction on individuals' freedom of speech.

The joint opinion now repeats this process. New Federal Election Campaign Act of 1971 (FECA) § 323(a), 2 U. S. C. § 441i(a) (Supp. II), is intended to prevent easy circumvention of the (now) $2,000 contribution ceiling. The joint opinion even recognizes this, relying heavily on evidence that, for instance, "candidates and donors alike have in fact exploited the soft-money loophole, the former to increase their prospects of election and the latter to create debt on the part of officeholders, with the national parties serving as willing intermediaries." *Ante*, at 146. The joint opinion upholds § 323(a), in part, on the grounds that it had become too easy to circumvent the $2,000 cap by using the national parties as go-betweens.

And the remaining provisions of new FECA § 323 are upheld mostly as measures preventing circumvention of other contribution limits, including § 323(a), *ante*, at 164–166 (§ 323(b)); *ante*, at 174–177 (§ 323(d)); *ante*, at 182–183 (§ 323(e)); *ante*, at 184–185 (§ 323(f)), which, as I have already explained, is a second-order anticircumvention measure. The joint opinion's handling of § 323(f) is perhaps most telling, as it upholds § 323(f) only because of "Congress' eminently reasonable *prediction* that . . . state and local candidates and officeholders will become the next conduits for the soft-money funding of sham issue advertising." *Ante*, at 185 (emphasis added). That is, this Court upholds a third-order anticircumvention measure based on Congress' anticipation of circumvention of these second-order anticircumvention measures that might possibly, at some point in the future, pose some problem.

It is not difficult to see where this leads. Every law has limits, and there will always be behavior not covered by the law but at its edges; behavior easily characterized as "circumventing" the law's prohibition. Hence, speech regulation will again expand to cover new forms of "circumvention," only to spur supposed circumvention of the new

regulations, and so forth. Rather than permit this never-ending and self-justifying process, I would require that the Government explain why proposed speech restrictions are needed in light of actual Government interests, and, in particular, why the bribery laws are not sufficient.

### B

But Title I falls even on the joint opinion's terms. This Court has held that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Missouri*, 528 U. S., at 391. And three Members of today's majority have observed that "the opportunity for corruption" presented by "[u]nregulated 'soft money' contributions" is, "at best, attenuated." *Colorado I*, 518 U. S., at 616 (opinion of BREYER, J., joined by O'CONNOR and SOUTER, JJ.). Such an observation is quite clearly correct. A donation to a political party is a clumsy method by which to influence a candidate, as the party is free to spend the donation however it sees fit, and could easily spend the money as to provide no help to the candidate. And, a soft-money donation to a party will be of even less benefit to a candidate, "because of legal restrictions on how the money may be spent." Brief for FEC et al. in No. 02–1674 et al., p. 43. It follows that the defendants bear an especially heavy empirical burden in justifying Title I.

The evidence cited by the joint opinion does not meet this standard and would barely suffice for anything more than rational-basis review. The first category of the joint opinion's evidence is evidence that "federal officeholders have commonly asked donors to make soft-money donations to national and state committees solely in order to assist federal campaigns, including the officeholder's own." *Ante*, at 146 (internal quotation marks omitted). But to the extent that donors and federal officeholders have collaborated so that donors could give donations to a national party committee "for

the purpose of influencing any election for Federal office," the alleged soft-money donation is in actuality a regular "contribution" as already defined and regulated by FECA. See 2 U. S. C. § 431(8)(A)(i). Neither the joint opinion nor the defendants present evidence that enforcement of pre-BCRA law has proved to be impossible, ineffective, or even particularly difficult.

The second category is evidence that "lobbyists, CEOs, and wealthy individuals" have "donat[ed] substantial sums of soft money to national committees not on ideological grounds, but for the express purpose of securing influence over federal officials." *Ante,* at 147. Even if true (and the cited evidence consists of nothing more than vague allegations of wrongdoing), it is unclear why existing bribery laws could not address this problem. Again, neither the joint opinion nor the defendants point to evidence that the enforcement of bribery laws has been or would be ineffective. If the problem has been clear and widespread, as the joint opinion suggests, I would expect that convictions, or at least prosecutions, would be more frequent.

The third category is evidence characterized by the joint opinion as "connect[ing] soft money to manipulations of the legislative calendar, leading to Congress' failure to enact, among other things, generic drug legislation, tort reform, and tobacco legislation." *Ante,* at 150. But the evidence for this is no stronger than the evidence that there has been actual vote buying or vote switching for soft money. The joint opinion's citations to the record do not stand for the propositions that they claim. For instance, the McCain declaration does not provide any evidence of any exchange of legislative action for donations of any kind (hard or soft).[3]

---

[3] Indeed, the principal contents of Senator McCain's declaration are his complaints that several bills he supported were defeated. The Senator also suggests, without evidence, that there had been some connection between the defeat of his favored policy outcomes and certain soft-money donors. See, *e. g.,* App. 393–394, ¶10 (declaration of Sen. John McCain

Neither do the Simpson or Simon declarations, with perhaps one exception effectively addressed by JUSTICE KENNEDY's opinion.[4]  See *post*, at 301–303.   In fact, the findings by two of the District Court's judges confirm that the evidence of any *quid pro quo* corruption is exceedingly weak, if not non-existent.   See 251 F. Supp. 2d 176, 349–352 (DC 2003) (Henderson, J., concurring in judgment in part and dissenting in part); *id.*, at 851–853 (Leon, J.).   The evidence cited by the joint opinion is properly described as, "at best, [the Members of Congress'] personal conjecture regarding the impact of soft money donations on the voting practices of their present and former colleagues."   *Id.*, at 852 (Leon, J.).

The joint opinion also places a substantial amount of weight on the fact that "in 1996 and 2000, more than half of the top 50 soft-money donors gave substantial sums to *both* major national parties," and suggests that this fact "leav[es] room for no other conclusion but that these donors were seeking influence, or avoiding retaliation, rather than promoting any particular ideology."   *Ante*, at 148 (emphasis in original).   But that is not necessarily the case.   The two major parties are not perfect ideological opposites, and supporters or opponents of certain policies or ideas might find substantial overlap between the two parties.   If donors feel that both major parties are in general agreement over an issue of importance to them, it is unremarkable that such

¶10) (noting Democratic "parliamentary procedural device" used to block one of Senator McCain's proposed amendments to the Sarbanes-Oxley corporate governance bill).   The possibility that his favored policy outcomes lost due to lack of public support, or because the opponents of the amendment honestly believed it would do harm to the public, does not appear to be addressed.

[4] Former Senators Simpson and Simon both seem to have the same response as Senator McCain, see n. 3, *supra*, in having their favored interests voted down, and similarly do not consider alternative explanations for the failure of their proposals.   See App. 811, ¶ 11 (declaration of former Sen. Alan Simpson ¶11); *id.*, at 805, ¶14 (declaration of former Sen. Paul Simon ¶14).

donors show support for both parties. This commonsense explanation surely belies the joint opinion's too-hasty conclusion drawn from a relatively innocent fact.

The Court today finds such sparse evidence sufficient. This cannot be held to satisfy even the "relatively complaisant review" of *Beaumont,* 539 U. S., at 161, unless, as it appears, the Court intends to abdicate entirely its role.[5]

## II

The Court is not content with "balanc[ing] away First Amendment freedoms," *Shrink Missouri,* 528 U. S., at 410 (THOMAS, J., dissenting), in the context of the restrictions imposed by Title I, which could arguably (if wrongly) be thought to be mere contribution limits. The Court also, in upholding virtually all of Title II, proceeds to do the same for limitations on expenditures, which constitute "political expression 'at the core of our electoral process and of the First Amendment freedoms,'" *Buckley,* 424 U. S., at 39 (quoting *Williams* v. *Rhodes,* 393 U. S. 23, 32 (1968)). Today's holding continues a disturbing trend: the steady decrease in the level of scrutiny applied to restrictions on core political speech. See *Buckley, supra,* at 16 (First Amendment requires "exacting scrutiny"); *Shrink Missouri, supra,* at 387 (applying *"Buckley'*s standard of scrutiny"); *Beaumont, supra,* at 161 (referencing "relatively complaisant review").[6] Although this trend is most obvious in the review of contribution limits, it has now reached what even this Court today would presumably recognize as a direct restriction on core political speech: limitations on independent expenditures.

---

[5] Because there is not an iota of evidence supporting the Government's asserted interests in BCRA § 318, I concur in the Court's conclusion that this provision is unconstitutional.

[6] The joint opinion continues yet another disturbing trend: the application of a complaisant level of scrutiny under the guise of "strict scrutiny." See *Grutter* v. *Bollinger,* 539 U. S. 306 (2003).

### A

Of course, by accepting Congress' expansion of what constitutes "coordination" for purposes of treating expenditures as limitations, the Court can pretend that it is, in fact, still only restricting primarily "contributions." I need not say much about this illusion. I have already discussed how the language used in new FECA § 315(a)(7)(B)(ii) is, even under *Buckley*'s framework, overly broad and restricts fully protected speech. See *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 467–468 (2001) *(Colorado II)* (THOMAS, J., dissenting). The particular language used, "expenditures made by any person . . . in cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party," BCRA § 214(a)(2), captures expenditures with "no constitutional difference" from "a purely independent one." *Id.*, at 468 (THOMAS, J., dissenting).[7] And new FECA § 315(a)(7)(C), although using the neutral term "coordinated," certainly has the purpose of "clarif[ying] the scope of the preceding subsection, § 315(a)(7)(B)," *ante*, at 202 (joint opinion), and thus should be read to be as expansive as the overly broad language in § 315(a)(7)(B). Hence, it too is unconstitutional.

### B

As for §§ 203 and 204, the Court rests its decision on another vast expansion of the First Amendment framework described in *Buckley*, this time of the Court's, rather than Congress', own making. In *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 659–660 (1990), the Court recognized a "different type of corruption" from the " 'financial *quid pro quo*' ": the "corrosive and distorting effects of im-

---

[7] This is doubly so now that the Court has decided that there is no constitutional need for the showing even of an "agreement" in order to transform an expenditure into a "coordinated expenditur[e]" and hence into a contribution for FECA purposes. *Ante*, at 220–223 (joint opinion).

mense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." The only effect, however, that the "immense aggregations" of wealth will have (in the context of independent expenditures) on an election is that they might be used to fund communications to convince voters to select certain candidates over others. In other words, the "corrosive and distorting effects" described in *Austin* are that corporations, on behalf of their shareholders, will be able to convince voters of the correctness of their ideas. Apparently, winning in the marketplace of ideas is no longer a sign that "the ultimate good" has been "reached by free trade in ideas," or that the speaker has survived "the best test of truth" by having "the thought . . . get itself accepted in the competition of the market." *Abrams*, 250 U. S., at 630 (Holmes, J., dissenting). It is now evidence of "corruption." This conclusion is antithetical to everything for which the First Amendment stands. See, *e. g., First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 790 (1978) ("[T]he fact that advocacy may persuade the electorate is hardly a reason to suppress it"); *Kingsley Int'l Pictures Corp.* v. *Regents of Univ. of N. Y.*, 360 U. S. 684, 689 (1959) ("[I]n the realm of ideas [the Constitution] protects expression which is eloquent no less than that which is unconvincing").

Because *Austin*'s definition of "corruption" is incompatible with the First Amendment, I would overturn *Austin* and hold that the potential for corporations and unions to influence voters, via independent expenditures aimed at convincing these voters to adopt particular views, is not a form of corruption justifying any state regulation or suppression. Without *Austin*'s peculiar variation of "corruption," §§ 203 and 204 are supported by no compelling government interest. The joint opinion does not even argue that these provi-

sions address *quid pro quo* corruption.[8]  And the share-
holder protection rationale is equally unavailing.  The
"shareholder invests in a corporation of his own volition and
is free to withdraw his investment at any time and for any
reason," *Bellotti*, 435 U. S., at 794, n. 34.  Hence, no compel-
ling interest can be found in protecting minority sharehold-
ers from the corporation's use of its general treasury, es-
pecially where, in other contexts, "equally important and
controversial corporate decisions are made by management
or by a predetermined percentage of the shareholders."
*Ibid.*

## C

I must now address an issue on which I differ from all of
my colleagues: the disclosure provisions in BCRA § 201, now
contained in new FECA § 304(f).  The "historical evidence
indicates that Founding-era Americans opposed attempts to
require that anonymous authors reveal their identities on the
ground that forced disclosure violated the 'freedom of the
press.'"  *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334,
361 (1995) (THOMAS, J., concurring in judgment).[9]  Indeed,
this Court has explicitly recognized that "the interest in hav-
ing anonymous works enter the marketplace of ideas unques-
tionably outweighs any public interest in requiring disclo-

---

[8] The National Rifle Association (NRA) plaintiffs compellingly state that
"[a]s a measure designed to prevent official corruption, of either the *quid
pro quo* or the 'gratitude' variety, Title II . . . makes no more sense than
a bribery statute requiring corporations to pay for their bribes using funds
from PACs."  Brief for Appellant NRA et al. in No. 02–1675, pp. 24–25.
And, regarding the appearance of corruption: "Defendants' own witnesses
concede that the public's perceptions of ads is not affected in the slightest
by whether they are purchased with general treasury funds or with PAC
money."  *Id.*, at 25.

[9] The fact that the Founders located the right to anonymous speech in
the "freedom of the press" is of no moment, as "it makes little difference
in terms of our analysis, which seeks to determine only whether the First
Amendment, as originally understood, protects anonymous writing."  *Mc-
Intyre*, 514 U. S., at 360 (THOMAS, J., concurring in judgment).

sure as a condition of entry," and thus that "an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *Id.*, at 342. The Court now backs away from this principle, allowing the established right to anonymous speech to be stripped away based on the flimsiest of justifications.

The only plausible interest asserted by the defendants to justify the disclosure provisions is the interest in providing "information" about the speaker to the public. But we have already held that "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.*, at 348. Of course, *Buckley* upheld the disclosure requirement on expenditures for communications using words of express advocacy based on this informational interest. 424 U. S., at 81. And admittedly, *McIntyre* purported to distinguish *Buckley*. *McIntyre, supra*, at 355–356. But the two ways *McIntyre* distinguished *Buckley*—one, that the disclosure of "an expenditure and its use, without more, reveals far less information [than a forced identification of the author of a pamphlet,]" 514 U. S., at 355; and two, that in candidate elections, the "Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures," *id.*, at 356—are inherently implausible. The first is simply wrong. The revelation of one's political expenditures for independent communications about candidates can be just as revealing as the revelation of one's name on a pamphlet for a noncandidate election. See also *id.*, at 384 (SCALIA, J., dissenting). The second was outright rejected· in *Buckley* itself, where the Court concluded that independent expenditures did not create any substantial risk of real or apparent corruption. 424 U. S., at 47. Hence, the only reading of *McIntyre* that remains consistent with the principles it contains is that it overturned *Buckley* to the extent that *Buckley* upheld a disclosure requirement solely based on the governmental interest in providing information to the voters.

The right to anonymous speech cannot be abridged based on the interests asserted by the defendants. I would thus hold that the disclosure requirements of BCRA § 201 are unconstitutional. Because of this conclusion, the so-called advance disclosure requirement of § 201 necessarily falls as well.[10]

## D

I have long maintained that *Buckley* was incorrectly decided and should be overturned. See *Colorado II*, 533 U. S., at 465; *Shrink Missouri*, 528 U. S., at 410; *Colorado I*, 518 U. S., at 640. But, most of Title II should still be held unconstitutional even under the *Buckley* framework. Under *Buckley* and *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, it is, or at least was, clear that any regulation of political speech beyond communications using words of express advocacy is unconstitutional. Hence, even under the joint opinion's framework, most of Title II is unconstitutional, as both the "primary definition" and "backup definition" of "electioneer-

---

[10] BCRA § 212(a) is also unconstitutional. Although the plaintiffs only challenge the advance disclosure requirement of § 212(a), by requiring disclosure of communications using express advocacy, the entire reporting requirement is unconstitutional for the same reasons that § 201 is unconstitutional. Consequently, it follows that the advance disclosure provision is unconstitutional.

BCRA §§ 311 and 504 also violate the First Amendment. By requiring any television or radio advertisement that satisfies the definition of "electioneering communication" to include the identity of the sponsor, and even a "full-screen view of a representative of the political committee or other person making the statement" in the case of a television advertisement, new FECA § 318, § 311 is a virtual carbon copy of the law at issue in *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995) (the only difference being the irrelevant distinction between a printed pamphlet and a television or radio advertisement). And § 504 not only has the precise flaws of § 201, but also sweeps broadly as well, covering any "message relating to any political matter of national importance, including . . . a national legislative issue of public importance." Hence, both §§ 311 and 504 should be struck down.

ing communications" cover a significant number of communications that do not use words of express advocacy. 2 U. S. C. § 434(f)(3)(A) (Supp. II).[11]

In *Buckley,* the Court was presented with the ambiguous language " 'any expenditure . . . relative to a clearly identified candidate.' " 424 U. S., at 41. The Court noted that the "use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech." *Ibid.* Hence, the Court read the phrase to mean "advocating the election or defeat of a candidate." *Id.,* at 42 (internal quotation marks omitted). But this construction did not complete the vagueness inquiry. As the Court observed:

> "[T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest." *Ibid.*

The Court then recognized that the constitutional issues raised by the provision "can be avoided only by reading

---

[11] The Court, in upholding most of its provisions by concluding that the "express advocacy" limitation derived by *Buckley* is not a constitutionally mandated line, has, in one blow, overturned every Court of Appeals that has addressed this question (except, perhaps, one). See *Clifton* v. *FEC,* 114 F. 3d 1309, 1312 (CA1 1997); *Vermont Right to Life Comm., Inc.* v. *Sorrell,* 221 F. 3d 376, 387 (CA2 2000); *FEC* v. *Christian Action Network, Inc.,* 110 F. 3d 1049, 1064 (CA4 1997); *Chamber of Commerce* v. *Moore,* 288 F. 3d 187, 193 (CA5 2000); *Iowa Right to Life Comm., Inc.* v. *Williams,* 187 F. 3d 963, 968–970 (CA8 1999); *Citizens for Responsible Govt. State Political Action Comm.* v. *Davidson,* 236 F. 3d 1174, 1187 (CA10 2000). The one possible exception is the Ninth Circuit. See *FEC* v. *Furgatch,* 807 F. 2d 857, 862–863 (1987).

§ 608(e)(1) as limited to communications that include explicit words of advocacy of election or defeat of a candidate." *Id.*, at 43.

The joint opinion argues that *Buckley* adopted this narrow reading only to avoid addressing a constitutional question. "[T]he concept of express advocacy and the concomitant class of magic words were born of an effort to avoid constitutional infirmities," concludes the joint opinion after examining the language of *Buckley*. *Ante*, at 192. This ignores the fact that the Court then struck down the expenditure limitation precisely because it was too narrow:

> "The exacting interpretation of the statutory language necessary to avoid unconstitutional vagueness thus undermines the limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or officeholder. It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign. Yet no substantial societal interest would be served by a loophole-closing provision designed to check corruption that permitted unscrupulous persons and organizations to expend unlimited sums of money in order to obtain improper influence over candidates for elective office." 424 U. S., at 45.

Far from saving the provision from constitutional doubt, the Court read the provision in such a way as to guarantee its unconstitutionality. If there were some possibility that regulation of communications without words of express advocacy were constitutional, the provision would have to have been read to include these communications, and the constitu-

tional question addressed head on.[12]  Indeed, the exceedingly narrow reading of the relevant language in *Buckley* is far from mandated by the text; it is, in fact, a highly strained reading.  " '[A]ny expenditure . . . relative to a clearly identified candidate,' " *id.*, at 41, would be better read to cover, for instance, any expenditure for an advertisement aired close to an election that is "intended to influence the voters' decisions and ha[s] that effect," a standard apparently endorsed by the joint opinion as being sufficiently "equivalent" to express advocacy to justify its regulation.  *Ante*, at 206.  By deliberately adopting a strained and narrow reading of the statutory text and then striking down the provision in question for being too narrow, the Court made clear that regulation of nonexpress advocacy was strictly forbidden.

This reading is confirmed by other portions of *Buckley* and by other cases.  For instance, in limiting FECA's disclosure provisions to expenditures involving express advocacy, the Court noted that it gave such a narrowing interpretation "[t]o insure that the reach of [the disclosure provision] is not *impermissibly broad.*"  424 U. S., at 80 (emphasis added). If overbreadth were a concern in limiting the scope of a disclosure provision, it surely was equally a concern in the limitation of an actual cap on expenditures.  And, in *MCFL*, the Court arguably eliminated any ambiguity remaining in *Buckley* when it explicitly stated that the narrowing interpretations taken in *Buckley* were necessary "in order to avoid problems of overbreadth."  *MCFL*, 479 U. S., at 248. The joint opinion's attempt to explain away *MCFL*'s uncomfortable language is unpersuasive.  The joint opinion emphasizes that the *MCFL* Court "held that a 'similar con-

---

[12] After all, the constitutional avoidance doctrine counsels us to adopt constructions of statutes to "avoid decision of constitutional questions," not to deliberately create constitutional questions.  *United States v. Thirty-seven Photographs*, 402 U. S. 363, 373 (1971); see also *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909).

*struction'* must apply to the expenditure limitation," as if that somehow proved its point. *Ante,* at 192, n. 76 (emphasis in original). The fact that the *MCFL* Court said this does not establish anything, of course; adopting a narrow construction of a statute "in order to avoid problems of overbreadth," 479 U. S., at 248, is perfectly consistent with a holding that, lacking the narrowing construction, the statute would be overly broad, *i. e.,* unconstitutional.

The defendants' principal argument in response is that

> "it would be bizarre to conclude that the Constitution permits Congress to prohibit the use of corporate or union general treasury funds for electioneering advertisements, but that the *only* standard that it can constitutionally use (express advocacy) is one that misses the vast majority (88.6 percent) of advertisements that candidates themselves use for electioneering." Brief for FEC et al. in No. 02–1674 et al., p. 103 (emphasis in original).

The joint opinion echoes this, stating that the express advocacy line "cannot be squared with our longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad." *Ante,* at 193. First, the presence of the "magic words" *does* differentiate in a meaningful way between categories of speech. Speech containing the "magic words" is "unambiguously campaign related," *Buckley, supra,* at 81, while speech without these words is not. Second, it is far from bizarre to suggest that (potentially regulable) speech that is in practice impossible to differentiate from fully protected speech must be fully protected. It is, rather, part and parcel of First Amendment first principles. See, *e. g., Free Speech Coalition,* 535 U. S., at 255 ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Consti-

tution requires the reverse"). In fact, First Amendment protection was extended to that fundamental category of artistic and entertaining speech not for its own sake, but only because it was indistinguishable, practically, from speech intended to inform. See *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 501 (1952); *Winters* v. *New York*, 333 U. S. 507, 510 (1948) (rejecting suggestion that "the constitutional protection for a free press applies only to the exposition of ideas" as the "line between the informing and the entertaining is too elusive for the protection of that basic right," noting that "[w]hat is one man's amusement, teaches another's doctrine"). This principle clearly played a significant role in *Buckley* itself, see 424 U. S., at 42 (after noting that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application," holding that the "express advocacy" standard must be adopted as the interpretation of the relevant language in FECA). The express-advocacy line was drawn to ensure the protection of the "discussion of issues and candidates," not out of some strange obsession of the Court to create meaningless lines. And the joint opinion misses the point when it notes that "*Buckley*'s express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption." *Ante*, at 193–194. *Buckley* did not draw this line solely to aid in combating real or apparent corruption, but rather also to ensure the protection of speech unrelated to election campaigns.[13]

Nor is this to say that speech with words of express advocacy is somehow less protected, as the joint opinion implies.

---

[13] These cases are an excellent example of why such a bright-line rule is necessary. The Court, having "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy," *ante*, at 194, proceeds to uphold significant new restrictions on speech that is, in every sense of the word, pure issue-related speech. The Court abandons the bright-line rule, and now subjects political speech of virtually any kind to the risk of regulation by Congress.

*Ante,* at 205–206. The Court in *Buckley* recognized an informational interest that justified the imposition of a disclosure requirement on campaign-related speech. See 424 U. S., at 81. This interest is not implicated with regard to speech that is unrelated to an election campaign. Hence, it would be unconstitutional to impose such a disclosure requirement on non-election-related speech. And, as "the distinction between discussion of issues and candidates . . . may often dissolve in practical application," *id.,* at 42, the only way to prevent the unjustified burdening of nonelection speech is to impose the regulation only on speech that is "unambiguously campaign related," *id.,* at 81, *i. e.,* speech using words of express advocacy. Hence, speech that uses words of express advocacy is protected under the same, standard, strict scrutiny, as all other forms of speech. The only difference is that, under *Buckley,* there is a governmental interest supporting some regulation of those using words of express advocacy not present in other forms of speech.

\*      \*      \*

The chilling endpoint of the Court's reasoning is not difficult to foresee: outright regulation of the press. None of the rationales offered by the defendants, and none of the reasoning employed by the Court, exempts the press. "This is so because of the difficulty, and perhaps impossibility, of distinguishing, either as a matter of fact or constitutional law, media corporations from [nonmedia] corporations." *Bellotti,* 435 U. S., at 796 (Burger, C. J., concurring). Media companies can run procandidate editorials as easily as non-media corporations can pay for advertisements. Candidates can be just as grateful to media companies as they can be to corporations and unions. In terms of "the corrosive and distorting effects" of wealth accumulated by corporations that has "little or no correlation to the public's support for the corporation's political ideas," *Austin,* 494 U. S., at 660, there is no distinction between a media corporation and

a nonmedia corporation.[14]   Media corporations are influen-
tial.   There is little doubt that the editorials and commen-
tary they run can affect elections.   Nor is there any doubt
that media companies often wish to influence elections.   One
would think that the New York Times fervently hopes that
its endorsement of Presidential candidates will actually in-
fluence people.   What is to stop a future Congress from de-
termining that the press is "too influential," and that the
"appearance of corruption" is significant when media organi-
zations endorse candidates or run "slanted" or "biased" news
stories in favor of candidates or parties?   Or, even easier,
what is to stop a future Congress from concluding that the
availability of unregulated media corporations creates a loop-
hole that allows for easy "circumvention" of the limitations
of the current campaign finance laws?[15]

Indeed, I believe that longstanding and heretofore unchal-
lenged opinions such as *Miami Herald Publishing Co.* v. *Tor-
nillo*, 418 U. S. 241 (1974), are in peril.   There, the Court
noted that "[c]hains of newspapers, national newspapers, na-
tional wire and news services, and one-newspaper towns, are

---

[14] Chief Justice Burger presciently commented on precisely this point in
*First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 796–797 (1978) (concur-
ring opinion) (citations omitted):

"In terms of 'unfair advantage in the political process' and 'corporate
domination of the electoral process,' it could be argued that such media
conglomerates as I describe pose a much more realistic threat to valid
interests than do appellants and similar entities not regularly concerned
with shaping popular opinion on public issues.   See *Miami Herald Pub-
lishing Co.* v. *Tornillo*, [418 U. S. 241 (1974)].   In *Tornillo*, for example,
we noted the serious contentions advanced that a result of the growth of
modern media empires 'has been to place in a few hands the power to
inform the American people and shape public opinion.'   418 U. S., at 250."

[15] It appears that "circumvention" of the campaign finance laws by ex-
ploiting media exemptions is already being planned by one of the plain-
tiffs in this litigation.   See Theimer, NRA Seeks Status as News Outlet,
Washington Post, Dec. 7, 2003, p. A09 (reporting that the NRA is look-
ing to acquire a broadcast outlet and seeking to be classified as a news
organization).

the dominant features of a press that has become noncompetitive and enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events." *Id.*, at 249. Despite expressing some sympathy for those arguing for a legally created "right of access" to encourage diversity in viewpoints in the media, the Court struck down such laws, noting that these laws acted both to suppress speech and to "intru[de] into the function of editors" by interfering with "the exercise of editorial control and judgment." *Id.*, at 257–258. Now, supporters of such laws need only argue that the press' "capacity to manipulate popular opinion" gives rise to an "appearance of corruption," especially when this capacity is used to promote a particular candidate or party. After drumming up some evidence,[16] laws regulating media outlets in their issuance of editorials would be upheld under the joint opinion's reasoning (a result considered so beyond the pale in *Miami Herald Publishing* that the Court there used it as a *reductio ad absurdum* against the right-of-access law being addressed, see *id.*, at 256). Nor is there anything in the joint opinion that would prevent Congress from imposing the Fairness Doctrine, not just on radio and television broadcasters, but on the entire media. See *Red Lion Broadcasting*, 395 U. S., at 369 (defining the "fairness doctrine" as a "requirement that discussion of public issues be presented . . . and that each side of those issues must be given fair coverage").

---

[16] Given the quality of the evidence the Court relies upon to uphold Title I, the evidence should not be hard to come by. See Kane & Preston, Fox Chief on Hot Seat, Roll Call, June 12, 2003 ("GOP leaders such as House Majority Leader Tom DeLay (R-Texas) have labeled CNN as the 'Communist News Network' and the 'Clinton News Network'—suggesting they only presented the liberal viewpoint and that of former President Clinton"); Jones, Fox News Moves from the Margins to the Mainstream, Shorenstein Center, Harvard, Dec. 1, 2002 (quoting Al Gore as describing Fox News and the Washington Times as "part and parcel of the Republican Party").

Hence, "the freedom of the press," described as "one of the greatest bulwarks of liberty," 1 J. Elliot, Debates on the Federal Constitution 335 (2d ed. 1876) (declaration of Rhode Island upon the ratification of the Constitution),[17] could be next on the chopping block. Although today's opinion does not expressly strip the press of First Amendment protection, there is no principle of law or logic that would prevent the application of the Court's reasoning in that setting. The press now operates at the whim of Congress.

JUSTICE KENNEDY, concurring in the judgment in part and dissenting in part with respect to BCRA Titles I and II.*

The First Amendment guarantees our citizens the right to judge for themselves the most effective means for the expression of political views and to decide for themselves which entities to trust as reliable speakers. Significant portions of Titles I and II of the Bipartisan Campaign Reform Act of 2002 (BCRA or Act) constrain that freedom. These new laws force speakers to abandon their own preference for speaking through parties and organizations. And they provide safe harbor to the mainstream press, suggesting that the corporate media alone suffice to alleviate the burdens the Act places on the rights and freedoms of ordinary citizens.

Today's decision upholding these laws purports simply to follow *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, and to abide by *stare decisis*, see *ante*, at 137–138 (joint opinion of STEVENS and O'CONNOR, JJ. (hereinafter Court or majority)); but the majority, to make its decision work, must abridge free speech where *Buckley* did not. *Buckley* did

---

[17] See also 4 W. Blackstone, Commentaries on the Laws of England 151 (1769) ("The liberty of the press is indeed essential to the nature of a free state").

*THE CHIEF JUSTICE joins this opinion in its entirety. JUSTICE SCALIA joins this opinion except to the extent it upholds new FECA § 323(e) and BCRA § 202. JUSTICE THOMAS joins this opinion with respect to BCRA § 213.

not authorize Congress to decide what shapes and forms the national political dialogue is to take. To reach today's decision, the Court surpasses *Buckley*'s limits and expands Congress' regulatory power. In so doing, it replaces discrete and respected First Amendment principles with new, amorphous, and unsound rules, rules which dismantle basic protections for speech.

A few examples show how BCRA reorders speech rights and codifies the Government's own preferences for certain speakers. BCRA would have imposed felony punishment on Ross Perot's 1996 efforts to build the Reform Party. Compare Federal Election Campaign Act of 1971 (FECA) §§ 309(d)(1)(A), 315(a)(1)(B), and 323(a)(1) (prohibiting, by up to five years' imprisonment, any individual from giving over $25,000 annually to a national party), with Spending By Perot, The Houston Chronicle, Dec. 13, 1996, p. 43, 1996 WL 11581440 (reporting Perot's $8 million founding contribution to the Reform Party). BCRA makes it a felony for an environmental group to broadcast an ad, within 60 days of an election, exhorting the public to protest a Congressman's impending vote to permit logging in national forests. See BCRA § 203. BCRA escalates Congress' discrimination in favor of the speech rights of giant media corporations and against the speech rights of other corporations, both profit and nonprofit. Compare BCRA § 203 with *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 659–660 (1990) (first sanctioning this type of discrimination).

To the majority, all this is not only valid under the First Amendment but also is part of Congress' "steady improvement of the national election laws." *Ante*, at 117. We should make no mistake. It is neither. It is the codification of an assumption that the mainstream media alone can protect freedom of speech. It is an effort by Congress to ensure that civic discourse takes place only through the modes of its choosing. And BCRA is only the beginning, as its congressional proponents freely admit:

"This is a modest step, it is a first step, it is an essential step, but it does not even begin to address, in some ways, the fundamental problems that exist with the hard money aspect of the system." 148 Cong. Rec. S2101 (Mar. 20, 2002) (statement of Sen. Feingold).

*Id.*, at S2097 (statement of Sen. Wellstone) ("[P]assing this legislation . . . will whet people's appetite for more"); *id.*, at S2101 (statement of Sen. Boxer) ("[T]his bill is not the be-all or the end-all, but it is a strong start"); *id.*, at S2152 (statement of Sen. Corzine) ("[T]his should not and will not be the last time campaign finance reform is debated on the Senate floor. We have many more important campaign finance issues to explore"); *id.*, at S2157 (statement of Sen. Torricelli) ("Make [BCRA] the beginning of a reform, not the end of reform"); *id.*, at H442 (Feb. 13, 2002) (statement of Rep. Doggett) ("Mr. Chairman, if [BCRA] has any defect, it is that it does too little, not too much").

Our precedents teach, above all, that Government cannot be trusted to moderate its own rules for suppression of speech. The dangers posed by speech regulations have led the Court to insist upon principled constitutional lines and a rigorous standard of review. The majority now abandons these distinctions and limitations.

With respect, I dissent from the majority opinion upholding BCRA Titles I and II. I concur in the judgment as to BCRA § 213 and new FECA § 323(e) and concur in the judgment in part and dissent in part as to BCRA §§ 201, 202, and 214.

## I. TITLE I AND COORDINATION PROVISIONS

Title I principally bans the solicitation, receipt, transfer, and spending of soft money by the national parties (new FECA § 323(a), 2 U. S. C. § 441i(a) (Supp. II)). It also bans certain uses of soft money by state parties (new FECA § 323(b)); the transfer of soft money from national parties to nonprofit groups (new FECA § 323(d)); the solicitation, re-

ceipt, transfer, and spending of soft money by federal candidates and officeholders (new FECA § 323(e)); and certain uses of soft money by state candidates (new FECA § 323(f)). These provisions, and the other provisions with which this opinion is principally concerned, are set out in full, see Appendix, *infra*. Even a cursory review of the speech and association burdens these laws create makes their First Amendment infirmities obvious:

Title I bars individuals with shared beliefs from pooling their money above limits set by Congress to form a new third party. See new FECA § 323(a).

Title I bars national party officials from soliciting or directing soft money to state parties for use on a state ballot initiative. This is true even if no federal office appears on the same ballot as the state initiative. See *ibid*.

A national party's mere involvement in the strategic planning of fundraising for a state ballot initiative risks a determination that the national party is exercising "indirect control" of the state party. If that determination is made, the state party must abide by federal regulations. And this is so even if the federal candidate on the ballot, if there is one, runs unopposed or is so certain of election that the only voter interest is in the state and local campaigns. See *ibid*.

Title I compels speech. Party officials who want to engage in activity such as fundraising must now speak magic words to ensure the solicitation cannot be interpreted as anything other than a solicitation for hard, not soft, money. See *ibid*.

Title I prohibits the national parties from giving any sort of funds to nonprofit entities, even federally regulated hard money, and even if the party hoped to sponsor the interest group's exploration of a particular issue in advance of the party's addition of it to their platform. See new FECA § 323(d).

By express terms, Title I imposes multiple different forms of spending caps on parties, candidates, and their agents. See new FECA §§ 323(a), (e), and (f).

Title I allows state parties to raise quasi-soft-money Levin funds for use in activities that might affect a federal election; but the Act prohibits national parties from assisting state parties in developing and executing these fundraising plans, even when the parties seek only to advance state election interests. See new FECA § 323(b).

Until today's consolidated cases, the Court has accepted but two principles to use in determining the validity of campaign finance restrictions. First is the anticorruption rationale. The principal concern, of course, is the agreement for a *quid pro quo* between officeholders (or candidates) and those who would seek to influence them. The Court has said the interest in preventing corruption allows limitations on receipt of the *quid* by a candidate or officeholder, regardless of who gives it or of the intent of the donor or officeholder. See *Buckley*, 424 U. S., at 26–27, 45–48; *infra*, at 291–294. Second, the Court has analyzed laws that classify on the basis of the speaker's corporate or union identity under the corporate speech rationale. The Court has said that the willing adoption of the entity form by corporations and unions justifies regulating them differently: Their ability to give candidates *quids* may be subject not only to limits but also to outright bans; their electoral speech may likewise be curtailed. See *Austin*, 494 U. S., at 659–660; *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 201–211 (1982).

The majority today opens with rhetoric that suggests a conflation of the anticorruption rationale with the corporate speech rationale. See *ante*, at 115–118 (hearkening back to, among others, Elihu Root and his advocacy against the use of corporate funds in political campaigning). The conflation appears designed to cast the speech regulated here as un-

seemly corporate speech. The effort, however, is unwarranted, and not just because money is not *per se* the evil the majority thinks. Most of the regulations at issue, notably all of the Title I soft-money bans and the Title II coordination provisions, do not draw distinctions based on corporate or union status. Referring to the corporate speech rationale as if it were the linchpin of the case, when corporate speech is not primarily at issue, adds no force to the Court's analysis. Instead, the focus must be on *Buckley*'s anticorruption rationale and the First Amendment rights of individual citizens.

### A. Constitutionally Sufficient Interest

In *Buckley*, the Court held that one, and only one, interest justified the significant burden on the right of association involved there: eliminating, or preventing, actual corruption or the appearance of corruption stemming from contributions to candidates.

> "It is unnecessary to look beyond the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large individual financial contributions—in order to find a constitutionally sufficient justification for the $1,000 contribution limitation." 424 U. S., at 26.

See also *ibid.* (concluding this corruption interest was sufficiently "significant" to sustain "closely drawn" interference with protected First Amendment rights).

In parallel, *Buckley* concluded the expenditure limitations in question were invalid because they did not advance that same interest. See *id.*, at 47–48 ("[T]he independent expenditure ceiling thus fails to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process"); see also *id.*, at 45, 46.

Thus, though *Buckley* subjected expenditure limits to strict scrutiny and contribution limits to less exacting review, it held neither could withstand constitutional challenge

unless it was shown to advance the anticorruption interest. In these consolidated cases, unless *Buckley* is to be repudiated, we must conclude that the regulations further that interest before considering whether they are closely drawn or narrowly tailored. If the interest is not advanced, the regulations cannot comport with the Constitution, quite apart from the standard of review.

*Buckley* made clear, by its express language and its context, that the corruption interest only justifies regulating candidates' and officeholders' receipt of what we can call the *"quids"* in the *quid pro quo* formulation. The Court rested its decision on the principle that campaign finance regulation that restricts speech without requiring proof of particular corrupt action withstands constitutional challenge only if it regulates conduct posing a demonstrable *quid pro quo* danger:

> "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id.*, at 26–27.

See also *id.*, at 45 ("[A]ssuming, *arguendo*, that large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions . . ."). That *Buckley* rested its decision on this *quid pro quo* standard is not a novel observation. We have held this was the case:

> "The exception [of contribution limits being justified under the First Amendment] relates to the perception of undue influence of large contributions to a *candidate:* 'To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined.'" *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,*

454 U. S. 290, 297 (1981) (quoting *Buckley, supra,* at 26–27).

See also *Federal Election Comm'n* v. *Beaumont,* 539 U. S. 146 (2003) (furthering this anticorruption rationale by upholding limits on contributions given directly to candidates); *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377 (2000) (same).

Despite the Court's attempt to rely on language from cases like *Shrink Missouri* to establish that the standard defining corruption is broader than conduct that presents a *quid pro quo* danger, see *ante,* at 152–153, n. 48, in those cases the Court in fact upheld limits on conduct possessing *quid pro quo* dangers, and nothing more. See also *infra,* at 296. For example, the *Shrink Missouri* Court's distinguishing of what was at issue there and *quid pro quo,* in fact, shows only that it used the term *quid pro quo* to refer to actual corrupt, vote-buying exchanges, as opposed to interactions that possessed *quid pro quo* potential even if innocently undertaken. Thus, the Court said:

> "[W]e spoke in Buckley of the perception of corruption 'inherent in a regime of large individual financial contributions' to candidates for public office . . . as a source of concern 'almost equal' to *quid pro quo* improbity." 528 U. S., at 390 (citations omitted).

Thus, the perception of corruption that the majority now asserts is somehow different from the *quid pro quo* potential discussed in this opinion was created by an exchange featuring *quid pro quo* potential—contributions directly to a candidate.

In determining whether conduct poses a *quid pro quo* danger the analysis is functional. In *Buckley,* the Court confronted an expenditure limitation provision that capped the amount of money individuals could spend on any activity intended to influence a federal election (*i. e.,* it reached to both independent and coordinated expenditures). See 424 U. S.,

at 46–47. The Court concluded that though the limitation reached both coordinated and independent expenditures, there were other valid FECA provisions that barred coordinated expenditures. Hence, the limit at issue only added regulation to independent expenditures. On that basis it concluded the provision was unsupported by any valid corruption interest. The conduct to which it added regulation (independent expenditures) posed no *quid pro quo* danger. See *ibid.*

Placing *Buckley's* anticorruption rationale in the context of the federal legislative power yields the following rule: Congress' interest in preventing corruption provides a basis for regulating federal candidates' and officeholders' receipt of *quids*, whether or not the candidate or officeholder corruptly received them. Conversely, the rule requires the Court to strike down campaign finance regulations when they do not add regulation to "actual or apparent *quid pro quo* arrangements." *Id.*, at 45.

The Court ignores these constitutional bounds and in effect interprets the anticorruption rationale to allow regulation not just of "actual or apparent *quid pro quo* arrangements," *ibid.*, but of any conduct that wins goodwill from or influences a Member of Congress. It is not that there is any quarrel between this opinion and the majority that the inquiry since *Buckley* has been whether certain conduct creates "undue influence." See *ante*, at 154. On that we agree. The very aim of *Buckley's* standard, however, was to define undue influence by reference to the presence of *quid pro quo* involving the officeholder. The Court, in contrast, concludes that access, without more, proves influence is undue. Access, in the Court's view, has the same legal ramifications as actual or apparent corruption of officeholders. This new definition of corruption sweeps away all protections for speech that lie in its path.

The majority says it is not abandoning our cases in this way, but its reasoning shows otherwise:

"More importantly, plaintiffs conceive of corruption too narrowly. Our cases have firmly established that Congress' legitimate interest extends beyond preventing simple cash-for-votes corruption to curbing 'undue influence on an officeholder's judgment, and the appearance of such influence.' *[Federal Election Comm'n v. Colorado Republican Federal Campaign Comm., 533 U. S. 431, 441 (2001) (Colorado II)].* Many of the 'deeply disturbing examples' of corruption cited by this Court in *Buckley* to justify FECA's contribution limits were not episodes of vote buying, but evidence that various corporate interests had given substantial donations to gain access to high-level government officials. Even if that access did not secure actual influence, it certainly gave the 'appearance of such influence.' *Colorado II, supra,* at 441; see also [*Buckley v. Valeo, 519 F. 2d 821, 838 (CADC 1975)*].

"The record in the present case is replete with similar examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations. See [251 F. Supp. 2d 176, 492–506 (DC 2003) (Kollar-Kotelly, J.)]." *Ante,* at 150 (some internal citations omitted).

The majority notes that access flowed from the regulated conduct at issue in *Buckley* and its progeny, then uses that fact as the basis for concluding that access peddling by the parties equals corruption by the candidates. That conclusion, however, is tenable only by a quick and subtle shift, and one that breaks new ground: The majority ignores the *quid pro quo* nature of the regulated conduct central to our earlier decisions. It relies instead solely on the fact that access flowed from the conduct.

To ignore the fact that in *Buckley* the money at issue was given to candidates, creating an obvious *quid pro quo* danger as much as it led to the candidates also providing access to the donors, is to ignore the Court's comments in *Buckley*

that show *quid pro quo* was of central importance to the analysis. See 424 U. S., at 26–27, 45. The majority also ignores that in *Buckley,* and ever since, those party contributions that have been subject to congressional limit were not general party-building contributions but were only contributions used to influence particular elections. That is, they were contributions that flowed to a particular candidate's benefit, again posing a *quid pro quo* danger. And it ignores that in *Colorado II,* the party spending was that which was coordinated with a particular candidate, thereby implicating *quid pro quo* dangers. In all of these ways the majority breaks the necessary tether between *quid* and access and assumes that access, all by itself, demonstrates corruption and so can support regulation. See also *ante,* at 156 ("[L]arge soft-money donations to national party committees are likely to buy donors preferential access to federal office-holders no matter the ends to which their contributions are eventually put").

Access in itself, however, shows only that in a general sense an officeholder favors someone or that someone has influence on the officeholder. There is no basis, in law or in fact, to say favoritism or influence in general is the same as corrupt favoritism or influence in particular. By equating vague and generic claims of favoritism or influence with actual or apparent corruption, the Court adopts a definition of corruption that dismantles basic First Amendment rules, permits Congress to suppress speech in the absence of a *quid pro quo* threat, and moves beyond the rationale that is *Buckley*'s very foundation.

The generic favoritism or influence theory articulated by the Court is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle. Any given action might be favored by any given person, so by the Court's reasoning political loyalty of the purest sort can be prohibited. There is no remaining principled method for inquiring whether a campaign finance

regulation does in fact regulate corruption in a serious and meaningful way. We are left to defer to a congressional conclusion that certain conduct creates favoritism or influence.

Though the majority cites common sense as the foundation for its definition of corruption, see *ante*, at 145, 152, in the context of the real world only a single definition of corruption has been found to identify political corruption successfully and to distinguish good political responsiveness from bad—that is *quid pro quo.* Favoritism and influence are not, as the Government's theory suggests, avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness. *Quid pro quo* corruption has been, until now, the only agreed upon conduct that represents the bad form of responsiveness and presents a justiciable standard with a relatively clear limiting principle: Bad responsiveness may be demonstrated by pointing to a relationship between an official and a *quid.*

The majority attempts to mask its extension of *Buckley* under claims that BCRA prevents the appearance of corruption, even if it does not prevent actual corruption, since some assert that any donation of money to a political party is suspect. See *ante*, at 149–152. Under *Buckley's* holding that Congress has a valid "interest in stemming the reality or appearance of corruption," 424 U. S., at 47–48, however, the inquiry does not turn on whether some persons assert that an appearance of corruption exists. Rather, the inquiry turns on whether the Legislature has established that the regulated conduct has inherent corruption potential, thus justifying the inference that regulating the conduct will stem

the appearance of real corruption. *Buckley* was guided and constrained by this analysis. In striking down expenditure limits the Court in *Buckley* did not ask whether people thought large election expenditures corrupt, because clearly at that time many persons, including a majority of Congress and the President, did. See *id.*, at 25 ("According to the parties and *amici*, the primary interest served . . . by the Act as a whole, is the prevention of corruption and the appearance of corruption"). Instead, the Court asked whether the Government had proved that the regulated conduct, the expenditures, posed inherent *quid pro quo* corruption potential. See *id.*, at 46.

The *Buckley* decision made this analysis even clearer in upholding contribution limitations. It stated that even if actual corrupt contribution practices had not been proved, Congress had an interest in regulating the appearance of corruption that is "inherent in a regime of large individual financial contributions." *Id.*, at 27 (discussing contributions to candidates). See also *id.*, at 28, 30. The *quid pro quo* nature of candidate contributions justified the conclusion that the contributions pose inherent corruption potential; and this in turn justified the conclusion that their regulation would stem the appearance of real corruption.

From that it follows that the Court today should not ask, as it does, whether some persons, even Members of Congress, conclusorily assert that the regulated conduct appears corrupt to them. Following *Buckley*, it should instead inquire whether the conduct now prohibited inherently poses a real or substantive *quid pro quo* danger, so that its regulation will stem the appearance of *quid pro quo* corruption.

### 1. New FECA §§ 323(a), (b), (d), and (f)

Sections 323(a), (b), (d), and (f), 2 U. S. C. §§ 441i(a), (b), (d), and (f) (Supp. II), cannot stand because they do not add regulation to conduct that poses a demonstrable *quid pro quo* danger. They do not further *Buckley*'s corruption interest.

The majority, with a broad brush, paints § 323(a) as aimed at limiting contributions possessing federal officeholder corruption potential. From there it would justify § 323's remaining provisions as necessary complements to ensure the national parties cannot circumvent § 323(a)'s prohibitions. The broad brush approach fails, however, when the provisions are reviewed under *Buckley*'s proper definition of corruption potential.

On its face § 323(a) does not regulate federal candidates' or officeholders' receipt of *quids* because it does not regulate contributions to, or conduct by, candidates or officeholders. See BCRA § 101(a) (setting out new FECA § 323(a): National parties may not "solicit, receive, or direct to another person . . . or spend any [soft money]").

The realities that underlie the statute, furthermore, do not support the majority's interpretation. Before BCRA's enactment, parties could only use soft money for a candidate's "benefit" (*e. g.*, through issue ads, which all parties now admit may influence elections) independent of that candidate. And, as discussed later, § 323(e) validly prohibits federal candidate and officeholder solicitation of soft-money party donations. See *infra*, at 314. Section 323(a), therefore, only adds regulation to soft-money party donations not solicited by, or spent in coordination with, a candidate or officeholder.

These donations (noncandidate or officeholder solicited soft-money party donations that are independently spent) do not pose the *quid pro quo* dangers that provide the basis for restricting protected speech. Though the Government argues § 323(a) does regulate federal candidates' and officeholders' receipt of *quids*, it bases its argument on this flawed reasoning:

(1) "[F]ederal elected officeholders are inextricably linked to their political parties," Brief for Appellee/ Cross Appellant FEC et al. in No. 02–1674 et al., p. 21; cf. *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 626 (1996) *(Col-*

*orado I)* (KENNEDY, J., concurring in judgment and dissenting in part).

(2) All party receipts must be connected to, and must create, corrupt donor favoritism among these officeholders.

(3) Therefore, regulation of party receipts equals regulation of *quids* to the party's officeholders.

The reasoning is flawed because the Government's reliance on reasoning parallel to the *Colorado I* concurrence only establishes the first step in its chain of logic: that a party is a proxy for its candidates generally. It does not establish the second step: that as a proxy for its candidates generally, *all* moneys the party receives (not just candidate solicited, soft-money donations, or donations used in coordinated activity) represent *quids* for all the party's candidates and officeholders. The Government's analysis is inconsistent with what a majority of the Justices, in different opinions, have said.

JUSTICE THOMAS' dissent in *Federal Election Comm'n v. Colorado Republican Campaign Comm.*, 533 U. S. 431, 476–477 (2001) *(Colorado II)*, taken together with JUSTICE BREYER's opinion announcing the judgment of the Court in *Colorado I*, rebuts the second step of the Government's argument. JUSTICE THOMAS demonstrated that a general party-candidate corruption linkage does not exist. As he pointed out:

> "The dearth of evidence [of such corruption] is unsurprising in light of the unique relationship between a political party and its candidates: 'The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes.' If coordinated expenditures help achieve this aim, the achievement 'does not . . . constitute "a subversion of the political process." ' " *Colorado II, supra*, at 476–477 (citations omitted).

JUSTICE BREYER reached the same conclusion about the corrupting effect general party receipts could have on particular candidates, though on narrower grounds. He concluded that independent party conduct lacks *quid pro quo* corruption potential. See *Colorado I*, 518 U. S., at 617–618; *id.*, at 617 ("If anything, an independent [party] expenditure made possible by a $20,000 donation, but controlled and directed by a party rather than the donor, would seem less likely to corrupt than the same (or a much larger) independent expenditure made directly by that donor"); *id.*, at 616 ("[T]he opportunity for corruption posed by [soft-money] contributions is, at best, attenuated" because they may not be used for the purposes of influencing a federal election under FECA).

These opinions establish that independent party activity, which by definition includes independent receipt and spending of soft money, lacks a possibility for *quid pro quo* corruption of federal officeholders. This must be all the more true of a party's independent receipt and spending of soft-money donations neither directed to nor solicited by a candidate.

The Government's premise is also unsupported by the record before us. The record confirms that soft-money party contributions, without more, do not create *quid pro quo* corruption potential. As a conceptual matter, generic party contributions may engender good will from a candidate or officeholder because, as the Government says: "[A] Member of Congress can be expected to feel a natural temptation to favor those persons who have helped the 'team,'" Brief for Appellee/Cross-Appellant FEC et al. in No. 02–1674 et al., p. 33. Still, no Member of Congress testified this favoritism changed voting behavior.

The piece of record evidence the Government puts forward on this score comes by way of deposition testimony from former Senator Simon and Senator Feingold. See 251 F. Supp. 2d, at 482 (Kollar-Kotelly, J.). Senator Simon reported an unidentified colleague indicated frustration with Simon's op-

position to legislation that would benefit a party contributor on the grounds that "'we've got to pay attention to who is buttering our bread'" and testified he did not think there was any question "'this'" (*i. e.*, "donors getting their way") was why the legislation passed. See App. 805. Senator Feingold, too, testified an unidentified colleague suggested he support the legislation because "'they [*i. e.*, the donor] just gave us [*i. e.*, the party] $100,000.'" 251 F. Supp. 2d, at 482 (Kollar-Kotelly, J.).

That evidence in fact works against the Government. These two testifying Senators expressed disgust toward the favoring of a soft-money giver, and not the good will one would have expected under the Government's theory. That necessarily undercuts the inference of corruption the Government would have us draw from the evidence.

Even more damaging to the Government's argument from the testimony is the absence of testimony that the Senator who allegedly succumbed to corrupt influence had himself solicited soft money from the donor in question. Equally, there is no indication he simply favored the company with his vote because it had, without any involvement from him, given funds to the party to which he belonged. This fact is crucial. If the Senator himself had been the solicitor of the soft-money funds in question, the incident does nothing more than confirm that Congress' efforts at campaign finance reform ought to be directed to conduct that implicates *quid pro quo* relationships. Only if there was some evidence that the officeholder had not solicited funds from the donor could the Court extrapolate from this episode that general party contributions function as *quids*, inspiring corrupt favoritism among party members. The episode is the single one of its type reported in the record and does not seem sufficient basis for major incursions into settled practice. Given the Government's claim that the corrupt favoritism problem is widespread, its inability to produce more than a single instance purporting to illustrate the point demonstrates the

Government has not fairly characterized the general attitudes of Members toward soft-money donors from whom they have not solicited.

Other aspects of the record confirm the Government has not produced evidence that Members corruptly favor soft-money donors to their party as a *per se* matter. Most testimony from which the Government would have the Court infer corruption is testimony that Members are rewarded by their parties for soliciting soft money. See *id.*, at 438–521 (Kollar-Kotelly, J.). This says nothing about how Members feel about a party's soft-money donors from whom they have not solicited. Indeed, record evidence on this point again cuts against the Government:

> "'As a Member of the Senate Finance Committee, I experienced the pressure first hand. On several occasions when we were debating important tax bills, I needed a police escort to get into the Finance Committee hearing room because so many lobbyists were crowding the halls, trying to get one last chance to make their pitch to each Senator. Senators generally knew which lobbyist represented the interests of which large donor. I was often glad that I limited the amount of soft money fundraising I did and did not take PAC contributions, because it would be extremely difficult not to feel beholden to these donors otherwise.'" *Id.*, at 482 (testimony of former Senator Boren; see 6–R Defs. Exhs., Tab 8, ¶ 8).

Thus, one of the handful of Senators on whom the Government relies to make its case candidly admits the pressure of appeasing soft-money donors derives from the Members' solicitation of donors, not from those donors' otherwise giving to their party.

In light of all this, § 323(a) has no valid anticorruption interest. The anticircumvention interests the Government offers in defense of §§ 323(b), (d), and (f) must also fall with the

interests asserted to justify § 323(a). Any anticircumvention interest can be only as compelling as the interest justifying the underlying regulation.

None of these other sections has an independent justifying interest. Section 323(b), for example, adds regulation only to activity undertaken by a state party. In the District Court two of the three judges found as fact that particular state and local parties exist primarily to participate in state and local elections, that they spend the majority of their resources on those elections, and that their voter registration and get-out-the-vote (GOTV) activities, in particular, are directed primarily at state and local elections. See 251 F. Supp. 2d, at 301–302 (Henderson, J., concurring in judgment in part and dissenting in part); *id.*, at 837–840 (Leon, J.). These findings, taken together with BCRA's other, valid prohibitions barring coordination with federal candidates or officeholders and their soft-money solicitation, demonstrate that § 323(b) does not add regulation to conduct that poses a danger of a federal candidate's or officeholder's receipt of *quids.*

Even § 323(b)'s narrowest regulation, which bans state party soft-money funded ads that (1) refer to a clearly identified federal candidate, and (2) either support or attack any candidate for the office of the clearly mentioned federal candidate, see new FECA § 301(20)(A)(iii), fails the constitutional test. The ban on conduct that by the statute's own definition may serve the interest of a federal candidate suggests to the majority that it is conduct that poses *quid pro quo* danger for federal candidates or officeholders. Yet, even this effect—considered after excising the coordination and candidate-solicited funding aspects elsewhere prohibited by BCRA §§ 202 and 214(a) and new FECA § 323(a)—poses no danger of a federal candidate's or officeholder's receipt of a *quid.* That conduct is no different from an individual's independent expenditure referring to and supporting

a clearly identified candidate—and this poses no regulable danger.

Section 323(d), which governs relationships between the national parties and nonprofit groups, fails for similar reasons. It is worth noting that neither the record nor our own experience tells us how significant these funds transfers are at this time. It is plain, however, that the First Amendment ought not to be manipulated to permit Congress to forbid a political party from aiding other speakers whom the party deems more effective in addressing discrete issues. One of the central flaws in BCRA is that Congress is determining what future course the creation of ideas and the expression of views must follow. Its attempt to foreclose new and creative partnerships for speech, as illustrated here, is consistent with neither the traditions nor principles of our free speech guarantee, which insists that the people, and not the Congress, decide what modes of expression are the most legitimate and effective.

The majority's upholding § 323(d) is all the more unsettling because of the way it ignores the Act as Congress wrote it. Congress said national parties "shall not solicit any funds for, or make or direct any donations to," § 501(c) nonprofit organizations that engage in federal election activity or to § 527 political committees. The Court, however, reads out the word "any" and construes the words "funds" and "donations" to mean "soft-money funds" and "soft-money donations." See ante, at 180 ("This construction is consistent with the concerns animating Title I, whose purpose is to plug the soft-money loophole"). The Court's statutory amendment may be consistent with its anti-soft-money rationale; it is not, however, consistent with the plain and unavoidable statutory text Congress has given us. Even as construed by the Court, moreover, it is invalid.

The majority strains to save the provision from what must seem to it an unduly harsh First Amendment. It does so by making a legislative determination Congress chose not to

make: to prefer hard money to soft money within the construct of national party relationships with nonprofit groups. Congress gave no indication of a preference to regulate either hard money or soft in this context. Rather, it simply proscribed all transfers of money between the two organizations and all efforts by the national parties to raise any money on the nonprofit groups' behalf. The question the Court faces is not which part of a text to sever and strike, but whether Congress can prohibit such transfers altogether. The answer, as the majority recognizes, is no. See *ante*, at 179 ("[P]rohibiting parties from donating funds already raised in compliance with FECA does little to further Congress' goal of preventing corruption or the appearance of corruption of federal candidates and officeholders").

Though § 323(f) in effect imposes limits on candidate contributions, it does not address federal candidate and officeholder contributions. Yet it is the possibility of federal officeholder *quid pro quo* corruption potential that animates *Buckley's* rule as it relates to Acts of Congress (as opposed to Acts of state legislatures). See 424 U. S., at 13 ("The constitutional power of Congress to regulate federal elections is well established").

When one recognizes that §§ 323(a), (b), (d), and (f) do not serve the interest the anticorruption rationale contemplates, Title I's entirety begins to look very much like an incumbency protection plan. See J. Miller, Monopoly Politics 84–101 (1999) (concluding that regulations limiting election fundraising and spending constrain challengers more than incumbents). That impression is worsened by the fact that Congress exempted its officeholders from the more stringent prohibitions imposed on party officials. Compare new FECA § 323(a) with new FECA § 323(e). Section 323(a) raises an inflexible bar against soft-money solicitation, in any way, by parties or party officials. Section 323(e), in contrast, enacts exceptions to the rule for federal officeholders (the

very centerpiece of possible corruption), and allows them to solicit soft money for various uses and organizations.

The law in some respects even weakens the regulation of federal candidates and officeholders. Under former law, officeholders were understood to be limited to receipt of hard money by their campaign committees. See 2 U. S. C. §§ 431, 441a (2000 ed. and Supp. II) (setting out the pre-BCRA FECA regime). BCRA, however, now allows them and their campaign committees to receive soft money that fits the hard-money source-and-amount restrictions, so long as the officeholders direct that money on to other nonfederal candidates. See new FECA § 323(e)(1)(B). The majority's characterization of this weakening of the regime as "tightly constrain[ing]" candidates, *ante*, at 181, n. 70, is a prime example of its unwillingness to confront Congress' own interest or the persisting fact that the regulations violate First Amendment freedoms. The more lenient treatment accorded to incumbency-driven politicians than to party officials who represent broad national constituencies must render all the more suspect Congress' claim that the Act's sole purpose is to stop corruption.

The majority answers this charge by stating the obvious, that "§ 323(e) applies to both officeholders *and candidates.*" *Ante*, at 185, n. 72. The controlling point, of course, is the practical burden on challengers. That the prohibition applies to both incumbents and challengers in no way establishes that it burdens them equally in that regard. Name recognition and other advantages held by incumbents ensure that as a general rule incumbents will be advantaged by the legislation the Court today upholds.

The Government identifies no valid anticorruption interest justifying §§ 323(a), (b), (d), and (f). The very nature of the restrictions imposed by these provisions makes one all the more skeptical of the Court's explanation of the interests at stake. These provisions cannot stand under the First Amendment.

## 2. New FECA § 323(e)

Ultimately, only one of the challenged Title I provisions satisfies *Buckley*'s anticorruption rationale and the First Amendment's guarantee. It is § 323(e). This provision is the sole aspect of Title I that is a direct and necessary regulation of federal candidates' and officeholders' receipt of *quids*. Section 323(e) governs "candidate[s], individual[s] holding Federal office, agent[s] of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office." 2 U. S. C. § 441i(e) (Supp. II). These provisions, and the regulations that follow, limit candidates' and their agents' solicitation of soft money. The regulation of a candidate's receipt of funds furthers a constitutionally sufficient interest. More difficult, however, is the question whether regulation of a candidate's solicitation of funds also furthers this interest if the funds are given to another.

I agree with the Court that the broader solicitation regulation does further a sufficient interest. The making of a solicited gift is a *quid* both to the recipient of the money and to the one who solicits the payment (by granting his request). Rules governing candidates' or officeholders' solicitation of contributions are, therefore, regulations governing their receipt of *quids*. This regulation fits under *Buckley*'s anticorruption rationale.

## B. Standard of Review

It is common ground between the majority and this opinion that a speech-suppressing campaign finance regulation, even if supported by a sufficient Government interest, is unlawful if it cannot satisfy our designated standard of review. See *ante*, at 134–137. In *Buckley*, we applied "closely drawn" scrutiny to contribution limitations and strict scrutiny to expenditure limitations. Compare 424 U. S., at 25, with *id.*, at 44–45. Against that backdrop, the majority as-

sumes that because *Buckley* applied the rationale in the context of contribution and expenditure limits, its application gives Congress and the Court the capacity to classify any challenged campaign finance regulation as either a contribution or an expenditure limit. Thus, it first concludes Title I's regulations are contribution limits and then proceeds to apply the lesser scrutiny.

> "Complex as its provisions may be, § 323, in the main, does little more than regulate the ability of wealthy individuals, corporations, and unions to contribute large sums of money to influence federal elections, federal candidates, and federal officeholders." *Ante,* at 138.

Though the majority's analysis denies it, Title I's dynamics defy this facile, initial classification.

Title I's provisions prohibit the receipt of funds; and in most instances, but not all, this can be defined as a contribution limit. They prohibit the spending of funds; and in most instances this can be defined as an expenditure limit. They prohibit the giving of funds to nonprofit groups; and this falls within neither definition as we have ever defined it. Finally, they prohibit fundraising activity; and the parties dispute the classification of this regulation (the challengers say it is core political association, while the Government says it ultimately results only in a limit on contribution receipts).

The majority's classification overlooks these competing characteristics and exchanges *Buckley*'s substance for a formulaic caricature of it. Despite the parties' and the majority's best efforts on both sides of the question, it ignores reality to force these regulations into one of the two legal categories as either contribution or expenditure limitations. Instead, these characteristics seem to indicate Congress has enacted regulations that are neither contribution nor expenditure limits, or are perhaps both at once.

Even if the laws could be classified in broad terms as only contribution limits, as the majority is inclined to do, that still

leaves the question what "contribution limits" can include if they are to be upheld under *Buckley.* *Buckley's* application of a less exacting review to contribution limits must be confined to the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder. Any broader definition of the category contradicts *Buckley's quid pro quo* rationale and overlooks *Buckley's* language, which contemplates limits on contributions to a candidate or campaign committee in explicit terms. See 424 U. S., at 13 (applying less exacting review to "contribution . . . limitations in the Act prohibit[ing] individuals from contributing more than $25,000 in a single year or more than $1,000 to any single candidate for an election campaign"); *id.,* at 45 ("[T]he contribution limitation[s] [apply a] total ban on the giving of large amounts of money to candidates"). See also *id.,* at 20, 25, 28.

The Court, it must be acknowledged, both in *Buckley* and on other occasions, has described contribution limits due some more deferential review in less than precise terms. At times it implied that donations to political parties would also qualify as contributions whose limitation too would be subject to less exacting review. See *id.,* at 23–24, n. 24 ("[T]he general understanding of what constitutes a political contribution[:] Funds provided to a candidate or political party or campaign committee either directly or indirectly through an intermediary constitute a contribution"). See also *Federal Election Comm'n* v. *Beaumont,* 539 U. S., at 161 ("'[C]ontributions may result in political expression if spent by a candidate or an association'" (quoting *Buckley, supra,* at 21)).

These seemingly conflicting statements are best reconciled by reference to *Buckley's* underlying rationale for applying less exacting review. In a similar, but more imperative, sense proper application of the standard of review to regulations that are neither contribution nor expenditure limits (or which are both at once) can only be determined by reference to that rationale.

*Buckley*'s underlying rationale is this: Less exacting review applies to Government regulations that "significantly interfere" with First Amendment rights of association. But any regulation of speech or associational rights creating "markedly greater interference" than such significant interference receives strict scrutiny. Unworkable and ill advised though it may be, *Buckley* unavoidably sets forth this test:

> "Even a ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates [1] a sufficiently important interest and [2] employs means closely drawn to avoid unnecessary abridgment of associational freedoms. *Cousins* v. *Wigoda*, [419 U. S. 477, 488 (1975)]; *NAACP* v. *Button*, [371 U. S. 415, 438 (1963)]; *Shelton* v. *Tucker*, [364 U. S. 479, 488 (1960)]." 424 U. S., at 25.

> "The markedly greater burden on basic freedoms [referring to 'the freedom of speech and association'] caused by [expenditure limits] thus cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations. Rather, the constitutionality of [the expenditure limits] turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.*, at 44–45.*

The majority, oddly enough, first states this standard with relative accuracy, but then denies it. Compare:

---

*See also *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 161 (2003) ("[T]he basic premise we have followed in setting First Amendment standards for reviewing political financial restrictions [is that] the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association"); *California Democratic Party* v. *Jones*, 530 U. S. 567, 582 (2000) ("We can think of no heavier burden on a political party's associational freedom. Proposition 198 is therefore unconstitutional unless it is narrowly tailored to serve a compelling state interest").

"The relevant inquiry [in determining the level of scrutiny] is whether the mechanism adopted to implement the contribution limit, or to prevent circumvention of that limit, burdens speech in a way that a direct restriction on the contribution itself would not," *ante,* at 138–139, with:

"None of this is to suggest that the alleged associational burdens imposed on parties by § 323 have no place in the First Amendment analysis; it is only that we account for them in the application, rather than the choice, of the appropriate level of scrutiny," *ante,* at 141.

The majority's attempt to separate out how burdens on speech rights and burdens on associational rights affect the standard of review is misguided. It is not even true to *Buckley*'s unconventional test. *Buckley,* as shown in the quotations above, explained the lower standard of review by reference to the level of burden on associational rights, and it explained the need for a higher standard of review by reference to the higher burdens on both associational and speech rights. In light of *Buckley*'s rationale, and in light of this Court's ample precedent affirming that burdens on speech necessitate strict scrutiny review, see 424 U. S., at 44–45 ("[E]xacting scrutiny [applies] to limitations on core First Amendment rights of political expression"), "closely drawn" scrutiny should be employed only in review of a law that burdens rights of association, and only where that burden is significant, not markedly greater. Since the Court professes not to repudiate *Buckley,* it was right first to say we must determine how significant a burden BCRA's regulations place on First Amendment rights, though it should have specified that the rights implicated are those of association. Its later denial of that analysis flatly contradicts *Buckley.*

The majority makes *Buckley*'s already awkward and imprecise test all but meaningless in its application. If one

is viewing BCRA through *Buckley*'s lens, as the majority purports to do, one must conclude the Act creates markedly greater associational burdens than the significant burden created by contribution limitations and, unlike contribution limitations, also creates significant burdens on speech itself. While BCRA contains federal contribution limitations, which significantly burden association, it goes even further. The Act entirely reorders the nature of relations between national political parties and their candidates, between national political parties and state and local parties, and between national political parties and nonprofit organizations.

The many and varied aspects of Title I's regulations impose far greater burdens on the associational rights of the parties, their officials, candidates, and citizens than do regulations that do no more than cap the amount of money persons can contribute to a political candidate or committee. The evidence shows that national parties have a long tradition of engaging in essential associational activities, such as planning and coordinating fundraising with state and local parties, often with respect to elections that are not federal in nature. This strengthens the conclusion that the regulations now before us have unprecedented impact. It makes impossible, moreover, the contrary conclusion—which the Court's standard of review determination necessarily implies—that BCRA's soft-money regulations will not much change the nature of association between parties, candidates, nonprofit groups, and the like. Similarly, Title I now compels speech by party officials. These officials must be sure their words are not mistaken for words uttered in their official capacity or mistaken for soliciting prohibited soft, and not hard, money. Few interferences with the speech, association, and free expression of our people are greater than attempts by Congress to say which groups can or cannot advocate a cause, or how they must do it.

Congress has undertaken this comprehensive reordering of association and speech rights in the name of enforcing con-

tribution limitations. Here, however, as in *Buckley*, "[t]he markedly greater burden on basic freedoms caused by [BCRA's pervasive regulation] cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations." *Ibid.* BCRA fundamentally alters, and thereby burdens, protected speech and association throughout our society. Strict scrutiny ought apply to review of its constitutionality. Under strict scrutiny, the congressional scheme, for the most part, cannot survive. This is all but acknowledged by the Government, which fails even to argue that strict scrutiny could be met.

### 1. New FECA § 323(e)

Because most of the Title I provisions discussed so far do not serve a compelling or sufficient interest, the standard of review analysis is only dispositive with respect to new FECA § 323(e). As to § 323(e), 2 U. S. C. § 441i(e) (Supp. II), I agree with the Court that this provision withstands constitutional scrutiny.

Section 323(e) is directed solely to federal candidates and their agents; it does not ban all solicitation by candidates, but only their solicitation of soft-money contributions; and it incorporates important exceptions to its limits (candidates may receive, solicit, or direct funds that comply with hard-money standards; candidates may speak at fundraising events; candidates may solicit or direct unlimited funds to organizations not involved with federal election activity; and candidates may solicit or direct up to $20,000 per individual per year for organizations involved with certain federal election activity (*e. g.*, GOTV, voter registration)). These provisions help ensure that the law is narrowly tailored to satisfy First Amendment requirements. For these reasons, I agree § 323(e) is valid.

### 2. New FECA §§ 323(a), (b), (d), and (f)

Though these sections do not survive even the first test of serving a constitutionally valid interest, it is necessary as

well to examine the vast overbreadth of the remainder of Title I, so the import of the majority's holding today is understood. Sections 323(a), (b), (d), and (f), 2 U. S. C. §§ 441i(a), (b), (d), and (f) (Supp. II), are not narrowly tailored, cannot survive strict scrutiny, and cannot even be considered closely drawn, unless that phrase is emptied of all meaning.

First, the sections all possess fatal overbreadth. By regulating conduct that does not pose *quid pro quo* dangers, they are incursions on important categories of protected speech by voters and party officials.

At the next level of analytical detail, § 323(a) is overly broad as well because it regulates all national parties, whether or not they present candidates in federal elections. It also regulates the national parties' solicitation and direction of funds in odd-numbered years when only state and local elections are at stake.

Likewise, while § 323(b) might prohibit some state party conduct that would otherwise be undertaken in conjunction with a federal candidate, it reaches beyond that to a considerable range of campaign speech by the state parties on nonfederal issues. A state or local party might want to say: "The Democratic slate for state assembly opposes President Bush's tax policy . . . . Elect the Republican slate to tell Washington, D. C. we don't want higher taxes." Section *323(b) encompasses this essential speech and prohibits it* equally with speech that poses a federal officeholder *quid quo pro* danger.

Other predictable political circumstances further demonstrate § 323(b)'s overbreadth. It proscribes the use of soft money for all state party voter registration efforts occurring within 120 days of a federal election. So, the vagaries of election timing, not any real interest related to corruption, will control whether state parties can spend nonfederally regulated funds on ballot efforts. This overreaching contradicts important precedents that recognize the need to pro-

tect political speech for campaigns related to ballot measures. See generally *Citizens Against Rent Control/ Coalition for Fair Housing* v. *Berkeley,* 454 U. S. 290 (1981); *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978).

Section 323(b) also fails the narrow tailoring requirement because less burdensome regulatory options were available. The Government justifies the provision as an attempt to stop national parties from circumventing the soft-money allocation constraints they faced under the prior FECA regime. We are told that otherwise the national parties would let the state parties spend money on their behalf. If, however, the problem were avoidance of allocation rates, Congress could have made any soft money transferred by a national party to a state party subject to the allocation rates that governed the national parties' similar use of the money.

Nor is § 323(d) narrowly tailored. The provision, proscribing any solicitation or direction of funds, prohibits the parties·from even distributing or soliciting regulated money (*i. e.,* hard money). It is a complete ban on this category of speech. To prevent circumvention of contribution limits by imposing a complete ban on contributions is to burden the circumventing conduct more severely than the underlying suspect conduct could be burdened.

By its own terms, the statute prohibits speech that does not implicate federal elections. The provision prohibits any transfer to a § 527 organization, irrespective of whether the organization engages in federal election activity. This is unnecessary, as well, since Congress enacted a much narrower provision in § 323(a)(2) to prevent circumvention by the parties via control of other organizations. Section 323(a)(2) makes "any entity that is directly or indirectly . . . controlled by" the national parties subject to the same § 323(a) prohibitions as the parties themselves. 2 U. S. C. § 441i (Supp. II).

Section 323(f), too, is not narrowly tailored or even close to it. It burdens a substantial body of speech and expres-

sion made entirely independent of any federal candidate. The record, for example, contains evidence of Alabama Attorney General Pryor's reelection flyers showing a picture of Pryor shaking hands with President Bush and stating: "Bush appointed Pryor to be Alabama co-chairman of the George W. Bush for President campaign." A host of circumstances could make such statements advisable for state candidates to use without any coordination with a federal candidate. Section 323(f) incorporates no distinguishing feature, such as an element of coordination, to ensure First Amendment protected speech is not swept up within its bounds.

Compared to the narrowly tailored effort of § 323(e), which addresses in direct and specific terms federal candidates' and officeholders' quest for dollars, these sections cast a wide net not confined to the critical categories of federal candidate or officeholder involvement. They are not narrowly tailored; they are not closely drawn; they flatly violate the First Amendment; and even if they do encompass some speech that poses a regulable *quid pro quo* danger, that little assurance does not justify or permit a regime which silences so many legitimate voices in this protected sphere.

## C. Coordination Provisions

Other BCRA Title II sections require analysis alongside the provisions of Title I, for they, too, are regulations that *principally operate within the ambit of Buckley's anticorrup-*tion principle. BCRA §§ 202 and 214 are two of these provisions. They involve the Act's new definition of coordination. BCRA § 213 is another. It institutes a new system in which the parties are forced to choose between two different types of relationships with their candidates.

### 1.

I agree with the majority that §§ 214(b) and (c) do not merit our review because they are not now justiciable. See *ante,* at 223. I disagree, however, with the majority's view

that § 214(a), § 214's sole justiciable provision, is valid. Nor can I agree that § 202 is valid in its entirety.

Section 214(a) amends FECA to define, as hard-money contributions to a political party, expenditures an individual makes in concert with the party. See *ante,* at 219. This provision, in my view, must fall. As the earlier discussion of Title I explains, individual contributions to the political parties cannot be capped in the soft-money context. Since an individual's soft-money contributions to a party may not be limited, it follows with even greater force that an individual's expenditure of money, coordinated with the party for activities on which the party could spend unlimited soft money, cannot be capped.

This conclusion emerges not only from an analysis of Title I but also from *Colorado I.* There, JUSTICE BREYER's opinion announcing the judgment of the Court concluded political parties had a constitutional right to engage in independent advocacy on behalf of a candidate. 518 U. S. 604 (1996). That parties can spend unlimited soft money on this activity follows by necessary implication. A political party's constitutional right to spend money on advocacy independent of a candidate is burdened by § 214(a) in a direct and substantial way. The statute commands the party to refrain from coordinating with an individual engaging in advocacy even if the individual is acting independently of the candidate.

Section 202 functions in a manner similar to the operation of § 214(a). It directs that when persons make "electioneering communication," see new FECA § 304(f)(3), 2 U. S. C. § 434(f)(3) (Supp. II), in a coordinated fashion with a candidate or a party, the coordinated communication expense must be treated as a hard-money contribution by the person to that candidate or party. The trial court erroneously believed it needed to determine whether § 304's definition of electioneering communications was itself unconstitutional to assess this provision. While a statutory definition may lead

to an unconstitutional result under one application, it may lead to a constitutional result under another. Compare *infra* this page and 321–322 with *infra*, at 333–337. It is unhelpful to talk in terms of the definition being unconstitutional or constitutional when the only relevant question is whether, as animated by a substantive prohibition, here § 202, the definition leads to unconstitutional results. The other Title II provisions that employ § 304's electioneering communication definition are analyzed below, within the context of the corporate speech rationale and the disclosure provisions. Section 202, however, must be judged under the anticorruption rationale because it does not distinguish according to corporate or union status, and it does not involve disclosure requirements. Section 202 simply limits the speech of all "persons."

Section 202 does satisfy *Buckley's* anticorruption rationale in one respect: It treats electioneering communications expenditures made by a person in coordination with a candidate as hard-money contributions to that candidate. For many of the same reasons that § 323(e) is valid, § 202, in this single way, is valid: It regulates conduct that poses a *quid pro quo* danger—satisfaction of a candidate's request.

Insofar as § 202 regulates coordination with a political party, however, it suffers from the same flaws as § 214(a). Congress has instructed us, as much as possible, to sever any infirm portions of statutory text from the valid parts, see BCRA § 401. Following that instruction, I would uphold § 202's text as to its candidate coordination regulation (the first clause of new FECA § 315(a)(7)(C)(ii), 2 U. S. C. § 441a(a)(7)(C)(ii) (Supp. II), but rule invalid its text that applies the coordination provision to political parties.

This provision includes an "advance contracts" aspect as well. That aspect of the provision, on its own, would be invalid, for many of the reasons discussed below with respect to the advance disclosure requirements embodied in BCRA §§ 201 and 212. See *infra*, at 321–322.

## 2.

The final aspect of BCRA that implicates *Buckley*'s anticorruption rationale is § 213, the forced choice provision. The majority concludes § 213 violates the Constitution. I agree and write on this aspect of the case to point out that the section's unlawfulness flows not from the unique contours of the statute that settle how much political parties may spend on their candidate's campaign, see *ante*, at 215–219, but from its raw suppression of constitutionally protected speech.

Section 213 unconstitutionally forces the parties to surrender one of two First Amendment rights. We affirmed that parties have a constitutionally protected right to make independent expenditures in *Colorado I.* I continue to believe, moreover, that even under *Buckley* a political party has a protected right to make coordinated expenditures with its candidates. See *Colorado II,* 533 U. S., at 466–482 (THOMAS, J., dissenting). Our well-established constitutional tradition respects the role parties play in the electoral process and in stabilizing our representative democracy. "There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government." *Davis* v. *Bandemer,* 478 U. S. 109, 144–145 (1986) (O'CONNOR, J., concurring in judgment). This role would be undermined in the absence of a party's ability to coordinate with candidates. Cf. *Colorado I, supra,* at 629 (KENNEDY, J., concurring in judgment and dissenting in part) (parties can "give effect to their views only by selecting and supporting candidates"). Section 213's command that the parties abandon one First Amendment right or the other offends the Constitution even more than a command that a person choose between a First Amendment right and a statutory right.

## II. TITLE II PROVISIONS

### A. Disclosure Provisions

BCRA § 201, which requires disclosure of electioneering communications, including those coordinated with the party but independent of the candidate, does not substantially relate to a valid interest in gathering data about compliance with contribution limits or in deterring corruption. Contra, *ante*, at 196. As the above analysis of Title I demonstrates, Congress has no valid interest in regulating soft-money contributions that do not pose *quid pro quo* corruption potential. In the absence of a valid basis for imposing such limits the effort here to ensure compliance with them and to deter their allegedly corrupting effects cannot justify disclosure. The regulation does substantially relate to the other interest the majority details, however. See *ibid.* This assures its constitutionality. For that reason, I agree with the Court's judgment upholding the disclosure provisions contained in § 201 of Title II, with one exception.

Section 201's advance disclosure requirement—the aspect of the provision requiring those who have contracted to speak to disclose their speech in advance—is, in my view, unconstitutional. Advance disclosure imposes real burdens on political speech that *post hoc* disclosure does not. It forces disclosure of political strategy by revealing where ads *are to be run and what their content is likely to be (based* on who is running the ad). It also provides an opportunity for the ad buyer's opponents to dissuade broadcasters from running ads. See Brief for Plaintiff-Appellant/Cross-Appellee National Right to Life Committee, Inc., et al. in No. 02–1733 et al., pp. 44–46, and nn. 42–43. Against those tangible additional burdens, the Government identifies no additional interest uniquely served by advance disclosure. If Congress intended to ensure that advertisers could not flout these disclosure laws by running an ad before the elec-

tion, but paying for it afterwards, see *ante*, at 200, then Congress should simply have required the disclosure upon the running of the ad. Burdening the First Amendment further by requiring advance disclosure is not a constitutionally acceptable alternative. To the extent § 201 requires advance disclosure, it finds no justification in its subordinating interests and imposes greater burdens than the First Amendment permits.

Section 212, another disclosure provision, likewise incorporates an advance disclosure requirement. The plaintiffs challenge only this advance disclosure requirement, and not the broader substance of this section. The majority concludes this challenge is not ripe. I disagree.

The statute commands advance disclosure. The Federal Election Commission has issued a regulation under § 212 that, by its terms, does not implement this particular requirement. See 68 Fed. Reg. 404, 452 (2003) (to be codified at 11 CFR § 109.10(c)(d)). Adoption of a regulation that does not implement the statute to its full extent does not erase the statutory requirement. This is not a case in which a statute is ambiguous and the agency interpretation can be relied upon to avoid a statutory obligation that is uncertain or arguable. The failure of the regulation at this point to require advance disclosure is of no moment. Contra, 251 F. Supp. 2d, at 251 *(per curiam)*. The validity of § 212 is an issue presented for our determination; it is ripe; and the advance disclosure requirement, for the reasons given when discussing the parallel provision under § 201, is unconstitutional. Contra, *ante*, at 212 (declining to address the ripeness question in light of the majority's rejection of the challenge to advance notice in § 201).

### B. BCRA § 203

The majority permits a new and serious intrusion on speech when it upholds § 203, the key provision in Title II that prohibits corporations and labor unions from using money from their general treasury to fund electioneering

communications. The majority compounds the error made in *Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652 (1990), and silences political speech central to the civic discourse that sustains and informs our democratic processes. Unions and corporations, including nonprofit corporations, now face severe criminal penalties for broadcasting advocacy messages that "refe[r] to a clearly identified candidate," 2 U. S. C. § 431(20)(A)(iii) (Supp. II), in an election season. Instead of extending *Austin* to suppress new and vibrant voices, I would overrule it and return our campaign finance jurisprudence to principles consistent with the First Amendment.

1.

The Government and the majority are right about one thing: The express-advocacy requirement, with its list of magic words, is easy to circumvent. The Government seizes on this observation to defend BCRA § 203, arguing it will prevent what it calls "sham issue ads" that are really to the same effect as their more express counterparts. *Ante,* at 185, 193–194. What the Court and the Government call sham, however, are the ads speakers find most effective. Unlike express ads that leave nothing to the imagination, the record shows that issue ads are preferred by almost all candidates, even though politicians, unlike corporations, can lawfully broadcast express ads if they so choose. It is a measure of the Government's disdain for protected speech that it would label as a sham the mode of communication sophisticated speakers choose because it is the most powerful.

The Government's use of the pejorative label should not obscure § 203's practical effect: It prohibits a mass communication technique favored in the modern political process for the very reason that it is the most potent. That the Government would regulate it for this reason goes only to prove the illegitimacy of the Government's purpose. The majority's validation of it is not sustainable under accepted First Amendment principles. The problem is that the majority

uses *Austin*, a decision itself unfaithful to our First Amendment precedents, to justify banning a far greater range of speech. This has it all backwards. If protected speech is being suppressed, that must be the end of the inquiry.

The majority's holding cannot be reconciled with *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), which invalidated a Massachusetts law prohibiting banks and business corporations from making expenditures "for the purpose of" influencing referendum votes on issues that do not "materially affect" their business interests. *Id.*, at 767. *Bellotti* was decided in the face of the same arguments on which the majority now relies. Corporate participation, the Government argued in *Bellotti*, "would exert an undue influence on the outcome of a referendum vote." *Id.*, at 789. The influence, presumably, was undue because "immense aggregations of wealth" were facilitated by the "unique state-conferred corporate structure." *Austin*, 494 U. S., at 660. With these "state-created advantages," *id.*, at 659, corporations would "drown out other points of view" and "destroy the confidence of the people in the democratic process," *Bellotti*, 435 U. S., at 789. *Bellotti* rejected these arguments in emphatic terms:

> "To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution 'protects expression which is eloquent no less than that which is unconvincing.' *Kingsley Int'l Pictures Corp.* v. *Regents*, 360 U. S., at 689. . . . '[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . .' *Buckley*, 424 U. S., at 48–49." *Id.*, at 790–791.

*Bellotti* similarly dismissed the argument that the prohibition was necessary to "protec[t] corporate shareholders"

"by preventing the use of corporate resources in furtherance of views with which some shareholders may disagree." *Id.*, at 792–793. Among other problems, the statute was overinclusive:

> "[It] would prohibit a corporation from supporting or opposing a referendum proposal even if its shareholders unanimously authorized the contribution or expenditure. . . . Acting through their power to elect the board of directors or to insist upon protective provisions in the corporation's charter, shareholders normally are presumed competent to protect their own interests. . . . [M]inority shareholders generally have access to the judicial remedy of a derivative suit to challenge corporate disbursements . . . . Assuming, *arguendo*, that protection of shareholders is a 'compelling' interest under the circumstances of this case, we find 'no substantially relevant correlation between the governmental interest asserted and the State's effort' to prohibit appellants from speaking." *Id.*, at 794–795 (quoting *Shelton* v. *Tucker*, 364 U. S. 479, 485 (1960)).

See also *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977) (providing analogous protections to union members).

*Austin* turned its back on this holding, not because the *Bellotti* Court had overlooked the Government's interest in combating *quid pro quo* corruption, but because a new majority decided to recognize "a different type of corruption," *Austin*, 494 U. S., at 660, *i. e.*, the same "corrosive and distorting effects of immense aggregations of wealth," *ibid.*, found insufficient to sustain a similar prohibition just a decade earlier. Unless certain narrow exceptions apply, see *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, the prohibition extends even to nonprofit corporations organized to promote a point of view. Aside from its disregard of precedents, the majority's ready willingness to equate corruption with all

organizations adopting the corporate form is a grave insult to nonprofit and for-profit corporations alike, entities that have long enriched our civic dialogue.

*Austin* was the first and, until now, the only time our Court had allowed the Government to exercise the power to censor political speech based on the speaker's corporate identity. The majority's contrary contention is simply incorrect. Contra, *ante*, at 203 ("Since our decision in *Buckley*, Congress' power to prohibit corporations and unions from using funds in their treasuries to finance advertisements expressly advocating the election or defeat of candidates in federal elections has been firmly embedded in our law"). I dissented in *Austin*, 494 U. S., at 695, and continue to believe that the case represents an indefensible departure from our tradition of free and robust debate. Two of my colleagues joined the dissent, including a Member of today's majority. *Ibid.* (O'CONNOR and SCALIA, JJ.). See also *id.*, at 679 (SCALIA, J., dissenting).

To be sure, *Bellotti* concerns issue advocacy, whereas *Austin* is about express advocacy. This distinction appears to have accounted for the position of at least two Members of the Court. See 494 U. S., at 675–676 (Brennan, J., concurring) ("The Michigan law . . . prohibits corporations from using treasury funds only for making independent expenditures in support of, or in opposition to, any candidate in state elections. A corporation remains free . . . to use general treasury funds to support an initiative proposal in a state referendum" (citations omitted)); *id.*, at 678 (STEVENS, J., concurring) ("[T]here is a vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other"). The distinction, however, between independent expenditures for commenting on issues, on the one hand, and supporting or opposing a candidate, on the other, has no First Amendment significance apart from *Austin*'s arbitrary line.

*Austin* was based on a faulty assumption. Contrary to JUSTICE STEVENS' proposal that there is "vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other," *ibid.*, there is a general recognition now that discussions of candidates and issues are quite often intertwined in practical terms. See, *e. g.*, Brief for Intervenor-Defendant Sen. John McCain et al. in No. 02–1674 et al., p. 42 ("'[The] legal . . . wall between issue advocacy and political advocacy . . . is built of the same sturdy material as the emperor's clothing. Everyone sees it. No one believes it'" (quoting the chair of the Political Action Committee (PAC) of the National Rifle Association (NRA))). To abide by *Austin*'s repudiation of *Bellotti* on the ground that *Bellotti* did not involve express advocacy is to adopt a fiction. Far from providing a rationale for expanding *Austin*, the evidence in these consolidated cases calls for its reexamination. Just as arguments about immense aggregations of corporate wealth and concerns about protecting shareholders and union members do not justify a ban on issue ads, they cannot sustain a ban on independent expenditures for express ads. In holding otherwise, *Austin* "forced a substantial amount of political speech underground" and created a species of covert speech incompatible with our free and open society. *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S., at 406 (KENNEDY, J., dissenting).

The majority not only refuses to heed the lessons of experience but also perpetuates the conflict *Austin* created with fundamental First Amendment principles. *Buckley* foresaw that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application," 424 U. S., at 42; see also *id.*, at 45. It recognized that "'[p]ublic discussion of public issues which also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct.'" *Id.*, at 42,

n. 50. Hence, "'[d]iscussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections.'" *Ibid.* In glossing over *Austin*'s opposite—and false—assumption that express advocacy is different, the majority ignores reality and elevates a distinction rejected by *Buckley* in clear terms.

Even after *Buckley* construed the statute then before the Court to reach only express advocacy, it invalidated limits on independent expenditures, observing that "[a]dvocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation." 424 U. S., at 48. *Austin* defied this principle. It made the impermissible content-based judgment that commentary on candidates is less deserving of First Amendment protection than discussions of policy. In its haste to reaffirm *Austin* today, the majority refuses to confront this basic conflict between *Austin* and *Buckley.* It once more diminishes the First Amendment by ignoring its command that the Government has no power to dictate what topics its citizens may discuss. See *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 530 (1980).

Continued adherence to *Austin,* of course, cannot be justified by the corporate identity of the speaker. Not only does this argument fail to account for *Bellotti,* 435 U. S., at 777 ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual"), but *Buckley* itself warned that "[t]he First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." 424 U. S., at 49; see also *id.,* at 48–49; *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972). The exemption for broadcast media

companies, moreover, makes the First Amendment problems worse, not better. See *Austin,* 494 U. S., at 712 (KENNEDY, J., dissenting) ("An independent ground for invalidating this statute is the blanket exemption for media corporations. . . . All corporations communicate with the public to some degree, whether it is their business or not; and communication is of particular importance for nonprofit corporations"); see also *id.,* at 690–691 (SCALIA, J., dissenting) ("Amassed corporate wealth that regularly sits astride the ordinary channels of information is much more likely to produce the New Corruption (too much of one point of view) than amassed corporate wealth that is generally busy making money elsewhere"). In the end the majority can supply no principled basis to reason away *Austin's* anomaly. *Austin's* errors stand exposed, and it is our duty to say so.

I surmise that even the majority, along with the Government, appreciates these problems with *Austin.* That is why it invents a new justification. We are now told that "the government also has a compelling interest in insulating federal elections from the type of corruption arising from the real or apparent creation of political debts." Brief for Appellee/Cross-Appellant FEC et al. in No. 02–1674 et al., p. 88. "[E]lectioneering communications paid for with the general treasury funds of labor unions and corporations," the Government warns, "endea[r] those entities to elected officials in a way that could be perceived by the public as corrupting." See 251 F. Supp. 2d, at 622–623 (Kollar-Kotelly, J.) (stating the Government's position).

This rationale has no limiting principle. Were we to accept it, Congress would have the authority to outlaw even pure issue ads, because they, too, could endear their sponsors to candidates who adopt the favored positions. Taken to its logical conclusion, the alleged Government interest "in insulating federal elections from . . . the real or apparent creation of political debts" also conflicts with *Buckley.* If a candidate feels grateful to a faceless, impersonal corporation for mak-

ing independent expenditures, the gratitude cannot be any less when the money came from the CEO's own pocket. *Buckley*, however, struck down limitations on independent expenditures and rejected the Government's corruption argument absent evidence of coordination. See 424 U. S., at 51. The Government's position would eviscerate the line between expenditures and contributions and subject both to the same "complaisant review under the First Amendment." *Federal Election Comm'n* v. *Beaumont*, 539 U. S., at 161. Complaisant or otherwise, we cannot cede authority to the Legislature to do with the First Amendment as it pleases. Since *Austin* is inconsistent with the First Amendment, its extension diminishes the First Amendment even further. For this reason § 203 should be held unconstitutional.

### 2.

Even under *Austin*, BCRA § 203 could not stand. All parties agree strict scrutiny applies; § 203, however, is far from narrowly tailored.

The Government is unwilling to characterize § 203 as a ban, citing the possibility of funding electioneering communications out of a separate segregated fund. This option, though, does not alter the categorical nature of the prohibition on the corporation. "[T]he corporation *as a corporation* is prohibited from speaking." *Austin*, 494 U. S., at 681, n. (SCALIA, J., dissenting). What the law allows—permitting the corporation "to serve as the founder and treasurer of a different association of individuals that can endorse or oppose political candidates"—"is not speech by the corporation." *Ibid.*

Our cases recognize the practical difficulties corporations face when they are limited to communicating through PACs. The majority need look no further than *MCFL*, 479 U. S. 238, for an extensive list of hurdles PACs have to confront:

> "Under [2 U. S. C.] § 432 [(1982 ed.)], [MCFL] must appoint a treasurer, § 432(a); ensure that contributions are

forwarded to the treasurer within 10 or 30 days of receipt, depending on the amount of contribution, § 432(b)(2); see that its treasurer keeps an account of every contribution regardless of amount, the name and address of any person who makes a contribution in excess of $50, all contributions received from political committees, and the name and address of any person to whom a disbursement is made regardless of amount, § 432(c); and preserve receipts for all disbursements over $200 and all records for three years, §§ 432(c), (d). Under § 433, MCFL must file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories, §§ 433(a), (b); must report any change in the above information within 10 days, § 433(c); and may dissolve only upon filing a written statement that it will no longer receive any contributions nor make disbursements, and that it has no outstanding debts or obligations, § 433(d)(1).

"Under § 434, MCFL must file either monthly reports with the FEC or reports on the following schedule: quarterly reports during election years, a pre-election report no later than the 12th day before an election, a postelection report within 30 days after an election, and reports every 6 months during nonelection years. §§ 434(a)(4)(A), (B). These reports must contain information regarding the amount of cash on hand; the total amount of receipts, detailed by 10 different categories; the identification of each political committee and candidate's authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds, dividends, or interest or any other offset to operating expenditures in an aggregate amount over $200; the total amount of all disbursements, detailed by 12 different categories; the names of all authorized or affiliated committees to whom expenditures aggregating

over $200 have been made; persons to whom loan repay-
ments or refunds have been made; the total sum of all
contributions, operating expenses, outstanding debts
and obligations, and the settlement terms of the retire-
ment of any debt or obligation. § 434(b). In addition,
MCFL may solicit contributions for its separate segre-
gated fund only from its 'members,' §§ 441b(b)(4)(A), (C),
which does not include those persons who have merely
contributed to or indicated support for the organization
in the past." *Id.*, at 253–254.

These regulations are more than minor clerical require-
ments. Rather, they create major disincentives for speech,
with the effect falling most heavily on smaller entities that
often have the most difficulty bearing the costs of compli-
ance. Even worse, for an organization that has not yet set
up a PAC, spontaneous speech that "refers to a clearly identi-
fied candidate for Federal office" becomes impossible, even if
the group's vital interests are threatened by a piece of legis-
lation pending before Congress on the eve of a federal elec-
tion. See Brief for Appellant Chamber of Commerce of the
United States et al. in No. 02–1756 et al., p. 37. Couple the
litany of administrative burdens with the categorical restric-
tion limiting PACs' solicitation activities to "members," and
it is apparent that PACs are inadequate substitutes for cor-
porations in their ability to engage in unfettered expression.
Even if the newly formed PACs manage to attract mem-
bers and disseminate their messages against these heavy
odds, they have been forced to assume a false identity while
doing so. As the American Civil Liberties Union (ACLU)
points out, political committees are regulated in minute de-
tail because their primary purpose is to influence federal
elections. "The ACLU and thousands of other organizations
like it," however, "are not created for this purpose and there-
fore should not be required to operate as if they were."
Reply Brief for Appellant ACLU in No. 02–1734 et al., p. 15.
A requirement that coerces corporations to adopt alter egos

in communicating with the public is, by itself, sufficient to make the PAC option a false choice for many civic organizations. Forcing speech through an artificial "secondhand endorsement structure . . . debases the value of the voice of nonprofit corporate speakers . . . [because] PAC's are interim, ad hoc organizations with little continuity or responsibility." *Austin*, 494 U. S., at 708–709 (KENNEDY, J., dissenting). In contrast, their sponsoring organizations "have a continuity, a stability, and an influence" that allows "their members and the public at large to evaluate their . . . credibility." *Id.*, at 709.

The majority can articulate no compelling justification for imposing this scheme of compulsory ventriloquism. If the majority is concerned about corruption and distortion of the political process, it makes no sense to diffuse the corporate message and, under threat of criminal penalties, to compel the corporation to spread the blame to its ad hoc intermediary.

For all these reasons, the PAC option cannot advance the Government's argument that the provision meets the test of strict scrutiny. See, *e. g., id.*, at 657–660; *MCFL*, 479 U. S. 238; see also *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 826 (2000) ("When the purpose and design of a statute is to regulate speech by reason of its content, special consideration or latitude is not accorded to the Government merely because the law can somehow be described as a burden rather than outright suppression").

Once we turn away from the distraction of the PAC option, the provision cannot survive strict scrutiny. Under the primary definition, § 203 prohibits unions and corporations from funding from their general treasury any broadcast, cable, or satellite communication which—

> "(I) refers to a clearly identified candidate for Federal office;
> "(II) is made within—

"(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

"(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

"(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." 2 U. S. C. § 434(f)(3)(A)(i) (Supp. II).

The prohibition, with its crude temporal and geographic proxies, is a severe and unprecedented ban on protected speech. As discussed at the outset, suppose a few Senators want to show their constituents in the logging industry how much they care about working families and propose a law, 60 days before the election, that would harm the environment by allowing logging in national forests. Under § 203, a nonprofit environmental group would be unable to run an ad referring to these Senators in their districts. The suggestion that the group could form and fund a PAC in the short time required for effective participation in the political debate is fanciful. For reasons already discussed, moreover, an ad hoc PAC would not be as effective as the environmental group itself in gaining credibility with the public. Never before in our history has the Court upheld a law that suppresses speech to this extent.

The group would want to refer to these Senators, either by name or by photograph, not necessarily because an election is at stake. It might be supposed the hypothetical Senators have had an impeccable environmental record, so the environmental group might have no previous or present interest in expressing an opinion on their candidacies. Or, the election might not be hotly contested in some of the districts, so whatever the group says would have no practical effect on the electoral outcome. The ability to refer to candidates

and officeholders is important because it allows the public to communicate with them on issues of common concern. Section 203's sweeping approach fails to take into account this significant free speech interest. Under any conventional definition of overbreadth, it fails to meet strict scrutiny standards. It forces electioneering communications sponsored by an environmental group to contend with faceless and nameless opponents and consign their broadcast, as the NRA well puts it, to a world where politicians who threaten the environment must be referred to as " 'He Whose Name Cannot Be Spoken.' " Reply Brief for Appellant NRA et al. in No. 02–1675 et al., p. 19.

In the example above, it makes no difference to § 203 or to the Court that the bill sponsors may have such well-known ideological biases that revealing their identity would provide essential instruction to citizens on whether the policy benefits them or their community. Nor does it make any difference that the names of the bill sponsors, perhaps through repetition in the news media, have become so synonymous with the proposal that referring to these politicians by name in an ad is the most effective way to communicate with the public. Section 203 is a comprehensive censor: On the pain of a felony offense, the ad must not refer to a candidate for federal office during the crucial weeks before an election.

We are supposed to find comfort in the knowledge that the ad is banned under § 203 only if it "is targeted to the relevant electorate," defined as communications that can be received by 50,000 or more persons in the candidate's district. See 2 U. S. C. § 434(f)(3)(C) (Supp. II). This Orwellian criterion, however, is analogous to a law, unconstitutional under any known First Amendment theory, that would allow a speaker to say anything he chooses, so long as his intended audience could not hear him. See *Kleindienst* v. *Mandel*, 408 U. S. 753, 762–765 (1972) (discussing the "First Amendment right to receive information and ideas" (internal quotation marks omitted)). A central purpose of issue ads is to

urge the public to pay close attention to the candidate's platform on the featured issues. By banning broadcast in the very district where the candidate is standing for election, § 203 shields information at the heart of the First Amendment from precisely those citizens who most value the right to make a responsible judgment at the voting booth.

In defending against a facial attack on a statute with substantial overbreadth, it is no answer to say that corporations and unions may bring as-applied challenges on a case-by-case basis. When a statute is as out of bounds as § 203, our law simply does not force speakers to "undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation." *Virginia* v. *Hicks*, 539 U. S. 113, 119 (2003). If they instead "abstain from protected speech," they "har[m] not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Ibid.* Not the least of the ill effects of today's decision is that our overbreadth doctrine, once a bulwark of protection for free speech, has now been manipulated by the Court to become but a shadow of its former self.

In the end the Government and intervenor-defendants cannot dispute the looseness of the connection between § 203 and the Government's proffered interest in stemming corruption. At various points in their briefs, they drop all pretense that the electioneering ban bears a close relation to anticorruption purposes. Instead, they defend § 203 on the ground that the targeted ads "may influence," are "likely to influence," or "will in all likelihood have the effect of influencing" a federal election. See Brief for Appellee/Cross-Appellant FEC et al. in No. 02–1674 et al., pp. 14, 24, 84, 92–93, 94; Brief for Intervenor-Defendant Sen. John McCain et al. in No. 02–1674 et al., pp. 42–43. The mere fact that an ad may, in one fashion or another, influence an election is an insufficient reason for outlawing it. I should have thought influencing elections to be the whole point of political speech. Neither strict scrutiny nor any other standard

the Court has adopted to date permits outlawing speech on the ground that it might influence an election, which might lead to greater access to politicians by the sponsoring organization, which might lead to actual corruption or the appearance of corruption. Settled law requires a real and close connection between end and means. The attenuated causation the majority endorses today is antithetical to the concept of narrow tailoring.

3.

As I would invalidate § 203 under the primary definition, it is necessary to add a few words about the backup provision. As applied in § 203, the backup definition prohibits corporations and unions from financing from their general treasury funds

> "any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate." 2 U. S. C. § 434(f)(3)(A)(ii) (Supp. II).

The prohibition under the backup has much of the same imprecision as the ban under the primary definition, though here there is even more overbreadth. Unlike the primary definition, the backup contains no temporal or geographic limitation. Any broadcast, cable, or satellite communications—not just those aired within a certain blackout period and received by a certain segment of the population—are prohibited, provided they "promote," "support," "attack," or "oppose" a candidate. There is no showing that such a permanent and ubiquitous restriction meets First Amendment standards for the relationship between means and ends.

The backup definition is flawed for the further reason that it is vague. The crucial words—"promote," "support," "at-

tack," "oppose"—are nowhere defined. In this respect the backup is similar to the provision in the Federal Election Campaign Act that *Buckley* held to be unconstitutionally vague. Cf. 424 U. S., at 39–44 ("'No person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000'").

The statutory phrase "suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate" cannot cure the overbreadth or vagueness of the backup definition. Like other key terms in the provision, these words are not defined. The lack of guidance presents serious problems of uncertainty. If "plausible" means something close to "reasonable in light of the totality of the circumstances," speakers will be provided with an insufficient degree of protection and will, as a result, engage in widespread self-censorship to avoid severe criminal penalties.

Given the statute's vagueness, even defendants' own experts disagree among themselves about whether specific ads fall within the prohibition. Hence, people "of common intelligence must necessarily guess at [the backup definition's] meaning and differ as to its application," *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). For these reasons, I would also invalidate the ban on electioneering communication under the backup definition.

### 4.

Before concluding the analysis on Title II, it is necessary to add a few words about the majority's analysis of §204. The majority attempts to minimize the damage done under §203 by construing §204 (the Wellstone Amendment) to incorporate an exception for *MCFL*-type corporations. See *MCFL*, 479 U. S. 238. Section 204, however, does no such thing. As even the majority concedes, the provision "does not, on its face, exempt *MCFL* organizations from its prohi-

bition." *Ante*, at 211. Although we normally presume that legislators would not deliberately enact an unconstitutional statute, that presumption is inapplicable here. There is no ambiguity regarding what § 204 is intended to accomplish. Enacted to supersede the Snowe-Jeffords Amendment that would have carved out precisely this exception for *MCFL* corporations, § 204 was written to broaden BCRA's scope to include issue-advocacy groups. See, *e. g.*, App. to Brief for Appellant NRA et al. in No. 02–1675 et al., pp. 65a, 67a (Sen. Wellstone) ("[I]ndividuals with all this wealth" will "make their soft money contributions to these sham issue ads run by all these . . . organizations, which under this loophole can operate with impunity" to run "poisonous ads." I have an amendment that . . . make[s] sure . . . this big money doesn't get [through]"). Instead of deleting the Snowe-Jeffords Amendment from the bill, however, the Wellstone Amendment was inserted in a separate section to preserve severability.

Were we to indulge the presumption that Congress understood the law when it legislated, the Wellstone Amendment could be understood only as a frontal challenge to *MCFL*. Even were I to agree with the majority's interpretation of § 204, however, my analysis of Title II remains unaffected. The First Amendment protects the right of all organizations, not just a subset of them, to engage in political speech. See *Austin*, 494 U. S., at 700–701 (KENNEDY, J., dissenting) ("The First Amendment does not permit courts to exercise speech suppression authority denied to legislatures").

### 5.

Title II's vagueness and overbreadth demonstrate Congress' fundamental misunderstanding of the First Amendment. The Court, it must be said, succumbs to the same mistake. The majority begins with a denunciation of direct campaign contributions by corporations and unions. It then uses this rhetorical momentum as its leverage to uphold the

Act. The problem, however, is that Title II's ban on electioneering communications covers general commentaries on political issues and is far removed from laws prohibiting direct contributions from corporate and union treasuries. The severe First Amendment burden of this ban on independent expenditures requires much stronger justifications than the majority offers. See *Buckley, supra,* at 23.

The hostility toward corporations and unions that infuses the majority opinion is inconsistent with the viewpoint neutrality the First Amendment demands of all Government actors, including the Members of this Court. Corporations, after all, are the engines of our modern economy. They facilitate complex operations on which the Nation's prosperity depends. To say these entities cannot alert the public to pending political issues that may threaten the country's economic interests is unprecedented. Unions are also an established part of the national economic system. They, too, have their own unique insights to contribute to the political debate, but the law's impact on them is just as severe. The costs of the majority's misplaced concerns about the "corrosive and distorting effects of immense aggregations of wealth," *Austin, supra,* at 660, moreover, will weigh most heavily on budget-strapped nonprofit entities upon which many of our citizens rely for political commentary and advocacy. These groups must now choose between staying on the sidelines in the next election or establishing a PAC against their institutional identities. PACs are a legal construct sanctioned by Congress. They are not necessarily the means of communication chosen and preferred by the citizenry.

In the same vein the Court is quite incorrect to suggest that the mainstream press is a sufficient palliative for the novel and severe constraints this law imposes on the political process. The Court should appreciate the dynamic contribution diverse groups and associations make to the intellectual and cultural life of the Nation. It should not permit

Congress to foreclose or restrict those groups from participating in the political process by constraints not applicable to the established press.

## CONCLUSION

The First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech. Citizens must be free to use new forms, and new forums, for the expression of ideas. The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it.

The First Amendment commands that Congress "shall make no law . . . abridging the freedom of speech." The command cannot be read to allow Congress to provide for the imprisonment of those who attempt to establish new political parties and alter the civic discourse. Our pluralistic society is filled with voices expressing new and different viewpoints, speaking through modes and mechanisms that must be allowed to change in response to the demands of an interested public. As communities have grown and technology has evolved, concerted speech not only has become more effective than a single voice but also has become the natural preference and efficacious choice for many Americans. The Court, upholding multiple laws that suppress both spontaneous and concerted speech, leaves us less free than before. Today's decision breaks faith with our tradition of robust and unfettered debate.

For the foregoing reasons, with respect, I dissent from the Court's decision upholding the main features of Titles I and II.

### APPENDIX TO OPINION OF KENNEDY, J.

BCRA § 101(a), 116 Stat. 81, which sets forth new FECA § 323, 2 U. S. C. § 441i (Supp. II), provides:

"SEC. 323. SOFT MONEY OF POLITICAL PARTIES.
"(a) NATIONAL COMMITTEES.—

"(1) IN GENERAL.—A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

"(2) APPLICABILITY.—The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

"(b) STATE, DISTRICT, AND LOCAL COMMITTEES.—

"(1) IN GENERAL.—Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

"(2) APPLICABILITY.—

"(A) IN GENERAL.—Notwithstanding clause (i) or (ii) of section 301(20)(A), and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts—

"(i) which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii)); and

"(ii) other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

"(B) CONDITIONS.—Subparagraph (A) shall only apply if—

"(i) the activity does not refer to a clearly identified candidate for Federal office;

"(ii) the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which refers solely to a clearly identified candidate for State or local office;

"(iii) the amounts expended or disbursed which are described in subparagraph (A)(ii) are paid from amounts which are donated in accordance with State law and which meet the requirements of subparagraph (C), except that no person (including any person established, financed, maintained, or controlled by such person) may donate more than $10,000 to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

"(iv) the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement, and do not include any funds provided to such committee from—

"(I) any other State, local, or district committee of any State party,

"(II) the national committee of a political party (including a national congressional campaign committee of a political party),

"(III) any officer or agent acting on behalf of any committee described in subclause (I) or (II), or

"(IV) any entity directly or indirectly established, financed, maintained, or controlled by any committee described in subclause (I) or (II).

"(C) PROHIBITING INVOLVEMENT OF NATIONAL PARTIES, FEDERAL CANDIDATES AND OFFICEHOLDERS, AND STATE PARTIES ACTING JOINTLY.—Notwithstanding subsection (e) (other than subsection (e)(3)), amounts specifically authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts—

"(i) are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e); and

"(ii) are not solicited, received, or directed through fundraising activities conducted jointly by 2 or more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

"(c) FUNDRAISING COSTS.—An amount spent by a person described in subsection (a) or (b) to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

"(d) TAX-EXEMPT ORGANIZATIONS.—A national, State, district, or local committee of a political party (including a national congressional campaign committee of a political party), an entity that is directly or indirectly established, financed, maintained, or controlled by any such national, State, district, or local committee or its agent, and an officer or agent acting on behalf of any

such party committee or entity, shall not solicit any funds for, or make or direct any donations to—

"(1) an organization that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code (or has submitted an application for determination of tax exempt status under such section) and that makes expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal·election activity); or

"(2) an organization described in section 527 of such Code (other than a political committee, a State, district, or local committee of a political party, or the authorized campaign committee of a candidate for State or local office).

"(e) FEDERAL CANDIDATES.—

"(1) IN GENERAL.—A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not—

"(A) solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including *funds for any Federal election activity, unless the* funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

"(B) solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds—

"(i) are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of section 315(a); and

"(ii) are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

"(2) STATE LAW.—Paragraph (1) does not apply to the solicitation, receipt, or spending of funds by an individual described in such paragraph who is or was also a candidate for a State or local office solely in connection with such election for State or local office if the solicitation, receipt, or spending of funds is permitted under State law and refers only to such State or local candidate, or to any other candidate for the State or local office sought by such candidate, or both.

"(3) FUNDRAISING EVENTS.—Notwithstanding paragraph (1) or subsection (b)(2)(C), a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party.

"(4) PERMITTING CERTAIN SOLICITATIONS.—

"(A) GENERAL SOLICITATIONS.—Notwithstanding any other provision of this subsection, an individual described in paragraph (1) may make a general solicitation of funds on behalf of any organization that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code (or has submitted an application for determination of tax exempt status under such section) (other than an entity whose principal purpose is to conduct activities described in clauses (i) and (ii) of section 301(20)(A)) where such solicitation does not specify how the funds will or should be spent.

"(B) CERTAIN SPECIFIC SOLICITATIONS.—In addition to the general solicitations permitted under subparagraph (A), an individual described in paragraph (1) may make a solicitation explicitly to obtain funds for

carrying out the activities described in clauses (i) and (ii) of section 301(20)(A), or for an entity whose principal purpose is to conduct such activities, if—

"(i) the solicitation is made only to individuals; and

"(ii) the amount solicited from any individual during any calendar year does not exceed $20,000.

"(f) STATE CANDIDATES.—

"(1) IN GENERAL.—A candidate for State or local office, individual holding State or local office, or an agent of such a candidate or individual may not spend any funds for a communication described in section 301(20)(A)(iii) unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act.

"(2) EXCEPTION FOR CERTAIN COMMUNICATIONS.—Paragraph (1) shall not apply to an individual described in such paragraph if the communication involved is in connection with an election for such State or local office and refers only to such individual or to any other candidate for the State or local office held or sought by such individual, or both."

BCRA § 101(b) adds a definition of "federal election activity" to FECA § 301, 2 U. S. C. § 431(20) (Supp. II), which provides as follows:

"(20) FEDERAL ELECTION ACTIVITY.—

"(A) IN GENERAL.—The term 'Federal election activity' means—

"(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

"(ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with

an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);

"(iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

"(iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

"(B) EXCLUDED ACTIVITY.—The term 'Federal election activity' does not include an amount expended or disbursed by a State, district, or local committee of a political party for—

"(i) a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);

"(ii) a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity described in subparagraph (A);

"(iii) the costs of a State, district, or local political convention; and

"(iv) the costs of grassroots campaign materials, including buttons, bumper stickers, and yard signs, that name or depict only a candidate for State or local office."

Title 2 U. S. C. §§ 441b(a) and (b)(1)–(2) (2000 ed. and Supp. II), as amended by BCRA § 203, provide:

"(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

"(b)(1) For the purposes of this section the term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

"(2) For purposes of this section and section 79*l*(h) of title 15, the term 'contribution or expenditure' includes a contribution or expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and reg-

ulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock."

CHIEF JUSTICE REHNQUIST, dissenting with respect to BCRA Titles I and V.*

Although I join JUSTICE KENNEDY's opinion in full, I write separately to highlight my disagreement with the Court on Title I of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81, and to dissent from the Court's opinion upholding § 504 of Title V.

## I

The issue presented by Title I is not, as the Court implies, whether Congress can permissibly regulate campaign contributions to candidates, *de facto* or otherwise, or seek to eliminate corruption in the political process. Rather, the issue is whether Congress can permissibly regulate much speech that has no plausible connection to candidate contributions or corruption to achieve those goals. Under our precedent,

---

*JUSTICE SCALIA and JUSTICE KENNEDY join this opinion in its entirety.

restrictions on political contributions implicate important First Amendment values and are constitutional only if they are "closely drawn" to reduce the corruption of federal candidates or the appearance of corruption. *Buckley* v. *Valeo,* 424 U. S. 1, 25–27 (1976) *(per curiam).* Yet, the Court glosses over the breadth of the restrictions, characterizing Title I of BCRA as "do[ing] little more than regulat[ing] the ability of wealthy individuals, corporations, and unions to contribute large sums of money to influence federal elections, federal candidates, and federal officeholders." *Ante,* at 138 (joint opinion of STEVENS and O'CONNOR, JJ.). Because, in reality, Title I is much broader than the Court allows, regulating a good deal of speech that does *not* have the potential to corrupt federal candidates and officeholders, I dissent.

The linchpin of Title I, new FECA § 323(a), prohibits national political party committees from "solicit[ing]," "receiv[ing]," "direct[ing] to another person," and "spend[ing]" *any* funds not subject to federal regulation, even if those funds are used for non-election-related activities. 2 U. S. C. § 441i(a)(1) (Supp. II). The Court concludes that such a restriction is justified because under FECA, "donors have been free to contribute substantial sums of soft money to the national parties, which the parties can spend for the specific purpose of influencing a particular candidate's federal election." *Ante,* at 145. Accordingly, "[i]t is not only plausible, but likely, that candidates would feel grateful for such donations and that donors would seek to exploit that gratitude." *Ibid.* But the Court misses the point. Certainly "infusions of money into [candidates'] campaigns," *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 497 (1985), can be regulated, but § 323(a) does not regulate only donations given to influence a particular federal election; it regulates *all donations* to national political committees, no matter the use to which the funds are put.

The Court attempts to sidestep the unprecedented breadth of this regulation by stating that the "close relationship be-

tween federal officeholders and the national parties" makes all donations to the national parties "suspect." *Ante,* at 154–155. But a close association with others, especially in the realm of political speech, is not a surrogate for corruption; it is one of our most treasured First Amendment rights. See *California Democratic Party* v. *Jones,* 530 U. S. 567, 574 (2000); *Eu* v. *San Francisco County Democratic Central Comm.,* 489 U. S. 214, 225 (1989); *Tashjian* v. *Republican Party of Conn.,* 479 U. S. 208, 214 (1986). The Court's willingness to impute corruption on the basis of a relationship greatly infringes associational rights and expands Congress' ability to regulate political speech. And there is nothing in the Court's analysis that limits congressional regulation to national political parties. In fact, the Court relies in part on this closeness rationale to regulate *nonprofit organizations. Ante,* at 156–157, n. 51. Who knows what association will be deemed too close to federal officeholders next. When a donation to an organization has no potential to corrupt a federal officeholder, the relationship between the officeholder and the organization is simply irrelevant.

The Court fails to recognize that the national political parties are exemplars of political speech at all levels of government, in addition to effective fundraisers for federal candidates and officeholders. For sure, national political party committees exist in large part to elect federal candidates, but as a majority of the District Court found, they also promote coordinated political messages and participate in public policy debates unrelated to federal elections, promote, even in off-year elections, state and local candidates and seek to influence policy at those levels, and increase public participation in the electoral process. See 251 F. Supp. 2d 176, 334–337 (DC 2003) (Henderson, J., concurring in judgment in part and dissenting in part); *id.,* at 820–821 (Leon, J.). Indeed, some national political parties exist primarily for the purpose of expressing ideas and generating debate. App. 185–

186 (declaration of Stephen L. Dasbach et al. ¶ 11 (describing Libertarian Party)).

As these activities illustrate, political parties often foster speech crucial to a healthy democracy, 251 F. Supp. 2d, at 820 (Leon, J.), and fulfill the need for like-minded individuals to band together and promote a political philosophy, see *Jones, supra,* at 574; *Eu, supra,* at 225. When political parties engage in pure political speech that has little or no potential to corrupt their federal candidates and officeholders, the Government cannot constitutionally burden their speech any more than it could burden the speech of individuals engaging in these same activities. *E. g., National Conservative Political Action Comm., supra,* at 496–497; *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,* 454 U. S. 290, 297–298 (1981); *Buckley,* 424 U. S., at 27. Notwithstanding the Court's citation to the numerous abuses of FECA, under any definition of "exacting scrutiny," the means chosen by Congress, restricting all donations to national parties no matter the purpose for which they are given or are used, are not "closely drawn to avoid unnecessary abridgment of associational freedoms," *id.,* at 25.

BCRA's overinclusiveness is not limited to national political parties. To prevent the circumvention of the ban on the national parties' use of nonfederal funds, BCRA extensively regulates state parties, primarily state elections, and state candidates. For example, new FECA § 323(b), by reference to new FECA §§ 301(20)(A)(i)–(ii), prohibits state parties from using nonfederal funds[1] for general partybuilding activities such as voter registration, voter identification, and get out the vote for state candidates even if federal candidates are not mentioned. See 2 U. S. C. §§ 441i(b), 431(20)(A)(i)–(ii) (Supp. II). New FECA § 323(d) prohib-

---

[1] The Court points out that state parties may use Levin funds for certain activities. Levin funds, however, are still federal restrictions on speech, even if they are less onerous than the restrictions placed on national parties.

its state and local political party committees, like their national counterparts, from soliciting and donating "any funds" to nonprofit organizations such as the National Rifle Association or the National Association for the Advancement of Colored People (NAACP). See 2 U. S. C. §441i(d). And, new FECA §323(f) requires a state gubernatorial candidate to abide by federal funding restrictions when airing a television ad that tells voters that, if elected, he would oppose the President's policy of increased oil and gas exploration within the State because it would harm the environment. See 2 U. S. C. §§441i(f), 431(20)(A)(iii) (regulating "public communication[s] that refe[r] to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that . . . attacks or opposes a candidate for that office").

Although these provisions are more focused on activities that may *affect* federal elections, there is scant evidence in the record to indicate that federal candidates or officeholders are corrupted or would appear corrupted by donations for these activities. See 251 F. Supp. 2d, at 403, 407, 416, 422 (Henderson, J., concurring in judgment in part and dissenting in part); *id.*, at 779–780, 791 (Leon, J.); see also *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 616 (1996) (plurality opinion) (noting that "the opportunity for corruption posed by [nonfederal contributions for state elections, get-out-the-vote, and voter registration activities] is, at best, attenuated"). Nonetheless, the Court concludes that because these activities *benefit* federal candidates and officeholders, see *ante*, at 167, or prevent the circumvention of pre-existing or contemporaneously enacted restrictions,[2] see *ante*, at 165–166, 174–177, 178–179,

---

[2] Ironically, in the Court's view, Congress cannot be trusted to exercise judgment independent of its parties' large donors in its usual voting decisions because donations may be used to further its members' reelection campaigns, but yet must be deferred to when it passes a comprehensive regulatory regime that restricts election-related speech. It seems to me

185, it must defer to the "'predictive judgments of Congress,'" *ante,* at 165 (quoting *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 665 (1994) (plurality opinion)).

Yet the Court cannot truly mean what it says. Newspaper editorials and political talk shows *benefit* federal candidates and officeholders every bit as much as a generic voter registration drive conducted by a state party; there is little doubt that the endorsement of a major newspaper *affects* federal elections, and federal candidates and officeholders are surely "grateful," *ante,* at 168, for positive media coverage. I doubt, however, the Court would seriously contend that we must defer to Congress' judgment if it chose to reduce the influence of political endorsements in federal elections.[3] See *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 247, 250 (1974) (holding unconstitutional a state law that required newspapers to provide "right to reply" to any candidate who was personally or professionally assailed in order to eliminate the "abuses of bias and manipulative reportage" by the press).

It is also true that any circumvention rationale ultimately must rest on the circumvention itself leading to the corruption of federal candidates and officeholders. See *Buckley, supra,* at 38 (upholding restrictions on funds donated to na-

---

no less likely that Congress would create rules that favor its Members' reelection chances, than be corrupted by the influx of money to its political parties, which may in turn be used to fund a portion of the Members' reelection campaigns.

[3] The Court's suggestion that the "close relationship" between federal officeholders and state and local political parties in some way excludes the media from its rationale is unconvincing, see *ante,* at 285, n. 16 (THOMAS, J., concurring in part, concurring in result in part, and dissenting in part), particularly because such a relationship may be proved with minimal evidence. Indeed, although the Court concludes that local political parties have a "close relationship" with federal candidates, thus warranting greater congressional regulation, I am unaware of *any* evidence in the record that indicates that local political parties have *any* relationship with federal candidates.

tional political parties "for the purpose of influencing any election for a Federal office" because they were prophylactic measures designed "to prevent evasion" of the contribution limit on *candidates*). All political speech that is not sifted through federal regulation circumvents the regulatory scheme to some degree or another, and thus by the Court's standard would be a "loophole" in the current system.[4] Unless the Court would uphold federal regulation of all funding of political speech, a rationale dependent on circumvention alone will not do. By untethering its inquiry from corruption or the appearance of corruption, the Court has removed the touchstone of our campaign finance precedent and has failed to replace it with any logical limiting principle.

But such an untethering is necessary to the Court's analysis. Only by using amorphous language to conclude a federal interest, however vaguely defined, exists can the Court avoid the obvious fact that new FECA §§ 323(a), (b), (d), and (f) are vastly overinclusive. Any campaign finance law aimed at reducing corruption will almost surely affect federal elections or prohibit the circumvention of federal law, and if broad enough, most laws will generally reduce some appearance of corruption. Indeed, it is precisely because·

---

[4] BCRA does not even close all of the "loopholes" that currently exist. Nonprofit organizations are currently able to accept, without disclosing, unlimited donations for voter registration, voter identification, and get-out-the-vote activities, and the record indicates that such organizations already receive large donations, sometimes in the millions of dollars, for these activities, 251 F. Supp. 2d 176, 323 (DC 2003) (Henderson, J., concurring in judgment in part and dissenting in part) (noting that the NAACP Voter Fund received a single, anonymous $7 million donation for get-out-the-vote activities). There is little reason why all donations to these nonprofit organizations, no matter the purpose for which the money is used, will deserve any more protection than the Court provides state parties if Congress decides to regulate them. And who knows what the next "loophole" will be.

broad laws are likely to nominally further a legitimate interest that we require Congress to tailor its restrictions; requiring all federal candidates to self-finance their campaigns would surely reduce the appearance of donor corruption, but it would hardly be constitutional. In allowing Congress to rely on general principles such as affecting a federal election or prohibiting the circumvention of existing law, the Court all but eliminates the "closely drawn" tailoring requirement and meaningful judicial review.

No doubt Congress was convinced by the many abuses of the current system that something in this area must be done. Its response, however, was too blunt. Many of the abuses described by the Court involve donations that were made for the "purpose of influencing a federal election," and thus are already regulated. See *Buckley, supra.* Congress could have sought to have the existing restrictions enforced or to enact other restrictions that are "closely drawn" to its legitimate concerns. But it should not be able to broadly restrict political speech in the fashion it has chosen. Today's decision, by not requiring tailored restrictions, has significantly reduced the protection for political speech having little or nothing to do with corruption or the appearance of corruption.

## II

BCRA § 504 amends § 315 of the Communications Act of 1934 to require broadcast licensees to maintain and disclose records of any *request* to purchase broadcast time that "is made by or on behalf of a legally qualified candidate for public office" or that "communicates a message relating to any political matter of national importance," including communications relating to "a legally qualified candidate," "any election to Federal office," and "a national legislative issue of public importance." BCRA § 504; 47 U. S. C. § 315(e)(1)

358

(Supp. II).[5] This section differs from other BCRA disclosure sections because it requires *broadcast licensees* to disclose *requests* to purchase broadcast time rather than requiring *purchasers* to disclose their *disbursements* for broadcast time. See, *e. g.*, BCRA § 201. The Court concludes that § 504 "must survive a *facial* attack under any potentially ap-

[5] Section 315(e), as amended by BCRA § 504, provides:

"Political record

"(1) In general

"A licensee shall maintain, and make available for public inspection, a complete record of a request to purchase broadcast time that—

"(A) is made by or on behalf of a legally qualified candidate for public office; or

"(B) communicates a message relating to any political matter of national importance, including—

"(i) a legally qualified candidate;

"(ii) any election to Federal office; or

"(iii) a national legislative issue of public importance.

"(2) Contents of record

"A record maintained under paragraph (1) shall contain information regarding—

"(A) whether the request to purchase broadcast time is accepted or rejected by the licensee;

"(B) the rate charged for the broadcast time;

"(C) the date and time on which the communication is aired;

"(D) the class of time that is purchased;

"(E) the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers (as applicable);

"(F) in the case of a request made by, or on behalf of, a candidate, the name of the candidate, the authorized committee of the candidate, and the treasurer of such committee; and

"(G) in the case of any other request, the name of the person purchasing the time, the name, address, and phone number of a contact person for such person, and a list of the chief executive officers or members of the executive committee or of the board of directors of such person.

"(3) Time to maintain file

"The information required under this subsection shall be placed in a political file as soon as possible and shall be retained by the licensee for a period of not less than 2 years."

plicable First Amendment standard, including that of heightened scrutiny." *Ante,* at 285 (opinion of BREYER, J.). I disagree.

This section is deficient because of the absence of a sufficient governmental interest to justify disclosure of mere requests to purchase broadcast time, as well as purchases themselves. The Court approaches § 504 almost exclusively from the perspective of the broadcast licensees, ignoring the interests of candidates and other purchasers, whose speech and association rights are affected by § 504. See, *e. g., ante,* at 236 (noting that broadcasters are subject to numerous recordkeeping requirements); *ante,* at 237 (opining that this Court has recognized "broad governmental authority for agency information demands from regulated entities"); *ante,* at 239 ("[W]e cannot say that these requirements will impose disproportionate administrative burdens"). An approach that simply focuses on whether the administrative burden is justifiable is untenable. Because § 504 impinges on core First Amendment rights, it is subject to a more demanding test than mere rational-basis review. The Court applies the latter by asking essentially whether there is any conceivable reason to support § 504. See *ibid.* (discussing the ways in which the disclosure "can help" the FCC and the public); *ante,* at 240 (noting that the "recordkeeping requirements seem likely to help the FCC" enforce the fairness doctrine).

Required disclosure provisions that deter constitutionally protected association and speech rights are subject to heightened scrutiny. See *Buckley,* 424 U. S., at 64. When applying heightened scrutiny, we first ask whether the Government has asserted an interest sufficient to justify the disclosure of requests to purchase broadcast time. *Ibid.;* see *ante,* at 196 (joint opinion of STEVENS and O'CONNOR, JJ.) (concluding that the important state interests the *Buckley* Court held justified FECA's disclosure requirements apply to BCRA § 201's disclosure requirement). But the Govern-

ment, in its brief, proffers no interest whatever to support § 504 as a whole.

Contrary to the Court's suggestion, *ante*, at 238 (opinion of BREYER, J.), the Government's brief does not succinctly present interests sufficient to support § 504. The two paragraphs that the Court relies on provide the following:

> "As explained in the government's brief in opposition to the motion for summary affirmance on this issue filed by plaintiff National Association of Broadcasters (NAB), longstanding FCC regulations impose disclosure requirements with respect to the sponsorship of broadcast matter 'involving the discussion of a controversial issue of public importance.' 47 C. F. R. 73.1212(d) and (e) (2002); see 47 C. F. R. 76.1701(d) (2002) (same standard used in disclosure regulation governing cablecasting). By enabling viewers and listeners to identify the persons actually responsible for communications aimed at a mass audience, those regulations assist the public in evaluating the message transmitted. See *Bellotti*, 435 U. S. at 792 n. 32 ('Identification of the source of advertising may be required . . . so that the people will be able to evaluate the arguments to which they are being subjected.').

> "The range of information required to be disclosed under BCRA § 504 is comparable to the disclosures mandated by pre-existing FCC rules. Compare 47 U. S. C. 315(e)(2)(G) (added by BCRA § 504), with 47 C. F. R. 73.1212(e) and 76.1701(d) (2002). Plaintiffs do not attempt to show that BCRA § 504's requirements are more onerous than the FCC's longstanding rules, nor do they contend that the pre-existing agency regulations are themselves unconstitutional. See generally 02–1676 Gov't Br. in Opp. to Mot. of NAB for Summ. Aff. 4–9. Because BCRA § 504 is essentially a codification of established and unchallenged regulatory requirements,

plaintiffs' First Amendment claim should be rejected." Brief for FEC et al. in No. 02–1674 et al., pp. 132–133.

While these paragraphs attempt to set forth a justification for the new Communications Act § 315(e)(1)(B), discussed below, I fail to see any justification for BCRA § 504 in its entirety. Nor do I find persuasive the Court's and the Government's argument that pre-existing unchallenged agency regulations imposing similar disclosure requirements compel the conclusion that § 504 is constitutional and somehow relieve the Government of its burden of advancing a constitutionally sufficient justification for § 504.

At oral argument, the Government counsel indicated that one of the interests supporting § 504 in its entirety stems from the fairness doctrine, Tr. of Oral Arg. 192, which in general imposes an obligation on licensees to devote a "reasonable percentage" of broadcast time to issues of public importance in a way that reflects opposing views. See *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969). Assuming, *arguendo,* this latter-day assertion should be considered, I think the District Court correctly noted that there is nothing in the record that indicates licensees have treated purchasers unfairly. 251 F. Supp. 2d, at 812 (Leon, J.). In addition, this interest seems wholly unconnected to the central purpose of BCRA, and it is not at all similar to the governmental interests in *Buckley* that we found to be "sufficiently important to outweigh the possibility of infringement," 424 U. S., at 66.

As to the disclosure requirements involving "any political matter of national importance" under the new Communications Act § 315(e)(1)(B), the Government suggests that the disclosure enables viewers to evaluate the message transmitted.[6] First, insofar as BCRA § 504 requires reporting of

---

[6] Communications relating to candidates will be covered by the new Communications Act § 315(e)(1)(A), so, in this context, we must consider, for example, the plaintiff-organizations, which may attempt to use the broadcast medium to convey a message espoused by the organizations.

"request[s for] broadcast time" as well as actual broadcasts, it is not supported by this goal. Requests that do not mature into actual purchases will have no viewers, but the information may allow competitors or adversaries to obtain information regarding organizational or political strategies of purchasers. Second, even as to broadcasts themselves, in this noncandidate-related context, this goal is a far cry from the Government interests endorsed in *Buckley*, which were limited to evaluating and preventing corruption of federal candidates. *Ibid.;* see also *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334, 354 (1995).

As to disclosure requirements with respect to candidates under the new Communications Act § 315(e)(1)(A), BCRA § 504 significantly overlaps with § 201, which is today also upheld by this Court, *ante,* at 194–202 (joint opinion of STEVENS and O'CONNOR, JJ.), and requires purchasers of "electioneering communications" to disclose a wide array of information, including the amount of each disbursement and the elections to which electioneering communications pertain. While I recognize that there is this overlap, § 504 imposes a different burden on the purchaser's First Amendment rights: as noted above, § 201 is limited to *purchasers'* disclosure of *disbursements* for electioneering communications, whereas § 504 requires *broadcast licensees'* disclosure of *requests* for broadcast time by purchasers. Not only are the purchasers' requests, which may never result in an actual advertisement, subject to the disclosure requirements, but § 504 will undoubtedly result in increased costs of communication because the licensees will shift the costs of the onerous disclosure and recordkeeping requirements to purchasers. The Government fails to offer a reason for the separate burden and apparent overlap.

The Government cannot justify, and for that matter, has not attempted to justify, its requirement that "request[s for] broadcast" time be publicized. On the record before this Court, I cannot even speculate as to a governmental interest

that would allow me to conclude that the disclosure of "requests" should be upheld.   Such disclosure risks, *inter alia,* allowing candidates and political groups the opportunity to ferret out a purchaser's political strategy and, ultimately, unduly burdens the First Amendment freedoms of purchasers.

Absent some showing of a Government interest served by § 504 and in light of the breadth of disclosure of "requests," I must conclude that § 504 fails to satisfy First Amendment scrutiny.

JUSTICE STEVENS, dissenting with respect to § 305.*

THE CHIEF JUSTICE, writing for the Court, concludes that the McConnell plaintiffs lack standing to challenge § 305 of the Bipartisan Campaign Reform Act of 2002 (BCRA) because Senator McConnell cannot be affected by the provision until "45 days before the Republican primary election in 2008." *Ante,* at 226.   I am not persuaded that Article III's case-or-controversy requirement imposes such a strict temporal limit on our jurisdiction.   By asserting that he has run attack ads in the past, that he plans to run such ads in his next campaign, and that § 305 will adversely affect his campaign strategy, Senator McConnell has identified a "concrete," "'distinct,'" and "actual" injury, *Whitmore* v. *Arkansas,* 495 U. S. 149, 155 (1990).   That the injury is distant in time does not make it illusory.

The second prong of the standing inquiry—whether the alleged injury is fairly traceable to the defendants' challenged action and not the result of a third party's independent choices†—poses a closer question.   Section 305 does not *require* broadcast stations to charge a candidate higher rates for unsigned ads that mention the candidate's opponent. Rather, the provision simply permits stations to charge their normal rates for such ads.   Some stations may take advan-

---

*JUSTICE GINSBURG and JUSTICE BREYER join this opinion in its entirety.

† *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560–561 (1992).

tage of this regulatory gap and adopt pricing schemes that discriminate between the kind of ads that Senator McConnell has run in the past and those that strictly comply with § 305. It is also possible, however, that instead of incurring the transaction costs of policing candidates' compliance with § 305, stations will continue to charge the same rates for attack ads as for all other campaign ads. In the absence of any record evidence that stations will uniformly choose to charge Senator McConnell higher rates for the attack ads he proposes to run in 2008, it is at least arguable that his alleged injury is not traceable to BCRA § 305.

Nevertheless, I would entertain plaintiffs' challenge to § 305 on the merits and uphold the section. Like BCRA §§ 201, 212, and 311, § 305 serves an important—and constitutionally sufficient—informational purpose. Moreover, § 305's disclosure requirements largely overlap those of § 311, and plaintiffs identify no reason why any candidate already in compliance with § 311 will be harmed by the marginal additional burden of complying with § 305. Indeed, I am convinced that "the important governmental interest of 'shed[ding] the light of publicity' on campaign financing," invoked above in connection with § 311, *ante*, at 231 (opinion of REHNQUIST, C. J.), would suffice to support a legislative provision expressly requiring all sponsors of attack ads to identify themselves in their ads. That § 305 seeks to achieve the same purpose indirectly, by withdrawing a statutory benefit, does not render the provision any less sound.

Finally, I do not regard § 305 as a constitutionally suspect "viewpoint-based regulation." Brief for Appellant/Cross-Appellee Sen. Mitch McConnell et al. in No. 02–1674 et al., p. 67. Like BCRA's other disclosure requirements, § 305 evenhandedly regulates speech based on its electioneering content. Although the section reaches only ads that mention opposing candidates, it applies equally to all such ads. Disagreement with one's opponent obviously expresses a

"viewpoint," but § 305 treats that expression exactly like the opponent's response.

In sum, I would uphold § 305.